IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| In re: | Chapter 11 |
| COLORADO NATIONAL BANCORP, EIN: 84-0847337 | Case No. 17-20315 EEB |
| Debtor. | |

**DEBTOR'S MOTION FOR ENTRY OF ORDERS (I) (A) ESTABLISHING BIDDING PROCEDURES RELATING TO THE SALE OF THE DEBTOR'S EQUITY INTERESTS IN NON-DEBTOR SUBSIDIARY; (B) ESTABLISHING PROCEDURES RELATING TO THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES RELATED TO THE EQUITY INTERESTS; (C) APPROVING BIDDING PROTECTIONS FOR THE STALKING HORSE BIDDERS; AND (D) SCHEDULING A HEARING TO CONSIDER THE PROPOSED SALE AND ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES AND APPROVING THE FORM AND MANNER OF NOTICE THEREOF AND (II) (A) APPROVING THE PROPOSED SALE; (B) APPROVING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES AND (C) GRANTING RELATED RELIEF**

Colorado National Bancorp (the "Debtor"), hereby files this motion (the "Motion") under sections 105(a), 363 and 365 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Colorado (the "Local Rules") for entry of an order substantially in the form annexed hereto as **Exhibit A** (the "Bidding Procedures Order"): (i) approving the proposed bidding procedures (the "Bidding Procedures")[1]; (ii) approving certain notice procedures with respect to the Sale (as defined below); (iii) establishing procedures for the assumption and assignment of executory contracts and unexpired leases related to the Equity Interests (as defined below); (iv) approving the Break-Up

---

[1] A copy of the proposed Bidding Procedures is attached to the Bidding Procedures Order as **Exhibit 1**.

Fee and Expense Reimbursement, as defined below, for Marks Moskvins and Maksims Jarosevskis, who serve as the "stalking horse" bidders (in such capacity, collectively, the "Stalking Horse Bidders"); (v) scheduling a hearing (the "Sale Hearing") to approve a sale (as described more fully below, the "Sale") of the Purchased Assets (as defined below) and assumption and assignment of executory contracts and unexpired leases and approving the form and manner of notice thereof; and (vi) granting related relief (the "Bidding Procedures Relief").

The Debtor also hereby moves the Court, pursuant to Bankruptcy Code sections 105, 363 and 365 and Bankruptcy Rules 2002, 6004,  and 6006 for entry of an order substantially in the form annexed hereto as **Exhibit B** (the "Sale Order"): (i) authorizing the Sale of the Purchased Assets (as defined below) free and clear of all liens, claims, interests, and encumbrances; (ii) authorizing the Debtor to assume and assign executory contracts and unexpired leases related to the Purchased Assets (as defined below) to the Successful Bidder (as defined below); and (iii) granting related relief (collectively, the "Sale Relief").[2]  In support of this Motion, the Debtor respectfully represents as follows:

<u>**JURISDICTION**</u>

1.      This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A), (M), (N), and (O).  Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory predicates for the relief requested herein are sections 105(a), 363, and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, and 6006 and Local Rule 6004-1.

---

[2]      This Motion contains the Debtor's request for approval of both the Bidding Procedures Relief and the Sale Relief.  The Debtor is seeking approval of the Bidding Procedures Relief at the initial hearing to be conducted on this Motion; the Sale Relief is requested to be considered at the Sale Hearing.

## BACKGROUND

3.      On November 8, 2017 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

4.      The Debtor is operating its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No creditors' or other committee has been formed.

5.      The Debtor, a Delaware corporation, is a holding company for its non-debtor subsidiary Colorado National Bank ("Bank"), a national banking association which provides banking products and services to businesses and consumers in Colorado and surrounding states.  The Debtor owns 100% of the capital stock (the "Equity Interests") of the Bank.

### *OCC Enforcement Action*

6.      The Bank is subject to regulatory oversight by the Office of the Comptroller of the Currency (the "OCC").

7.      On May 31, 2016, the Bank became subject to an enforcement action by the OCC based on "unsafe and unsound banking practices relating to the Bank's capital, Comprehensive Business Plan, corporate governance, credit administration, trust administration, and Bank Secrecy Act/Anti-Money Laundering compliance program."  A formal agreement with the OCC arising from the enforcement action significantly restricts the Bank's business by imposing capital requirements significantly in excess of regulatory minimum requirements; prohibiting the Bank from declaring or paying a dividend without obtaining non-objection from the OCC; prohibiting the Bank from deviating from an OCC-approved business plan; requiring

extensive and frequent reporting to the OCC; imposing concentration limits for certain assets; and designating the bank to be in "troubled condition" and to not be an "eligible bank" for purposes of OCC regulations.

8.     As a consequence of the agreement with the OCC:

- Before appointing a director or senior executive officer, prior notice to the OCC is required under 12 C.F.R. 5.51, and the OCC will have the opportunity to object to the appointment.
- The Bank is deemed to not be "well capitalized" under the OCC's prompt corrective action regulations, 12 C.F.R. Part 6, which results in restrictions on, among other things, the Bank's ability to take brokered deposits and establish subsidiaries.
- The Bank cannot receive expedited processing for corporate applications to the OCC under 12 C.F.R. Part 5.
- The Bank is subject to limitations on indemnification payments and golden parachute payments under 12 C.F.R. Part 359.

### *Noteholder Litigation*

9.     From January 1, 2013 to November 19, 2013 the debtor incurred unsecured loan obligations under promissory notes in an aggregate outstanding principal amount of $4,700,428.00.  The Debtor has no secured debt.

10.     The holders (the "Plaintiff Noteholders") under eleven of the promissory notes, representing a principal amount of $2,868,416.00 of all the notes issued during this time frame (the "Plaintiff Notes"), on or about June 23, 2016, commenced a collection action against the Debtor in the District Court for the City and County of Denver, Colorado, styled *Charles Burger, et al., v. Colorado National Bancorp*, case no. 2016 CV 32240 (the "State Court Action").

11.     On August 31, 2016, Plaintiffs filed their First Amended Complaint on Promissory Notes (the "Complaint").  By the Complaint, the Plaintiff Noteholders sought a money judgment against the Debtor because of the Debtor's default under the Plaintiff Notes.

On January 11, 2017,, the state court entered summary judgment in favor of Plaintiffs in the aggregate principal amount of $4,012,756.36, plus  $210,534.02 in aggregate interest accrued from August 15, 2016 through the date of entry of judgment, for a total judgment amount of $4,223,290.38 (the "Judgment").  On March 6, 2017, the state court awarded the Plaintiff' Noteholders their attorney's fees in the aggregate amount of $28,603.50 and costs in the aggregate amount of $716.61, for a total fees and costs award in the amount of $29,320.11.

