**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| COLORADO NATIONAL BANCORP, | ) | Case No. 17-20315-EEB |
| EIN: 27-0847337 | ) | |
| | ) | |
| Debtor-in-Possession. | ) | |

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS' MOTION TO CONTINUE HEARING ON DEBTOR'S MOTION TO APPROVE BIDDING PROCEDURES AND RELATED RELIEF**

The Official Committee of Unsecured Creditors (the "**Committee**") appointed in this chapter 11 case hereby files its Motion to Continue Hearing ("**Motion**") on Debtor's Motion for Entry of Orders (I) Establishing Bidding Procedures Relating to the Sale of the Debtor's Equity Interests In Non-Debtor Subsidiary (and associated relief) and (II) Approving a Proposed Sale (and associated relief) (Part I is the "**Bidding Procedures Motion**" and Part II is the "**Sale Motion**"). In support of this Motion, the Committee states as follows:

### I. Summary of Argument

Debtor has proposed an unjustifiably hurried sale process based on the premise that its proposed stalking horse represents the only bid received for the Debtor's assets. This premise is wrong. In just two weeks since the Committee's financial advisor was authorized to be employed, the Committee has received three written proposals for either a restructure of the Debtor through a Chapter 11 plan or a 363 sale of the Debtor's assets. Two of these proposals are on their face better and higher financial bids than the proposed stalking horse and the third is from a bank in Colorado.

The Committee believes that each of the proposals represents a significantly decreased transaction risk than that presented by the Debtor's stalking horse bidder, which is a Latvian based payment processor. The Debtor is unable to point to any payment processor that has ever been approved to purchase an American bank. The Committee is requesting that the hearing on bidding procedures and selection of a stalking horse be continued to a date after March 23, 2018, which is sixty days from the date of the first continued hearing on the Bidding Procedures Motion.

{Z0202633/1}                                     1

## II.   Procedural Background

1. On November 8, 2017 (the "**Petition Date**"), Debtor filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Colorado.

2. Debtor remains in possession of its assets and continues to operate as debtor-in-possession in accordance with 11 U.S.C. §§ 1107 and 1108.

3. On November 16, 2017, the Office of the United States Trustee filed its Notice of Appointment of the Committee.  Each of the members of the Committee holds a judgment against the Debtor based on promissory notes made and delivered by the Debtor.  Commencing in 2013, Debtor engaged in a fundraising effort resulting in approximately 8 million dollars currently owed by the Debtor to various holders of promissory notes (collectively "**Noteholders**").

4. On November 9, 2017, one day after the Petition Date, Debtor, a bank holding company, proposed an unjustifiably hurried sale process that the Committee believes was designed to chill bidding and prevent a possible reorganization and that failed to provide a competitive, open and fair process for marketing of the assets of the Debtor, which consist primarily of ownership of a national bank.  Debtor, without reason, unilaterally abandoned an agreed recapitalization proposal through a proposed pre-packaged bankruptcy to effect reorganization of the Debtor, by which existing debt holders would convert their debt to equity, combined with a three million dollar capital infusion into the bank ("**Creditor Reorganization**").

5. Instead, the Debtor has proposed a stalking horse bidder consisting of two individuals who have no United States banking experience.  Further, the stalking horse bidder owns a Latvian payment processing business.  Payment processors allow anonymous transfers of

funds which don't comply with bank secrecy laws or the anti-money laundering laws. The proposed stalking horse bidder involves virtually the highest degree of execution risk possible due to the high degree of regulatory scrutiny given to payment processing companies who try to purchase banks and to individuals who have no banking experience.

6. It is clear that the Debtor and the proposed stalking horse are unsure whether the stalking horse will be approved as a buyer by the federal banking regulators. The stalking horse bid provides no non-refundable deposit and allows until September 2018 for the stalking horse to close with a possible additional 120 days if the stalking horse has not obtained regulatory approval by September 2018.

7. Without any factual justification whatsoever, Debtor originally requested an order that:

    a. Required bids be due within 21 days after the bidding procedure order was entered. (If entered on the original hearing date of December 6, 2017[1], this would have made bids due December 26, 2017, the day after Christmas.)

    b. Required having a sale hearing 35 days after the bidding procedures order is entered. (If entered on December 6, 2017, this would have put the sale hearing at January 10, 2018.)

    c. Allowed an expense reimbursement of $250,000 to a stalking horse bidder who made a bid on the Debtor's assets four months before the Petition Date that explicitly provided that the stalking horse bidder would be "responsible for its own expenses".

    d. Allowed a break-up fee of an additional $250,000 to a stalking horse bidder that made a bid on the Debtor's assets four months before the bankruptcy that contained no break-up fee.

    e. Required a good faith cash deposit of $600,000 from interested bidders, without requiring the Debtor's proposed stalking horse bidder to provide such a deposit or any deposit at all.