12.     Since entry of the Judgment and the award of attorney's fees, the Plaintiff Noteholders have pursued enforcement proceedings against the Debtor and sought to seize the Equity Interests in satisfaction of their claims.  The Debtor believes that on August 11 and August 14, 2017, the court entered writs of execution and garnishment respectively against the Debtor.  Most recently, on November 1, 2017, the Plaintiff Noteholders filed a motion in the State Court Action to compel the Debtor to turn the Equity Interests over to the registry of the state court and to enjoin the Debtor from transferring the Equity Interests to any person or entity other than the state court's registry or the Plaintiff Noteholders' counsel.

13.     To prevent the seizure of the Equity Interests and to ensure the continuance of the Debtor's and the Bank's operations, and to enable the infusion of additional capital into the Bank, the Debtor filed this chapter 11 case to facilitate the sale of the Equity Interests to a well-funded buyer.

### *Prepetition Marketing Efforts*

14.     The Debtor has been engaged in efforts to reorganize the Debtor through a recapitalization, sale, or merger of the Debtor and/or the Bank since around June of 2015.  By October 2015, it became apparent that the Debtor would not be able to raise additional equity capital to inject into the Bank due to the Bank's inability to obtain regulatory non-objection to its

business plan, the Debtor has since directed its efforts towards a sale or merger of the Bank. As part of this effort, the Debtor solicited offers from potential transaction partners and engaged in discussions with Debtor's noteholders regarding potential reorganization transaction structures. In January 2016 Atlantic Merchant Capital Advisors, LLC ("AMCA") was hired to solicit offers and provide advisory services to the Debtor's board of directors (the "Board") in evaluating potential transactions. In addition, the Debtor also solicited offers from potential transaction partners and engaged in discussion with certain of the Debtor's noteholders on potential reorganization structures.

15.     In December of 2015, the Debtor received a letter of intent from a group comprising certain of the Noteholders for a proposed reorganization/recapitalization transaction. This proposal was reviewed by the Board but rejected because it contained an unreasonable break-up fee, did not contain sufficient details on a business plan for the Bank to assess the potential value of the offer, and was subject to significant execution risks related to regulatory approval and sources of capital.

16.     AMCA initially identified fifty-two potential buyers or merger partners based upon their known desire to acquire another financial institution, their financial capacity, and their geographic location. In addition, the Debtor's management solicited several other potential merger partners. Of the fifty-two potential buyers or merger partners, fifteen signed non-disclosure agreements and were granted access to due diligence materials necessary to formulate indications of interest. AMCA and management of the Debtor proposed March 25, 2016 as the due date for interested parties to submit indications of interest. Only two indications of interest were received. Several interested parties declined to put in offers citing regulatory

uncertainty, and two declined due to the current regulatory limitations on the Bank's SBA lending activities.

17. The Board engaged in extensive discussions with one interested party, but the ultimate offer required 100% of the noteholders to convert their debt to equity. This would represent approximately a forty-five percent (45%) interest in the recapitalized entity and represent about a ten percent (10%) discount on the principal amount of the promissory notes. The Board noted that obtaining 100% consent of noteholders presented a significant hurdle to consummating this transaction and was not within the control of the Board or the Debtor. Further, the Board expressed concern regarding the timing and feasibility for gaining regulatory approval of this transaction as proposed. The Debtor engaged in on-going discussions with the potential purchaser over the course of several months and requested information regarding the potential purchaser's business plan, pro-formas, and sources of capital in order to evaluate the potential value of the proposal, but the potential purchaser failed to produce these items.

18. The Debtor continued to solicit offers throughout the remainder of 2016 and did not receive any further indications of interest other than a letter of intent received in November 2016. The letter of intent required an exclusivity period, a diligence fee of $50,000.00 to be paid by the Debtor, and required implementation of the transaction through a pre-packaged bankruptcy. In addition, the proposal required the Debtor to secure a conversion threshold of ninety percent (90%) of the outstanding debt into equity or, alternatively, the noteholders would be paid cash at fifty percent (50%) of principal. The proposal did not include any proof of the source of funds to support the proposed transaction, which would involve a subsequent and simultaneous recapitalization of the Bank. The Debtor engaged in on-going negotiations with the potential purchaser and received an offer from a third-party bank holding

company that had been introduced to the opportunity by the potential purchaser while soliciting capital.  On March 31, 2017, the Debtor received an offer from the bank holding company to purchase 100% of the stock of the Bank.  This offer presented the least execution risk of any proposed transactions to that date, but was for a purchase price of $3.0 million, a substantial discount to the book value of the Bank.  The Debtor forwarded the offer to the Noteholders, who formally rejected the offer in April of 2017.

19.     Throughout the prepetition marketing period, the Debtor and Plaintiff Noteholders discussed settlement of the State Court Action. On or about May 19, 2017, the Debtor and Plaintiff Noteholders entered into a non-binding proposal pursuant to which the reorganization of the Debtor, including a $3.0 million equity infusion, would be implemented under a prepackaged bankruptcy plan.  Under the proposal, all of the Debtor's noteholders would have to agree to convert into fully diluted ownership of the Debtor based upon all amounts due and outstanding and all warrants and options under any convertible notes would be extinguished. Further, the Plaintiff Noteholders were to be paid all their attorney's fees in cash.  The Debtor's and Bank's executive management were to resign to be replaced by candidates proposed by the Plaintiff Noteholders with such resignations and appointments subject to the approval by the OCC and Federal Reserve Board and the Federal Reserve Bank of Kansas City (the "FRB").

### *The Stalking Horse Bid*

20.     In July of 2017, the Debtor received a letter of intent from the Stalking Horse Bidders for the purchase of 100% of the stock of the Bank for cash at tangible book value. The Board and management concluded that this offer was financially and otherwise superior to any offer received in the roughly two years that the Debtor had been seeking to sell, merge, or

recapitalize the Bank.  As finally negotiated, as further described below, the bid received from the Stalking Horse Bidders included the injection of new capital into the Bank.

21.     A stock purchase agreement (collectively with all exhibits and schedules, the "Stalking Horse SPA"), dated as of November 8, 2017, has been entered into between the Debtor and the Stalking Horse Bidders.[3]  The Stalking Horse SPA contemplates, among other things, a sale of the Debtor's right, title and interests in the Equity Interests and an assumption and assignment of certain executory contracts and unexpired leases[4] to the Stalking Horse Bidders or their designee.  Importantly, the Stalking Horse SPA requires the Purchasers to contribute significant capital to support the Bank, in addition to the cash purchase price that that is being paid to the Debtor for the Equity Interests.  A copy of the Stalking Horse SPA is attached hereto as **Exhibit C**.