---

[1] This is date that was first set for hearing on the Bidding Procedures Motion.

{Z0202633/1}      3

      f.      Restricted creditors and interested parties from attending any auction.

      g.      Proposed a sale without use of a financial advisor or investment banker to appropriately market the assets and provided for no concrete plan for marketing of the assets and seeking competitive bids.

8. On November 30, 2017 the Committee filed its Objection ("**Objection**") to the Bidding Procedures Motion (Docket # 45).

9. On December 6, 2017, immediately prior to the first scheduled hearing on the Bidding Procedures Motion, the Debtor filed its response to the Objection ("**Response**") at Docket 52.

10. In the Response, the Debtor proposed the following *de minimis* changes to the bid procedures:

      a.      Bid Deadline moved from December 26, 2017 to January 17, 2018.

      b.      Auction Date moved from January 2, 2018 to January 24, 2018.

      c.      Notice of Successful bidder moved from January 3, 2018 to January 25, 2018.

      d.      Sale Objection Date moved from January 5, 2018 to January 31, 2018.

      e.      Sale Hearing moved from January 10, 2017 to February 15, 2018.

      f.      The proposed stalking horse bidder would make a $600,000 good faith deposit.

      g.      The Committee could attend any auction.

      h.      The Debtor would consult with the committee before exercising its business judgment on selecting the highest and best bid.

      i.      The proposed stalking horse bidder would reduce its combined break-up fee and expense reimbursement request from $500,000 to $202,618.

11. At the initial hearing on the Bidding Procedures Motion, the Committee and the Debtor, with the consent of the Debtor's proposed stalking horse bidder, proposed that the hearing

on the Bidding Procedures Motion be continued to January 23, 2018. A continued hearing on the Bidding Procedures Motion is now set for 9:30 a.m. on January 23, 2018.

12. The purpose of the continuance was to give the Committee time to employ a financial advisor to assist with marketing the Debtor's assets. The proposed financial advisor was Vining-Sparks Community Bank Advisory Group ("**Vining**").

13. On December, 11, 2017, after negotiating with the Office of the United States Trustee ("**UST**") what it thought were acceptable final terms of an engagement agreement with Vining, the Committee filed its motion to approve employment of Vining ("**Employment Motion**") at Docket #61. With approval of the Court, the Employment Motion was filed on shortened notice with an objection date of December 18, 2017 (Docket #62).

14. On December 18, 2018 the UST filed its limited objection to the Employment Motion (Docket #71). The Committee filed its certificate of contested matter (Docket #74) and the Court set a hearing for January 8, 2018.

15. The intervening holidays precluded resolution of the UST objection until January 5, 2018, when the Committee filed a Certificate of Non-Contested Matter with a revised proposed order resolving the objections of the UST (Docket # 88).

16. The Court went forward with a hearing on the Employment Motion on January 8, 2018 in order to further review certain terms of the proposed employment.

17. On January 9, 2018 the Court approved the Vining Employment Motion (Docket # 91).

### III.   Grounds for Continuance of Hearing to Consider Bidding Procedures and Selection of Stalking Horse Bidder

18. Despite the best efforts of the Committee to obtain approval of Vining on an expedited basis, due to the technical objections filed by the UST as to the terms of employment, Vining was not officially employed until January 9, 2018.

19. Vining has already circulated a Confidential Information Memorandum regarding sale of the Debtor's assets or reorganization of the Debtor.

20. The Committee has already received three letters of intent from persons interested in a debt for equity reorganization or a purchase of assets. Two of these are from existing US bank holding companies as follows:

   a. TIG Bancorp, owner of First State Bank in Colorado. A copy of the TIG proposal is attached hereto as **Exhibit A**.

   b. Stratega Capital VI LLC, by its manager Joshua B. Bock. Mr. Bock owns interests in other U.S. banks and has been previously approved on an expedited basis by the FDIC to acquire distressed banks. A copy of the Stratega proposal is attached hereto as **Exhibit B**.

   c. Atlas Fintech Holdings Corp ("**Atlas**"). The Atlas leadership team includes former officers and directors of a U.S. Bank. A copy of the Atlas proposal is attached hereto as **Exhibit C**.

21. In addition, the Committee is informed and believes that two of the judgment creditor noteholders, Jeffrey Desich and Richard Desich are preparing a proposed letter of intent to purchase the shares in the Bank.