22.     As is customary in a sale transaction under section 363 of the Bankruptcy Code, the Stalking Horse SPA permits the Debtor to consider certain higher or otherwise better competing bids (each a "Competing Bid") by certain overbidders ("Competing Bidders").  The Stalking Horse Bidders have agreed to set the "floor" price for Competing Bidders to outbid by serving as a "stalking horse" bidder in the bankruptcy auction process.

23.     In consideration for serving as the stalking horse bidder, if a Competing Bid is ultimately selected as the winning bid at the auction, or upon termination of the Stalking Horse SPA (provided that the Stalking Horse Bidders are not in material breach thereof), the Stalking Horse Bidders will be entitled to (i) a break-up fee in the amount of $250,000.00 (the

---

[3]     The bid of the Stalking Horse Bidders as set forth in the Stalking Horse SPA is referred to herein as the "Stalking Horse Bid".

[4]     The Equity Interests and the other assets to be acquired by way of the Stalking Horse SPA are collectively referred to herein as the "Purchased Assets".

"Break-Up Fee"), and (ii) an expense reimbursement of up to $250,000.00 in certain circumstances (the "Expense Reimbursement").

24.     In accordance with the terms of the Stalking Horse SPA and as provided in the Bidding Procedures, the Debtor, with the assistance of its professionals will continue to market the Purchased Assets to parties that the Debtor believes may have an interest in purchasing such assets under the Bidding Procedures.

25.     Any Sale of the Purchased Assets will require regulatory approval from the OCC.  The Debtor informed the OCC and FRB, prior to the Petition Date, that it would be filing chapter 11 and has provided the OCC and FRB with copies of the Voluntary Petition and the Stalking Horse SPA.  Neither the OCC nor FRB has voiced objections to the bankruptcy filing.

## RELIEF REQUESTED

26.     By this Motion, the Debtor seeks entry of the Bidding Procedures Order granting the Bidding Procedures Relief, which includes, (i) approving the Bidding Procedures to be used to solicit the highest or otherwise best offer for the Purchased Assets; (ii) approving certain notice procedures with respect to the Sale; (iii) establishing procedures for the assumption and assignment of executory contracts and unexpired leases related to the Purchased Assets; (iv) establishing procedures for the conduct of the Auction; (v) approving the Break-Up Fee and Expense Reimbursement; and (vi) scheduling the Sale Hearing and associated deadlines relating thereto.

27.     By this Motion, the Debtor also seeks approval of the successful bid after completion of the bidding process and Auction if needed, or absent an Auction, approval of the

Stalking Horse SPA.  The Motion seeks the customary relief in connection with the Sale of the Purchased Assets free and clear of liens, claims and encumbrances.

28.     Following completion of the Sale process, the Debtor intends to request entry of a Sale Order: (i) approving the Sale of the Purchased Assets free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options and interests thereon and there against (collectively, the "Liens") (with such Liens attaching to the proceeds of sale (excluding, for the avoidance of doubt, the Equity Contribution) in the same order of priority and to the same extent as such Liens were valid, perfected and enforceable prior to entry of the Sale Order), to the Successful Bidder; and (ii) authorizing the Debtor to assume and assign certain executory contracts and unexpired leases related to the Purchased Assets to the Successful Bidder (as defined below) after the Closing Date (as defined below).

**The Proposed Bidding Procedures**

29.     The Debtor seeks approval of the Bidding Procedures, which have been designed to be flexible and open to all bids for the Purchased Assets in order to facilitate a robust sales process thereby generating the greatest value for the Debtor's estate.

30.     The Debtor proposes the following timeline for solicitation of bids, the Sale, and Sale Hearing:

     i.   Hearing to Consider Entry of Bidding Procedures Order: On or before December 6, 2017.

     ii.   Bid Deadline: 21 days after the Bidding Procedures Order is entered by 5:00 p.m. (Prevailing MT).

     iii.   Auction (if necessary):[5] 7 days after the Bid Deadline.

     iv.   Proposed Sale Objection Deadline:  3 days after the scheduled date of the Auction.

---

[5]     As set forth in the Bidding Procedures, an auction will only be held if there is one or more Qualified Bidder (as defined below), other than the Stalking Horse Bidders.

      v. <u>Proposed Sale Hearing</u>:  35 days after entry of the Bidding Procedures Order.

31.    The Bidding Procedures describe, among other things, the requirements and manner in which bidders and bids become "qualified," the coordination of due diligence efforts, the receipt and negotiation of bids received, and the selection and approval of any ultimately successful bidders (the "<u>Bidding Process</u>").

32.    Set forth below is a summary of certain key terms of the Bidding Procedures:[6]

      i. <u>Due Diligence</u>:  To participate in the Bidding Process and receive access to due diligence, a party must submit to the Debtor (i) an executed confidentiality agreement in form and substance reasonably acceptable to the Debtor and the Stalking Horse Bidders; and (ii) reasonable evidence demonstrating the party's financial capability to consummate a sale transaction for the Purchased Assets, including the ability to recapitalize the Bank by making the Equity Contribution (as defined in the Stalking Horse SPA.)  A party who qualifies for access to Diligence Materials shall be an "<u>Interested Bidder</u>."  The Debtor will afford any Interested Bidder the time and opportunity to conduct reasonable due diligence under the time constraints; <u>provided</u>, <u>however</u>, that the Debtor shall not be obligated to furnish any due diligence information after the Bid Deadline.

      ii. <u>Scope of Bid</u>:  A Bid must be for the all of the Debtor's Equity Interests in the Bank.  Any Bid which seeks to purchase less than all of the Equity Interests will not be considered by the Debtor.

      iii. <u>Participation and Bid Requirements</u>: To ensure that only bidders with a serious interest in purchasing the Purchased Assets participate in the Bidding Process, the Bidding Procedures provide for certain minimal requirements for a potential bidder to become a "<u>Qualified Bidder</u>."  These requirements, which are set forth more fully in the Bidding Procedures, include (i) execution of a confidentiality agreement before participating in the due diligence process; (ii) providing the Debtor with certain corporate information regarding the bidder and certain financial assurances as to such bidder's ability to close a transaction for the Purchased Assets and such bidder's ability to obtain required regulatory approvals acceptable to the Debtor in all respects; (iii) submission of a

---

[6]    This is meant to be summary in nature only.  In the event of any inconsistencies between this summary and the Bidding Procedures, the terms of the Bidding Procedures shall control.