22. The Committee stands by its original Objection to the Bidding Procedures Motion, even as revised. The Committee does not believe that the Debtor has shown any facts supporting a hurried sale process, with a stalking horse bidder that has no US banking experience and whose main business is payment processing outside the United States.

23. The Committee believes that the transaction risk with the Debtor's proposed stalking horse bidder is extremely high because there is no historical track record of US Bank regulators approving payment processing companies as purchasers of US banks. The Committee's proposed regulatory counsel who has more than ten years' in depth experience with bank mergers and sales is unaware of any payment processor, let alone a foreign based payment processor having ever been approved to purchase a United States bank. In fact, the Committee requested that the Debtor and its proposed stalking horse bidder to cite an example of any situation in which a payment processor organization has been approved as purchaser of a domestic bank. Neither the Debtor nor counsel for the stalking horse could furnish a single example of such approval.

24. Further, the Debtor subjected itself to an exclusivity agreement that prevented any discussions of recapitalization of the Debtor or sale of the Debtor's assets for the four month period immediately preceding the Petition Date.

25. As detailed in the Committee's original objection to the Bidding Procedures Motion, the Debtor signed a binding pre-petition agreement ("**Letter Agreement**") with the following terms:

> "neither CNB nor any of its directors, officers, shareholders, employees, accountants or other agents or representatives (collectively, "Representatives") or otherwise, [shall] solicit or entertain offers from, negotiate with **or in any manner encourage, discuss, accept or consider any proposal of any other person relating to the acquisition of the common stock of the Bank** or their respective assets or business, in whole or in part, whether through direct purchase, merger, consolidation or other business combination for a period of 120 days from the date that this letter is executed by CNB."

26. Due to the binding nature of the Letter Agreement, Debtor was contractually prohibited from either marketing the Bank stock or seeking recapitalization of the Debtor for the four month period immediately preceding the Petition Date. As such there has not been an adequate or sufficient current effort at marketing the Debtor's assets.

### A. The Bid Procedures Hearing Should be Continued Because Debtor's Revised Proposed Bidding Procedures Continue to be Flawed and Unreasonable.

27. Debtor proposed a revised bid deadline that would occur over a period of no more than 70 days from the Petition Date, including the Christmas and New Year's holidays (Response ¶ 10, p. 3). Debtor has not provided any factual or legal justification whatsoever for this extremely accelerated process.

28. Vining, having received court approval of its employment only on January 9, 2018, needs at least 60 days to adequately market the Debtor's assets and receive bids. Such date would be March 23, 2018.

29. Postponing consideration of the bidding procedures and selection of a stalking horse bidder until after March 23, 2018 does not interfere with the Debtor's proposed stalking

horse bid because the closing date for the Debtor's proposed stalking horse is not until September 8, 2018, more than six months after the Debtor's revised date for entry of a proposed sale order. Further, the Debtor's stalking horse bid closing date can be extended another 120 days, into 2019, if regulatory approval has not been obtained. This sets the closing with the proposed stalking horse ten months after the proposed sale approval. Allowing sixty days for the Committee and its financial advisor to seek a better and more qualified stalking horse bidder does not harm the Debtor or the Debtor's proposed stalking horse bidder.

30. Finally, Debtor has presented no evidence that the Stalking Horse bidder has even begun the formal written application process with the US Bank regulators.

31. Contrary to a need for an accelerated sales process, there is plenty of time to allow for a reasonable marketing period, due diligence period, bid date and auction date, if that is the process that creditors prefer.

32. A fair marketing and bidding period would be as follows:

    a. Bids due March 23, 2018.

    d. An auction no less than ten days after bids are received.

**B. Debtor's Proposed $600,000 Deposit Requirement Will Chill Bidding.**

33. Requiring a $600,000 cash deposit from bidders will chill bids. Debtor provides no legal or factual explanation as to why a deposit should be so high. This is clearly designed to chill bidding and benefit the stalking horse bidder.

34. While the Committee believes that a deposit, if required of all bidders (including the stalking horse bidder), is necessary, a deposit of $600,000 on a $5,000,000 purchase price

seems unreasonably high. A more appropriate deposit would be no more than $250,000 which is five percent of the original purchase price.

### C. The Revised Proposed Combined Break Up Fee and Expense Reimbursement Should Not Be Approved.

35. As stated above, the Debtor's stalking horse bidder has already agreed in writing that he would pay his own expenses regarding the transaction. This occurred by way of a binding Letter Agreement four months prior to the Petition Date. Further, the Letter Agreement contained no provision for a break-up fee.