binding proposal regarding the Purchased Assets, the consideration to be paid, and binding, executed transaction documents that contain substantially similar terms to the Stalking Horse SPA, and a copy of a redline reflecting all of the changes to the Stalking Horse SPA requested by the Qualified Bidder; and (iv) a good faith deposit in the amount of $600,000.00.  The Stalking Horse Bid is to be considered a Qualified Bid and the Stalking Horse Bidders are to be considered a Qualified Bidder for all purposes and requirements pursuant to the Bidding Procedures, and shall be deemed to have satisfied all of the requirements that a Bidder must satisfy to be a Qualified Bidder under the Bidding Procedures.

iv.   The Auction:  If at least one Qualified Bid other than that of the Stalking Horse Bidders is received by the Bid Deadline, the Debtor will hold an auction (the "Auction") on **7 days after Bid Deadline** at the offices of Jackson Kelly PLLC, 1099 18th St., Suite 2150, Denver, CO 80202.  Only Qualified Bidders who have submitted Qualified Bids and their representatives and counsel may participate in the Auction.  If the Debtor does not receive any Qualified Bids other than the Stalking Horse Bid: (a) the Debtor will not hold an Auction; (b) the Stalking Horse Bid will be the Successful Bid and the Stalking Horse Bidders will be named the Successful Bidder; and (c) the Debtor will proceed to request at the Sale Hearing (as defined below) that the Court approve the Sale in accordance with the Stalking Horse SPA, including that the Sale Order be entered by the Court and that the Sale Order shall be made immediately effective upon entry, notwithstanding the provisions of Rule 6004(h) of the Bankruptcy Rules.  Only the Debtor, the Stalking Horse Bidders and any other Qualified Bidder, in each case along with their respective representatives and counsel may attend the Auction (such attendance to be in person) and only the Stalking Horse Bidders and any other such Qualified Bidders will be entitled to make any bids at the Auction.

v.   Selection of Successful Bid: At the conclusion of the auction, the Debtor, in consultation with its professionals, will determine the highest or otherwise best Qualified Bid for the Purchased Assets (the "Successful Bid" and, the Bidder submitting such Successful Bid, the "Successful Bidder") and the next highest or next best Qualified Bid (the "Backup Bidder").

vi.   Evaluation of Qualified Bids: The determination of which Qualified Bid is to be selected as the Successful Bid will take into account any factors the Debtor reasonably deems relevant to the value of the Qualified Bid to the Estates and may include, but are not limited to, the following:  (a)  the amount of the consideration and the resulting recovery to holders of general unsecured claims; (b) the number, type and nature of any changes to the Stalking Horse SPA requested by each bidder; (c) the extent to which such modifications are likely to delay closing of the Sale of the

Purchased Assets and the cost to the Debtor of such modifications or delay; (d) the total consideration to be received by the Debtor, including the assumption of any liabilities of the Debtor; (e) the bidder's ability to close a transaction and the timing thereof; (f) the bidder's ability to meet regulatory requirements, and otherwise receive regulatory approval of the proposed sale transaction; and (g) the net benefit to the Debtor.

vii. <u>Sale Hearing</u>: The Debtor requests that a Sale Hearing take place 35 days after the entry of the Bidding Procedures Order.

33.     The contemplated sale under the Stalking Horse SPA is not to an insider and the procedures provide that any potential bidders at the Auction must confirm that it has not engaged in any collusion with respect to the bidding or the Auction.  The closing under the Stalking Horse SPA is scheduled to occur after certain conditions have been met including receipt of the necessary regulatory approvals (§ 6.1(g) of the Stalking Horse SPA).  The Stalking Horse SPA terminates if closing has not occurred by September 8, 2018 except either party may extend this outside date for 120 days if the only remaining condition to be completed is receipt of the regulatory approvals.  The Bidding Procedures also describe how and when deposits will be returned.

**The Proposed Sale Notice Procedures**

34.     <u>Notice of Sale Hearing</u>.  On the date the notice of motion and hearing of this Motion is filed, the Debtor caused this Motion and all exhibits hereto, including the Stalking Horse SPA, the Bidding Procedures and a copy of the proposed Bidding Procedures Order, by first-class mail, postage prepaid, to be served upon (i) the Office of the United States Trustee for the District of Colorado; (ii) the OCC; (iii) any party known or reasonably believed to have asserted any lien, claim or encumbrance or other interest in the Purchased Assets; (iv) any party known or reasonably believed to have expressed an interest in acquiring some or substantially all of the Purchased Assets; (v) the Internal Revenue Service; (vi) counsel for the Plaintiff

Noteholders; and (vii) any other party entitled to notice pursuant to Bankruptcy Rule 2002 and Local Rule 9013-1(b) ("Sale Notice Parties").  Such notice shall be sufficient and proper notice of the Sale with respect to known interested parties.

35.     Notice of Sale.  Within three (3) days of the entry of the Bidding Procedures Order or as soon thereafter as practicable, the Debtor shall cause to be served, by first-class mail, postage prepaid, a sale notice (the "Notice of Auction and Sale") setting forth, among other things, the dates established for submission of Qualified Bids, the Auction and the Sale Hearing, substantially in the form attached to the Bidding Procedures Order as **Exhibit 2**, upon the Sale Notice Parties.

36.     Post-Auction Notice. No later than one business day after the conclusion of the Auction, the Debtor shall file, but not serve, a notice identifying the Successful Bidder and attaching such Successful Bidder's stock purchase agreement.

**The Proposed Notice of Assumption and Assignment of Contracts**

37.     As part of the Sale, the Debtor seeks authority to assume and assign certain executory contracts and unexpired leases related to the Purchased Assets to the Successful Bidder (the "Assumed Contracts" and "Assumed Leases," respectively)

38.     With respect to any Assumed Contract or Assumed Lease, the Debtor will file with the Court and serve on each party to such Assumed Contract or Assumed Lease a notice substantially in the form annexed to the Bidding Procedures Order as **Exhibit 3** (the "Cure Notice") setting forth the amount of cure owed thereunder according to the Debtor's books and records.  The Cure Notice shall be filed and served within one day of the Auction.  The Cure Notice shall state (i) the cure amount that the Debtor believes is necessary to assume such contract or lease pursuant to the Bankruptcy Code section 365 (the "Cure Amount"), (ii) notify

each party that such party's contract shall be assumed and assigned to the Successful Bidder, and (iii) state the deadline by which the non-Debtor party shall file an objection (a "Cure Objection") to the Cure Amount (the "Cure Objection Deadline").

39.     Any objection to the Cure Amount must (i) be in writing; (ii) conform to the applicable provisions of the Bankruptcy Rules and the Local Rules for the United States Bankruptcy Court for the District of Colorado; and (iii) state with specificity what cure the party to the Assumed Contract or Assumed Lease believes is required with appropriate documentation in support thereof.  If no objection is timely received, the Cure Amount set forth in the Cure Notice shall be controlling notwithstanding anything to the contrary in any Assumed Contract or Assumed Lease or other document as of the date of the Cure Notice.  Any objections not resolved between the parties shall be set for a hearing as fixed by the Court.