36. The Debtor has the burden of demonstrating that an expense reimbursement is an "actual necessary expense of preserving the estate." *See In re Reliant Energy Channelview, LP*, 594 F.3d 200, 206 (3rd Cir. 2010). Debtor has made no such showing.

37. Moreover, the Debtor's revised proposed break-up fee and expense reimbursement is in excess of the formula of 3% of the original bid typically used by this Court, absent evidence showing why a higher fee would be appropriate.

38. An exhibit attached to the debtor's proposed stalking horse Stock Purchase Agreement ("**SPA**") shows the current "Tangible Book Value" of the Debtors interest in the Bank is approximately $5,000,000. (Exhibit C to SPA, Docket #11-3 Page 79 of 79). That is the amount of the Purchase Price as defined in the SPA. (Section 2.2 of the SPA, Doc. #11-3, P. 16 of 79.)

39. Bankruptcy courts that have allowed break-up fees, allow between 1% and 3% of the purchase price. If the purchase price is $5,000,000 then a break-up fee consistent with prior practice in the bankruptcy courts would be between $50,000 and $150,000, not the revised $207,000 proposed by the Debtor.

40. In this case the proposed revised breakup fee hampers rather than encourages bidding and the amount of the fee is not reasonable in relation to the proposed purchase price.

**D.  Debtors Proposed Bid Procedures and Stalking Horse Selection are Not Shielded by the Business Judgment Rule.**

41. "To invoke the [business judgment] rule's protection directors have a duty to inform themselves, prior to making a business decision, of **all** material information reasonably available to them.  Having become so informed, they must then act with requisite care in the discharge of their duties." *Sheffield Steel Corp. v. HMK Enters. (In re Sheffield Steel Corp)*, 320 BR 405, 422 (Bankr. N.D. Ok. 2004) (emphasis added).

42. As a component of its duty of care, a director must exercise "informed business judgment" in entering into transactions on behalf of a corporation. *See McMullin v. Beran*, 765 A.2d 910, 921 (Del. 2000).

43. In this case, the Debtor rushed into a proposed stalking horse arrangement calling for sale approval within 35 days after approval of bid procedures.  However, all material information points to no emergency conditions that would mandate such an accelerated process.  The attempt to engage in an unjustified and hurried sale process demonstrates a lack of informed business judgment.

44. Further, the Debtor's proposed stalking horse was selected without the aid of any financial advisor or marketing agent and after a four month lock up for the benefit of the stalking horse.  This is further evidence of a failure of business judgment.

45. The exercise of fiduciary duties by a corporate board member includes more than avoiding fraud, bad faith and self-dealing.  Directors must exercise their "honest judgment in the lawful and legitimate furtherance of corporate purposes," *Auerbach v. Bennett*, 419 N.Y.S.2d, 920, 926 (1979).  It is not enough that directors merely be disinterested and thus not disposed to self-dealing or other indicia of a breach of the duty of loyalty.  Directors are also held to a standard of

due care. They must meet this standard with "conscientious fairness," *Alpert v. 28 Williams St. Corp.*, 63 N.Y.2d 557, 569, 483 N.Y.S.2d 667, 674, 473 N.E.2d 19, 26 (1984) (citing cases).

46. For example, where their "methodologies and procedures" are "so restricted in scope, so shallow in execution, or otherwise so pro forma or halfhearted as to constitute a pretext or sham," then inquiry into their acts is not shielded by the business judgment rule. *Auerbach*, 419 N.Y.S.2d at 929.

47. The Second Circuit addressed this duty head on in *Hanson Trust PLC v. ML SCM Acquisition, Inc.*, 781 F.2d 264, 274-275 (2nd Cir. 1986).

> "The law is settled that, particularly where directors make decisions likely to affect shareholder welfare, the duty of due care requires that a director's decision be made on the basis of "reasonable diligence" in gathering and considering material information. In short, a director's decision must be an informed one. [citations omitted] Arsht, supra, at 111 (business judgment rule should not be available to directors who do "not exercise due care to ascertain the relevant and available facts before voting"). Directors may be liable to shareholders for failing reasonably to obtain material information or to make a reasonable inquiry into material matters. [citations omitted] Thus, while directors are protected to the extent that their actions evidence their business judgment, such protection assumes that courts must not reflexively decline to consider the content of their "judgment" and the extent of the information on which it is based." *Id.*

48. Although *Hanson* was not decided in a bankruptcy context it did involve a sale of a business. Further, business judgment rule principles have "vitality by analogy" in Chapter 11. *In re Integrated Resources*, 147 B.R. 650, 656 (D. S.D.N.Y. 1992), citing *In re 995 Fifth Ave. Assoc., LP.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989).