40.     Any counterparty to any Assumed Contract or Assumed Lease who does not file a Cure Objection by the Cure Objection Deadline, shall be forever barred and estopped from objecting to the Cure Amount or asserting or claiming against the Debtor or any Successful Bidder that any Cure Amount (other than the Cure Amount listed on the Cure Notice) is due or any condition to assumption and assignment must be satisfied under such Assumed Contract or Assumed Lease.

41.     Any objection to the assumption and assignment of any Assumed Contract or Assumed Lease to the Successful Bidder ("Assumption and Assignment Objection"), including any objection based on lack of adequate assurance of performance of the contract or lease by the Successful Bidder must be filed by within seven (7) days of the filing of the Cure Notice.  Any Assumption and Assignment Objection must (i) be in writing; (ii) conform to the applicable provisions of the Bankruptcy Rules and the Local Rules for the United States

Bankruptcy Court for the District of Colorado; and (iii) state with specificity the legal and factual basis for such objection.

42.     Any counterparty to an Assumed Contract who does not file a timely objection Assumption and Assignment Objection shall be deemed to have consented to the assumption and assignment of its Assumed Contract or Assumed Lease to the Successful Bidder and will be forever barred and estopped from objecting to such assumption and assignment on account of the Cure Amount, lack of adequate assurance or any other grounds.

## BASIS FOR RELIEF REQUESTED

A.      **Entry Of The Bidding Procedures Order Is Necessary And Appropriate Under The Facts And Circumstances Of This Case.**

*The Bidding Procedures Are Fair and Are Designed to Maximize the Value Received for the Assets*

43.     The Debtor respectfully submits that the Bidding Procedures will maximize the value received for the Purchased Assets by enhancing competitive bidding. Courts in the Tenth Circuit have approved of bidding procedures when they provide a benefit to the estate by maximizing the value of the debtor's assets.  See, e.g., *In re Castre, Inc.,* 312 B.R. 426, 429 (Bankr. D. Colo. 2004) (applying the business judgment rule to approval of bidding procedures); *In re Psychrometric Sys.,* 367 B.R. 670, 674 (Bankr. D. Colo. 2007).  The Debtor submits that the Bidding Procedures are appropriate to ensure that the bidding process is fair and reasonable and will yield the maximum value for its stakeholders.  Among other things, the Bidding Procedures (i) provide potential bidders with sufficient notice and an opportunity to acquire information necessary to submit a timely and informed bid, especially given the substantial marketing described above, (ii) are designed to maximize the value received for the Purchased Assets by facilitating a competitive bidding process in which all potential bidders are encouraged to participate and submit competing bids, and (iii) will provide the Debtor with the

opportunity to consider all competing offers and to select the highest or otherwise best offer for the Sale of substantially all of the Purchased Assets.  Moreover, the Bidding Procedures contain salient features—including bid deadlines, auction procedures, and bid criteria—that are largely consistent with, or more inclusive than, other procedures previously approved by courts in this and other districts.

44.     A debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling assets of the estate.  *See, e.g., In re Castre, Inc.*, 312 B.R. 426, 430 (Bankr. D. Colo. 2004); *In re Integrated Resources, Inc.,* 147 B.R. 650, 656–7 (S.D.N.Y. 1992) (bidding procedures are to be reviewed according to the "business judgment" standard, under which such procedures and arrangements are "presumptively valid").  And, when a debtor's sound business judgment dictates it, a bankruptcy court can authorize the sale of all of the debtor's assets pursuant to §363(b)(1) prior to plan confirmation.  *Stephens Indus. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986) ("[A] bankruptcy court can authorize a sale of all a Chapter 11 debtor's assets under § 363(b)(1) when a sound business purpose dictates such action.").  There is no reason for this Court to treat these Bidding Procedures any differently.  Like those approved in other cases, the Bidding Procedures that the Debtor proposes will help maximize the value received for the Purchased Assets and, thus, maximize the value of the Debtor's estate.

45.     Additionally, Bankruptcy Code section 105(a) provides a bankruptcy court with broad powers in the administration of a case so that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  Further, pursuant to section 105(a), a court may fashion an order or decree that helps preserve or protect the value of a debtor's assets.  *See, e.g., Chinichian v. Campolongo*

*(In re Chinichian)*, 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code.").

46.     Accordingly, the Debtor requests this Court's approval of the Bidding Procedures, including the dates established thereby for an Auction and a Sale Hearing.  All parties-in-interest can be assured that the consideration for the Assets will be fair and reasonable, and there are sound business reasons to approve the Bidding Procedures.

47.     In the event one or more Qualified Bids are received by the Bid Deadline, the Debtor may select the highest and/or best Qualified Bid(s) for some or all of the Purchased Assets after conducting an auction.   **ALL BID(S) SHALL BE SUBJECT TO THE APPROVAL OF THE BANKRUPTCY COURT.**

48.     Given the current circumstances of these cases, the Debtor believes that implementation of a prompt sale process is the best way to maximize the value of the Purchased Assets.  Prompt entry of the Bidding Procedures Order will permit the Sale process contemplated by the Bidding Procedures to begin as expeditiously as possible.

***The Break-Up Fee and Expense Reimbursement are Necessary to Maximize the Value of the Debtor's Estate.***

49.     In the Tenth Circuit, bid protections are considered reasonable administrative expenses and, therefore, the payment of such fees must provide a postpetition benefit to the bankruptcy estate.  *See O'Brien,* 191 F.3d at 533.  To that end, courts recognize that bid protections intended to enhance competitive bidding, such as break-up fees and expense reimbursements are consistent with the goal of maximizing the value received by the estate and, therefore, are appropriate in the context of bankruptcy sales.  *See O'Brien*, 181 F.3d at 536-37; *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*,

147 B.R. 650, 659 (S.D.N.Y. 1992) ("Break-up fees are important tools to encourage bidding and to maximize the value of the debtor's assets"); *In re Twenver, Inc.* 149 B.R. 954, 956 (Bankr. D. Colo. 1992) (adopting and applying *Integrated Resources* in the context of approval of breakup fees).  Courts have also recognized that if the availability of break-up fees and expense reimbursements were to induce a bidder to research the value of the debtor and convert the value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth.  *See O'Brien*, 181 F.3d at 537; *see also Reliant Energy Channelview LP v. Kelson Channelview LLC*, 594 F.3d 200, 206-07 (3d Cir. 2010).