> **E. Debtor Has Insufficient Information to Evaluate the Regulatory Execution Risk of the Stalking Horse Bidder and Has Unreasonably Subjected Other Interested Bidders to Higher Standards Than Required of the Stalking Horse.**

49. Debtor states, at paragraph 15 of the Bid Procedures Motion, that it rejected a December 2015 bid from certain Noteholders because the bid contained an unreasonable breakup fee, did not contain sufficient details on a business plan for the Bank to assess the potential value of the offer and was subject to significant execution risks related to regulatory approval and sources of capital.

50. Yet the Debtor's proposal with Moskvins as stalking horse bidder contained an unusually high break-up fee and expense reimbursement ($500,000) and does not contain sufficient details on a business plan for the Debtor's creditors to assess the potential value of the offer. Why? Because the stalking horse is an individual with no banking experience who operates a Latvian payment processing company. For this reason alone the stalking horse proposal is subject to significant execution risks related to regulatory approval and sources of capital.

51. After March 25, 2016, the Board engaged in discussions with an interested buyer and requested information regarding the potential purchasers' business plan, pro-formas and sources of capital in order to evaluate the proposal (Motion ¶ 17). The Debtor fails to state whether it has requested and received information regarding the stalking horse bidder's business plan, pro formas and source of capital in order to evaluate the stalking horse proposal.

52. The Board rejected the March 2016 proposal due to the "timing and feasibility for gaining regulatory approval". The Debtor needs to disclose what information the Stalking Horse has brought to the table that eases the Debtor's concerns about timing and feasibility of regulatory approval for the proposed stalking horse.

53. The Debtor discusses the proposal made by the Noteholders (many of whom are known to the banking community) proposing a $3 million equity infusion (Motion ¶19) but fails to describe why the Debtor rejected this proposal and entered into a binding exclusivity agreement with an individual with no banking experience and who operates a payment processing company.

54. The Debtor needs to disclose what information has been provided by the proposed stalking horse bidder that would lead to the conclusion that it is financially capable of closing and that it is not subject to extremely high execution risks related to regulatory approval. At best, an attempt by an eastern European citizen, with no banking experience, and who owns a Latvian money transfer business, to obtain regulatory approval to purchase a US national bank, would involve a prolonged process with an uncertain future.

## **IV. Conclusion**.

55. The unnecessary "rocket docket" sale process proposed by the Debtor will foreclose all possibility that creditors may have to evaluate and propose a plan along the lines of the Creditor Reorganization, which was supported by the majority of the debt holders. Since the proposed stalking horse does not contemplate closing until September 2018, creditors should be given at least until March 23, 2018 to evaluate whether a reorganization plan, exchanging debt for equity, would be a more attractive alternative and, if a sale is determined to be the better alternative, a more appropriate bidder should be proposed as a stalking horse.

56. Finally, contrary to the assertions by Debtor in paragraph 43 of its Motion, the proposed bidding procedures:

    a. will not maximize value,

    b. will not enhance competitive bidding,

    c. are not fair or reasonable,

d. will not yield maximum value for stakeholders,

e. do not provide sufficient notice,

f. do not provide a reasonable opportunity to acquire information,

g. are not designed to maximize value,

h. do not facilitate a competitive bidding process,

i. do not encourage potential bidders to participate, and

j. are not consistent with other procedures previously approved by courts in this district, where there is no evidence of exigent circumstances.

WHEREFORE, the Committee respectfully requests that the Court continue the hearing on the Bidding Procedures Motion to a date after March 23, 2018.

Dated: January 22, 2018

MARKUS WILLIAMS YOUNG AND ZIMMERMANN LLC

By: /s/ *Donald D. Allen*
Donald D. Allen, 10340
James T. Markus, 25065
1700 Lincoln St. Suite 4550
Denver, Colorado 80203
(303) 830-0800
dallen@markuswiliams.com
Counsel for the Official Committee of Unsecured Creditor

## CERTIFICATE OF SERVICE

The undersigned, counsel for The Official Committee of Unsecured Creditors, hereby certifies that on January 22, 2018, a true and correct copy of the foregoing **OFFICIAL COMMITTEE OF UNSECURED CREDITORS' MOTION TO CONTINUE HEARING ON DEBTOR'S MOTION TO APPROVE BIDDING PROCEDURES AND RELATED RELIEF** was electronically filed and served via CM/ECF pursuant to L.B.R. 9036-1 and 1009- 1.

*/s/ Serina R. Schaefer*
Serina R. Schaefer, Legal Assistant
for MARKUS WILLIAMS YOUNG &
ZIMMERMANN LLC