50.     In *Twenver*, the Colorado Bankruptcy court reviewed the following three factors set forth by the lower court as relevant in deciding whether to award a break-up fee:  (1) whether the relationship of the parties who negotiated the fee is marked by self-dealing or manipulation; (2) whether the fee hampers, rather than encourages, bidding; and, (3) whether the amount of the fee is reasonable in relation to the proposed purchase price.  *In re Twenver, Inc., 149 B.R. at 956.*

51.     By participating in negotiations for a potential transaction and entering into the Stalking Horse SPA, the Stalking Horse Bidders have established a bid standard, including a price floor, and initiated a legitimate sale process which the Debtor hopes will serve as a catalyst for other bidders.  The price floor established by the Stalking Horse Bidders enables the Debtor to insist that insist that competing bids be materially higher or otherwise better than the Stalking Horse Agreement—a clear benefit to the Debtor's estate.  Without the Break-Up Fee and the Expense Reimbursement, the Debtor might lose the opportunity to obtain the highest or otherwise best offer for the Purchased Assets and would certainly lose the downside protection

that will be afforded by the existence of the Stalking Horse Bidders.  The bid of the Stalking

Horse Bidders sends a message to all potential bidders that the Purchased Assets are at least

worth the purchase price in the Stalking Horse SPA.  Therefore, without the benefit of the bid of

the Stalking Horse Bidders, the bids received at auction for the Purchased Assets could be

substantially lower than the bid offered by the Stalking Horse Bidders.  Moreover, the Stalking

Horse Bidders would not agree to act as a stalking horse without the Break-Up Fee and the

Expense Reimbursement given the substantial time and expense that would be incurred in

connection with entering into definitive documentation and the risk that the Stalking Horse

Bidder will be outbid at the Auction.  In short, the Stalking Horse Bidders have provided a

postpetition benefit to the Debtor that will enable the Debtor to maximize the value received for

the Purchased Assets.  As such, the Break-Up Fee and the Expense Reimbursement are an actual

and necessary cost of preserving the estates and should be approved as an administrative expense

within the meaning of sections 503 and 507 of the Bankruptcy Code.

52.     "The usual rule is that if break-up fees encourage bidding, they are

enforceable; if they stifle bidding, they are not enforceable."  *In re Integrated Res., Inc.*, 147

B.R. at 660.   The Debtor does not believe that the Break-Up Fee and the Expense

Reimbursement will stifle bidding.  To the contrary, the Debtor believes that, should an auction

be held, such bid protections will encourage bidding by serving "any of three possible useful

functions: (1) to attract or retain a potentially successful bid; (2) to establish a bid standard or

minimum for other bidders to follow; or (3) to attract additional bidders."  *Id*. at 662.

53.     Here, the bid of the Stalking Horse Bidders serves all three functions.

First, the Stalking Horse Bidders would not enter into the Stalking Horse SPA without the Break-

Up Fee and the Expense Reimbursement.   Second, pursuant to the Bidding Procedures, any

bidder that wishes to participate in the Auction must submit an offer that is higher or otherwise better than the bid of the Stalking Horse Bidders.  Third, the bid of the Stalking Horse Bidders attracts additional bidders because, among other things, additional bidders will be able to save considerable time and expense because they can use many of the documents that the Stalking Horse Bidders heavily negotiated, including, among other things, the Stalking Horse SPA, the schedules thereto including, but not limited to, the Disclosure Statement and License Agreement, in making their bid.  In sum, if the Purchased Assets are sold to a competing bidder, any such sale will likely be the result of the Stalking Horse Bidders' crucial role as an initial bidder generating interest in the Purchased Assets and establishing a minimum acceptable price and offer against which other parties can bid.

54.     In addition, "[a] break-up fee should constitute a fair and reasonable percentage of the proposed purchase price, and should be reasonably related to the risk, effort, and expenses of the prospective purchaser.  When reasonable in relation to the bidder's efforts and to the magnitude of the transaction, break-up fees are generally permissible." *Id.*

55.     Here, the Break-Up Fee is equal to  3.5% of the approximate $5.0 million anticipated cash portion of the Purchase Price plus the $2.0 million Equity Contribution.  This  is consistent with the range of bid protections typically paid in sale transactions that have been approved by this Court and other bankruptcy courts.  *See, e.g. In re Twenver, Inc.,* 149 B.R. at 956 (finding 1-2% break-up fees reasonable); *In re HMX Acquisition Corp.*, No. 12-14300 (ALG) (Bankr S.D.N.Y. Nov. 29, 2012) (approving a breakup fee of approximately 3% of the purchase price); *In re The Great Atlantic & Pacific Tea Company, Inc.,* No. 10-24549 (RDD) (Bankr. S.D.N.Y. May 2, 2011) (approving a breakup fee of 2.5% of the purchase price); *In re BearingPoint, Inc.*, No. 09-10691 (REG) (Bankr. S.D.N.Y. Apr. 7, 2009) (approving a breakup

fee of approximately 3% of the purchase price); *In re Silicon Graphics, Inc.*, No. 09- 11701 (MG) (Bankr. S.D.N.Y. Apr. 3, 2009) (approving breakup fee of approximately 2.8% of the purchase price); *In re Steve & Barry's Manhattan LLC,* No. 08-12579 (ALG) (Bankr. S.D.N.Y. Aug. 5, 2008) (approving break-up fee of 2% of the purchase price).  If the Break-up Fee is considered together with the Expense Reimbursement up to $250,000.00, this equals approximately seven percent (7%) of the Purchase Price and Equity Contribution.  Given the size of the purchase price and the relative complexity of this deal, which involves a regulated entity subject to existing regulatory restrictions and creditor litigation, the Debtor believes that the amounts of the Break-Up Fee and the Expense Reimbursement are appropriate under the circumstances.

**B.     The Proposed Sale Of the Purchased Assets Should Be Approved As A Product Of The Debtor's Exercise Of Sound And Reasonable Business Judgment.**

56.     Section 363(b)(1) of the Bankruptcy Code provides: "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  Section 105(a) of the Bankruptcy Code provides in relevant part: "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

57.     In determining whether to approve a sale of a debtors property outside the ordinary course of business, bankruptcy courts generally apply the "business judgment rule." *See,e.g., In re Castre, Inc.*, 312 B.R. 426, 428 (Bankr. D. Colo. 2004); *In re Psychrometric Sys.*, 367 B.R. 670, 674 (Bankr. D. Colo. 2007).  This Court should approve a proposed sale if the Debtor demonstrates a sound business reason or justification in support thereof.  *In re Martin*, 91 F.3d at 395; *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 149-50 (3d Cir. 1986); *Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward*

*Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999); *In re Delaware & Hudson Ry. Co.*, 124 B.R.

at 176; *In re Exaeris, Inc.*, 380 B.R. 741, 744 (Bankr. D. Del. 2008); *In re Phoenix Steel Corp.,*

82 B.R. 334, 335-36 (Bankr. D. Del. 1987) (section 363 sale should be approved if "the proposed

sale is fair and equitable, ...a good business reason [exists] for completing the sale and the

transaction is in good faith"); *In re Lionel Corp.,* 722 F.2d 1063, 1070 (2d Cir. 1983).  Once a

debtor articulates a valid business justification, "[t]he business judgment rule 'is a presumption

that in making the business decision the directors of a corporation acted on an informed basis, in

good faith and in the honest belief that the action was in the best interests of the company.'" *In re*

*S.N.A. Nut Co.*, 186 B.R. 98 (Bonier. N.D. Ill. 1995); *see also In re Integrated Res., Inc.*, 147

B.R. 650, 656 (Bankr. S.D.N.Y. 1992); *In re Johns-Manville Corp.*, 60 B.R. 612, 615-16 (Bankr.

S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a Debtor's management

decisions").

       58.     Here, the proposed sale procedures and proposed sale of assets easily meet

the "sound business reason" test and it is clear the proposed sale is necessary to preserve the

value of the Purchased Assets.  First, the fairness and reasonableness of the consideration to be

paid for the Purchased Assets will be demonstrated by continued exposure of the opportunity to

the marketplace via the Sale process proposed herein, on notice to potential purchasers, creditors,

and other parties in interest.  Consequently, the fairness and reasonableness of the consideration

to be received by the Debtor will ultimately be demonstrated by a "market check" through the

Auction process, which is the best means for establishing whether a fair and reasonable price is

being paid.  Further, the Stalking Horse SPA is (and the Debtor anticipates that any purchase

agreement proposed by another Successful Bidder will be) the product of good faith, arm's

length negotiations between the Debtor and the highest and/or best bidder(s) with respect to the

price and other terms of the Sale of the Purchased Assets.  In short, the Debtor believes in its business judgment that a prompt sale of the Purchased Assets to a Successful Bidder presents the best opportunity to realize the maximum value of the assets.

59.     In addition, all creditors and parties-in-interest will receive adequate notice of the Bidding Procedures and Sale Hearing as set forth above.  Such notice is reasonably calculated to provide timely and adequate notice to the Debtor's major creditor constituencies, those parties most interested in the Debtor's bankruptcy case, those parties potentially interested in bidding on the Purchased Assets and others whose interests are potentially implicated by the proposed Sale.  Accordingly, consummating the Sale as soon as possible is in the best interests of the Debtor and its stakeholders and parties-in-interest.

## C.     The Sale of the Purchased Assets Should Be Approved Free And Clear Of Liens Pursuant to Section 363(f) Of The Bankruptcy Code.

60.     Pursuant to section 363(f) of the Bankruptcy Code, the Debtor seeks authority to sell and transfer the Purchased Assets free and clear of all Liens, with such Liens to attach to the proceeds of the Sale (excluding, for the avoidance of doubt, the Equity Contribution) in the same order of priority, and to the same extent as such Liens were valid, perfected, and/or enforceable immediately prior to the Sale.  While the Debtor is not aware of any lien, claim or encumbrance on the Purchased Assets, even if there were such liens, they can be directed to the proceeds of the Sale.  Section 363(f) of the Bankruptcy Code is written in the disjunctive and provides, in pertinent part:

> The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if –
>
> (1)     applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2)     such entity consents;

   (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

   (4) such interest is in bona fide dispute; or

   (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

   61. As section 363(f) of the Bankruptcy Code is stated in the disjunctive, when proceeding pursuant to section 363(b), it is only necessary to meet one of the five conditions of section 363(f).  *See Citicorp Homeowners Servs., Inc. v. Elliot*, 94 B.R. 343, 345 (Bankr. E.D. Pa. 1988) (stating that section 363(f) of the Bankruptcy Code is written in the disjunctive; holding that if any of the five conditions of section 363(f) are met, the trustee has the authority to conduct the sale free and clear of all liens).

   62. A sale free and clear of Liens is necessary to maximize the value of the Purchased Assets.  A sale subject to Liens would result in a lower purchase price and be of substantially less benefit to the bankruptcy estate.  A sale free and clear of Liens is particularly appropriate under the circumstances because any Lien that exists immediately prior to the closing of any sale will attach to the sale proceeds (excluding, for the avoidance of doubt, the Equity Contribution) with the same validity, priority, force and effect as it had at such time, subject to the rights and defenses of the Debtor or any party in interest.  Moreover, any holder of a Lien that receives notice of the proposed sale and which fails to object should be deemed to consent to the proposed Sale, thereby complying with section 363(f)(2) of the Bankruptcy Code.  Thus, the proposed Sale satisfies section 363(f) of the Bankruptcy Code.

**F. A Successful Bidder Should Be Entitled to the Protections of Section 363(m)**

63.     Pursuant to section 363(m) of the Bankruptcy Code, a good faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims.  The Tenth Circuit has defined a good faith purchaser as one who buys (i) "in good faith," *i.e.*, through a sale that does not involve "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders," and (ii) for "value," i.e., by paying "at least 75% of the appraised value of the assets*.*"  *In re Bel Air Associates, Ltd.*, 706 F.3d 301, 305 & nn. 11-12 (10th Cir. 1983); *see also, In re Abbotts Dairies*, 788 F.2d at 147; *In re Mark Bell Furniture Warehouse, Inc.*, 992 F.2d 7, 9 (1st Cir. 1993);  *In re Willemain V. Kivitz*, 764 F.2d 1019, 1023 (4th Cir. 1985).

64.     The Stalking Horse Agreement was negotiated at arm's length, with both parties represented by their own counsel.  Additionally, the Debtor will adduce facts at the Sale Hearing demonstrating that any bidder who is deemed a Successful Bidder for the Purchased Assets has negotiated at arm's length, with all parties represented by their own counsel.  Accordingly, the Sale Order will include a provision that the Successful Bidder for the Purchased Assets, is a "good faith" purchaser within the meaning of Section 363(m) of the Bankruptcy Code.  The Debtor believes that providing any Successful Bidder with such protection will ensure that the maximum price will be received by the Debtor for the Purchased Assets and that closing of the Sale will occur promptly.

**E.     The Court Should Approve The Assumption And Assignment Of Executory Contracts and Unexpired Leases Related to the Purchased Assets**

65.     Under section 365 of the Bankruptcy Code, a debtor may assume, reject, or assume and assign executory contracts or unexpired leases.

66.     In accordance with section 365(a), a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."

11 U.S.C. § 365(a).  The standard governing bankruptcy court approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection.  The standard that is applied in determining whether an executory contract or unexpired lease should be assumed is the debtor's "business judgment" that the assumption is in its economic best interests. *See, e.g., In re Grayhall Resources, Inc.,* 63 B.R. 382, 384 (Bankr. D. Colo. 1986);  *see also Sharon Steel Corp. v. Nat'l Fuel Gas Dist. Corp.*, 872 F.2d 36, 39-40 (3d Cir. 1989).  The business judgment test "requires only that the [debtor] demonstrate that [assumption or] rejection of the executory contract will benefit the estate." *Wheeling-Pittsburgh Steel Corp. v. W. Penn Power Co. (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) (quoting *In re Stable Mews Assoc., Inc.*, 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984).

67.     Bankruptcy Code section 365(b)(1), in turn, codifies the requirements for a debtor to assume an executory contract or unexpired lease.  This subsection provides:

> (b) (1)     If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee -
>
> (A)     cures, or provides adequate assurance that the trustee will promptly cure, such default;
>
> (B)     compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>
> (C)     provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

68.    With respect to assignment of an executory contract or unexpired lease, section 365(f)(2) of the Bankruptcy Code provides, in pertinent part, that:

> The trustee may assign an executory contract or unexpired lease of the debtor only if --
>
> (A)    the trustee assumes such contract or lease in accordance with the provisions of this section; and
>
> (B)    adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).

69.    The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical pragmatic construction." *EBG Midtown South Corp. v. McLaren/Hart Env. Eng'g Corp. (In re Sanshoe Worldwide Corp.)*, 139 B.R. 585, 593 (S.D.N.Y. 1992). Adequate assurance does not mean absolute assurance or a guarantee that the assignee will thrive and make all payments required under the subject contract. *See In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D. N.Y. 1985).

70.    Among other things, adequate assurance may be provided by demonstrating the proposed assignee's financial health and experience in managing the type of enterprise or property assigned. *See In re Bygaph, Inc.,* 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (finding adequate assurance of future performance present when prospective assignee of lease from debtor has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

71.    The Debtor requests that any counterparty that wishes to file an objection to the Cure Amount (the "Cure Amount Objection") must do so (and serve a copy so as to be received by the Notice Parties) by 4:00 p.m. (prevailing MT) within seven (7) days after the filing of the Cure Notice.

72.     If no timely Cure Amount Objection is received, the Debtor seeks entry of an order providing that such non-debtor party (a) be forever barred from objecting to the Cure Amount and from asserting any additional cure or other amounts with respect to such Assumed Contract or Assumed Lease, and the Debtor and the Successful Bidder shall be entitled to rely solely upon the Cure Amount; and (b) be deemed to have consented to the assumption and assignment of such Assumed Contract or Assumed Lease and shall be forever barred and estopped from asserting or claiming against the Debtor or the Successful Bidder that any additional amounts are due, that any defaults exist, or that any other conditions or obligations related to assumption and assignment must be satisfied prior to such assumption and assignment becoming effective.

73.     In the event that a timely Cure Amount Objection is filed, the Cure Amount Objection must set forth (i) all grounds for the objection and (ii) the amount the party asserts to be the correct Cure Amount.  After receipt of the Cure Amount Objection, the Debtor and the Successful Bidder will attempt to reconcile any differences in the Cure Amount.  If agreement cannot be reached, the Court will resolve the disputed issues at a hearing scheduled by the Court.

## F.     The Automatic Fourteen Day Stay Under Bankruptcy Rule 6004(h) and 6006(d) Should Be Waived.

74.     Pursuant to Bankruptcy Rule 6004(h), unless the Court orders otherwise, all orders authorizing the sale of property pursuant to section 363 of the Bankruptcy Code are automatically stayed for fourteen days after entry of the order.  *See* Fed. R. Bankr. P. 6004(h). Similarly, under Bankruptcy Rule 6006(d), unless the Court orders otherwise, all orders authorizing the assignment of executory contracts or unexpired leases are automatically stayed for fourteen days after entry of the order.

75.     Although Bankruptcy Rule 6004(h) and 6006(d) and the Advisory Committee Notes thereto are silent as to when a court should "order otherwise" and eliminate or reduce the 14-day stay period, Collier on Bankruptcy suggests that the stay period should be eliminated to allow a sale or other transaction to close immediately where there has been no objection to the procedure.  10 *Collier on Bankruptcy* ¶ 6004.09 (15th ed. 1999).  Furthermore, Collier provides that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time necessary to file such appeal.  *Id.*

76.     To preserve and maximize the value of the Purchased Assets, the Debtor seeks to close the Sale immediately after all closing conditions have been met or waived.  Thus, waiver of any applicable stays afforded by the Bankruptcy Rules is appropriate under the facts and circumstances of this case.

## NOTICE

77.     Notice of this Motion has been provided to: (i) the Office of the United States Trustee for the District of Colorado; (ii) the OCC; (iii) any party known or reasonably believed to have asserted any lien, claim or encumbrance or other interest in the Purchased Assets; (iv) any party known or reasonably believed to have expressed an interest in acquiring some or substantially all of the Purchased Assets; (v) counsel for the Plaintiff Noteholders; and (vi) any other party entitled to notice pursuant to Bankruptcy Rule 2002 and L.B.R. 2002-1 and 9013-1(b).  In light of the nature of the relief requested herein, the Debtor submits that no other or further notice is necessary or required prior to entry of the proposed Bidding Procedures Order and proposed Bidding Procedures.

## NO PRIOR REQUEST

78.     No prior motion for the relief requested herein has been made to this or any other Court.

*[Remainder of Page Intentionally Left Blank]*

WHEREFORE, for the foregoing reasons, the Debtor respectfully requests entry of: (A) an order substantially in the form annexed as **Exhibit A** hereto (i) approving the Bidding Procedures; (ii) approving certain notice procedures with respect to the Sale; (ii) scheduling the Sale Hearing; (iii) establishing procedures for the assumption and assignment of executory contracts related to the Purchased Assets; (iv) approving the Break-Up Fee and Expense Reimbursement; and (v) granting such other and further relief as is just and proper; and (B) an order substantially in the form annexed as **Exhibit B** hereto (i) approving the sale of the Purchased Assets, and (ii) such other and further relief as is just and proper.


Dated:  November 9, 2017                              By: _/s/ Steven T. Mulligan_____.
                                                      Steven T. Mulligan, #19901
                                                      Jackson Kelly PLLC
                                                      1099 18th St., Suite 2150
                                                      Denver, CO  80202
                                                      smulligan@jacksonkelly.com
                                                      303-390-0192
                                                      *Counsel for Debtor Colorado National Bancorp*