## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| In re: | Chapter 11 |
| COLORADO NATIONAL BANCORP,<br>EIN:  27-0847337 | Case No. 17-20315-EEB |
| Debtor. | |

## NOTICE OF FILING EXECUTED STOCK PURCHASE AGREEMENT WITH THE SUCCESSFUL BIDDER

Colorado National Bancorp ("Debtor"), by its counsel Jackson Kelly PLLC, hereby provides notice of filing the executed Stock Purchase Agreement by and between Jeffrey A. Desich, Richard A. Desich, and the Debtor, a copy of which is attached hereto.

Dated:  May 7, 2018.

JACKSON KELLY PLLC

By: /s/ Steven T. Mulligan
      Steven T. Mulligan, #19901
      Benjamin J. Ross, #49370
1099 18th Street, Suite 2150
Denver, CO 80202
Telephone: (303) 390-0003
Facsimile: (303) 390-0177
smulligan@jacksonkelly.com
bross@jacksonkelly.com

Counsel for Debtor

4822-5998-1669.v1

*EXECUTION COPY*

**STOCK PURCHASE AGREEMENT**

**by and between**

**JEFFREY A. DESICH**

**RICHARD A. DESICH**

**and**

**COLORADO NATIONAL BANCORP**

**Dated as of March 28, 2018**

4829-0090-3265.v1

## TABLE OF CONTENTS

**Page**

Article 1 INTERPRETATION..................................................................................................2
    *Section 1.1*   *Definitions* ..........................................................................................2
    *Section 1.2*   *Interpretation* ...................................................................................13
    *Section 1.3*   *Governing Law* .................................................................................13
    *Section 1.4*   *Effectiveness* ....................................................................................14
Article 2 PURCHASE OF SHARES AND OTHER ASSETS ............................................14
    *Section 2.1*   *Purchase and Sale of the Shares and Other Purchased Assets*...........14
    *Section 2.2*   *Consideration* ...................................................................................14
    *Section 2.3*   *Purchase Price Deposit*....................................................................14
    *Section 2.4*   *Payments* ..........................................................................................15
    *Section 2.5*   *Equity Contribution*..........................................................................15
    *Section 2.6*   *Excluded Liabilities*..........................................................................15
    *Section 2.7*   *Purchase Price Calculation and Adjustment.* ....................................16
Article 3 REPRESENTATIONS AND WARRANTIES OF THE COMPANY .....................17
    *Section 3.1*   *Organization; Non-contravention.* .....................................................17
    *Section 3.2*   *Capitalization of the Bank.*................................................................19
    *Section 3.3*   *Licenses, Permits and Orders.* ..........................................................20
    *Section 3.4*   *Reports* .............................................................................................21
    *Section 3.5*   *Deposits*............................................................................................22
    *Section 3.6*   *Financial Statements; Reporting; Internal Controls.* ........................22
    *Section 3.7*   *Tax Matters.* .....................................................................................24
    *Section 3.8*   *Litigation* .........................................................................................26
    *Section 3.9*   *Key Employees* .................................................................................26
    *Section 3.10* *Employee Benefit Plans.*....................................................................27
    *Section 3.11* *Real Property* ...................................................................................29
    *Section 3.12* *Absence of Certain Changes* .............................................................30
    *Section 3.13* *Material Contracts.* ..........................................................................30
    *Section 3.14* *Risk Management Instruments* ..........................................................32
    *Section 3.15* *Environmental Matters.*.....................................................................32
    *Section 3.16* *Insurance*.........................................................................................33
    *Section 3.17* *Intellectual Property* ........................................................................34
    *Section 3.18* *Related Party Transactions.*..............................................................35

Section 3.19   Community Reinvestment Act and Consumer Compliance ....................... 35

Section 3.20   Money Laundering; Unlawful Payments ........................................................ 36

Section 3.21   OFAC ........................................................................................................... 37

Section 3.22   Customer Information Security ..................................................................... 37

Section 3.23   Loans. .......................................................................................................... 37

Section 3.24   Brokers ........................................................................................................ 39

Section 3.25   Investment Securities. .................................................................................. 39

Section 3.26   Takeover Statute .......................................................................................... 39

Article 4 REPRESENTATIONS AND WARRANTIES OF THE PURCHASERS ................... 40

Section 4.1   Organization; Non-contravention. ................................................................. 40

Section 4.2   Governmental Consents ................................................................................ 40

Section 4.3   Investment Intent .......................................................................................... 40

Section 4.4   Financing ...................................................................................................... 40

Article 5 PRE-CLOSING MATTERS AND OTHER COVENANTS ...................................... 41

Section 5.1   Conduct of Business Prior to Closing ............................................................ 41

Section 5.2   Confidentiality ............................................................................................... 46

Section 5.3   Return of Information ..................................................................................... 47

Section 5.4   Consents and Approvals. ............................................................................... 47

Section 5.5   Certain Company Contracts .......................................................................... 49

Section 5.6   Indemnification; D&O Insurance; D&O Tail Coverage. ................................. 49

Section 5.7   Notifications ................................................................................................... 50

Section 5.8   Reserved. ...................................................................................................... 51

Section 5.9   Debtor-in-Possession .................................................................................... 51

Section 5.10   The Sale Motion ............................................................................................ 51

Section 5.11   The Bidding Procedures ................................................................................ 51

Section 5.12   Resignations ................................................................................................. 51

Section 5.13   Sale Order ..................................................................................................... 52

Section 5.14   Non-Solicitation ............................................................................................ 52

Section 5.15   Public Announcements .................................................................................. 52

Section 5.16   Tax Refunds and Other Proceeds .................................................................. 52

Section 5.17   Tax Election ................................................................................................... 53

Section 5.18   Preparation and Filing of Tax Returns; Taxes ................................................ 53

Section 5.19   Tax Cooperation ............................................................................................ 53

Section 5.20   Tax Proceedings ........................................................................................... 54

4829-0090-3265.v1

*Section 5.21   Transfer Taxes*......................................................................................54

*Section 5.22   Bankruptcy Filings.*..............................................................................55

*Section 5.23   Transfer of Business-Related Assets and Contracts*..............................55

*Section 5.24   Plan* .....................................................................................................55

*Section 5.25   Appeal*..................................................................................................55

*Section 5.26   Charter Documents* ..............................................................................56

*Section 5.27   Payment of the Broker's Fees* ..............................................................56

Article 6 CONDITIONS OF CLOSING.........................................................................56

*Section 6.1    Conditions to Purchasers' Obligations*..................................................56

*Section 6.2    Conditions to the Company's Obligations* .............................................58

*Section 6.3    Mutual Condition* ..................................................................................58

*Section 6.4    Termination.* ..........................................................................................58

Article 7 CLOSING TRANSACTIONS ..........................................................................61

*Section 7.1    Time and Place* ......................................................................................61

*Section 7.2    Company's Closing Deliverables*...........................................................61

*Section 7.3    Purchasers' Closing Deliverables* .........................................................62

*Section 7.4    Concurrent Delivery* ..............................................................................62

*Section 7.5    Transfer of Shares and Other Purchased Assets*....................................62

Article 8 MISCELLANEOUS .........................................................................................63

*Section 8.1    Expenses* ...............................................................................................63

*Section 8.2    Notices*..................................................................................................63

*Section 8.3    Further Assurances* ...............................................................................64

*Section 8.4    Time of the Essence* ...............................................................................64

*Section 8.5    Entire Agreement* ..................................................................................64

*Section 8.6    Assignability*.........................................................................................64

*Section 8.7    Severability*...........................................................................................64

*Section 8.8    Waiver and Amendment* .........................................................................65

*Section 8.9    Benefit*...................................................................................................65

*Section 8.10   Captions* ...............................................................................................65

*Section 8.11   Disclosure Schedule* .............................................................................65

*Section 8.12   Counterparts*.........................................................................................65

*Section 8.13   Specific Performance* ...........................................................................65

*Section 8.14   Consent to Jurisdiction*.........................................................................65

*Section 8.15   Waiver of Jury Trial* .............................................................................66

4829-0090-3265.v1

*EXECUTION VERSION*

## STOCK PURCHASE AGREEMENT

THIS STOCK PURCHASE AGREEMENT (this "**Agreement**") is made as of March 28, 2018 (the **Execution Date**"), by and between Jeffrey A. Desich and Richard A. Desich (the "**Purchasers**"), and Colorado National Bancorp, a Delaware corporation (the "**Company**")**.**

### PREAMBLE

The Company is the record and beneficial owner of 10,000 shares of the 10,000 aggregate issued and outstanding shares of capital stock of Colorado National Bank, a national banking association (the "**Bank**").

The Company wishes to sell, and the Purchasers wish to purchase, all of the Company's shares of capital stock of the Bank on the Closing or (as hereinafter defined) (the "**Shares**") and certain other assets of the Company, all free and clear of all Encumbrances (as hereinafter defined) and on the terms and conditions set forth in this Agreement.

Immediately following the Purchasers' acquisition of all of the capital stock of the Bank, the Purchasers shall make the Equity Contribution (as hereinafter defined) to the Bank, on the terms and conditions set forth in this Agreement.

On November 8, 2017, the Company filed a voluntary bankruptcy petition (the "**Bankruptcy Case**") under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the District of Colorado (the "**Bankruptcy Court**").  The Bankruptcy Case is captioned *In Re Colorado National Bancorp.*, Case No. 17-20315 EEB (Bankr. D. Colo.)

The parties intend for the sale and purchase of the Shares and the Other Purchased Assets (as hereinafter defined), including the assumption and assignment of the Assumed Bank Related Contracts (as hereinafter defined), if any (the "**Sale**"), to be effectuated pursuant to an order of the Bankruptcy Court under Sections 105, 363 and 365 of the Bankruptcy Code approving such transactions.

In consideration of the covenants, agreements, representations and warranties set forth below, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties, intending to be legally bound, covenant and agree as follows:

ARTICLE 1
INTERPRETATION

Section 1.1     *Definitions*. In this Agreement, unless the context otherwise requires or unless otherwise specifically provided herein:

"**Affiliate**" means, with respect to any Person, any other Person controlling, controlled by or under common control with, such Person, with "control" for such purpose meaning the

possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities or voting interests, by contract or otherwise.

"**Agreement**" is defined in the introductory paragraph.

"**Alternative Transaction**" is defined in Section 5.14.

"**Assumed Bank Related Contracts**" is defined in Section 5.5.

"**Assumed Contract Liabilities**" is defined in Section 5.5.

"**Auction**" is defined in Exhibit A.

"**Audited Financial Statements**" means the consolidated audited financial statements of the Bank and its Subsidiaries, consisting of consolidated audited statements of financial condition as of December 31, 2016, 2015, and 2014, consolidated audited statements of operations for the years ended December 31, 2016, 2015, and 2014, consolidated audited statements of comprehensive income for the years ended December 31, 2016, 2015 and 2014, consolidated audited statements of stockholders' equity for the years ended December 31, 2016, 2015 and 2014, and consolidated audited statements of cash flows for the years ended December 31, 2016, 2015 and 2014, true and complete copies of which have previously been provided to the Purchasers prior to the Execution Date.

"**Bank**" is defined in the Preamble.

"**Bank D&O Policy**" is defined in Section 5.6(b).

"**Bank Related Contracts**" is defined in Section 2.1.

"**Bank Significant Agreement**" is defined in Section 3.13(a).

"**Bank Transaction Expenses**" is defined in Section 8.1.

"**Bankruptcy Case**" is defined in the Preamble.

"**Bankruptcy Code**" is defined in the Preamble.

"**Bankruptcy Court**" is defined in the Preamble.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure, as in effect from time to time.

"**Benefit Arrangement**" means any "employee benefit plan" as defined in Section 3(3) of ERISA (whether or not subject to ERISA) and any other plan, program, agreement, arrangement, obligation or practice, including any pension, profit sharing, severance, welfare, fringe benefit, employee loan, retirement, medical, welfare, employment or consulting, severance, stay or retention bonuses or compensation, executive or incentive compensation, sick leave, vacation pay, disability, workers' compensation, retirement, deferred compensation,

2

bonus, stock option or purchase or other stock-based, tuition reimbursement or scholarship, employee discount, meals, travel, or vehicle allowances, plan, program, agreement, arrangement, obligation or practice, any plans subject to Section 125 of the Code, as amended, and any plans or arrangements providing benefits or payments in the event of a change of control, change in ownership or effective control or sale of assets (i) established, sponsored, maintained, or contributed to, or required to be contributed to, by the Bank or any ERISA Affiliate, on behalf of any current or former director, employee, agent, independent contractor, or service provider of the Bank or its Subsidiaries, or their beneficiaries, or (ii) pursuant to which the Bank or any ERISA Affiliate has any obligation (whether contingent or otherwise) with respect to any such persons.

"**BHCA**" means the Bank Holding Company Act of 1956, as amended.

"**Bidding Procedures**" means the procedures set forth in Exhibit A hereto and such other procedures as may be set forth in the Bidding Procedures Order and are acceptable to the Purchasers and the Company.

"**Bidding Procedures Order**" means an order of the Bankruptcy Court, approving, among other things, the process by which bids may be solicited in connection with the sale of the Shares and the Other Purchased Assets, including the Bidding Procedures, in the form attached hereto as Exhibit B with such changes as are acceptable to the Purchasers and the Company.

"**Books and Records**" means all files, ledgers and correspondence, all manuals, reports, notes, memoranda, invoices, receipts, accounts, accounting records and books, financial statements and financial working papers and all other records and documents of any nature or kind whatsoever, including those recorded, stored, maintained, operated, held or otherwise wholly or partly dependent on discs, tapes and other means of storage, including any electronic, magnetic, mechanical, photographic or optical process, whether computerized or not, and all software, passwords and other information and means of or for access thereto, belonging to the Bank or its Subsidiaries or relating to the Business.

"**Broker**" means Vining Sparks IBG, L.P.

"**Broker's Fees**" means the $100,000 flat transaction fee payable by the Company to the Broker pursuant to Section 3 of the Broker's Financial Advisory Agreement, dated December 8, 2017 (filed as Docket No. 61-1 in the Bankruptcy Case) and reimbursement of expenses as provided for in the Order approving the Broker's retention filed as Docket No. 91 in the Bankruptcy Case, subject to the Bankruptcy Court's approval pursuant to paragraph 4 of the Order at Docket No. 91.

"**Burdensome Condition**" means any restraint, limitation, term, requirement, provision or condition imposed by any Governmental Authority that could (i) reasonably be expected to be materially burdensome on, or impair in any material respect the anticipated benefits of the Contemplated Transactions to, the Purchasers; (ii) require a material modification of or impose any material limitation or restriction on the ownership, activities, governance, legal structure, compensation, or fee arrangements of the Purchasers or the Bank; (iii) require a contribution of

3

capital to the Bank or require any guaranty, support or maintenance of capital of the Bank at or after the Closing, other than the Equity Contribution; or (iv) cause any Person other than the Purchasers to be deemed to control the Bank.

"**Business**" means the business currently and previously carried on by the Bank and its Subsidiaries.

"**Business Day**" means any day other than a Saturday, Sunday or any federal holiday in the United States.

"**Call Reports**" means the Bank's Consolidated Reports of Condition and Income (FFIEC Form 051) or any successor form of the Federal Financial Institutions Examination Council, or any successor thereto.

"**CBCA**" means the Change in Bank Control Act.

"**Charter Documents**" means articles or certificate of incorporation or association, bylaws and any other comparable constituent document of a corporate entity.

"**Closing**" means the completion of the sale and purchase of the Shares and the Other Purchased Assets, including the assumption and assignment of the Assumed Bank Related Contracts (if any), in accordance with Article 7.

"**Closing Date**" means the fifth Business Day following the satisfaction or waiver, as applicable, of the conditions set forth in Article 6 (other than those conditions that by their nature are to be satisfied at the Closing, but subject to fulfillment or waiver of those conditions), or such other date as may be agreed upon in writing by the Company and the Purchasers.

"**Closing Statement**" has the meaning set forth in Section 2.7(b).

"**Closing Tangible Common Equity**" means total common equity capital minus the unamortized core deposit intangible asset, each as reflected in the applicable line items of the consolidated balance sheet of the Bank as of the last day of the month ending immediately prior to the Closing prepared in accordance with GAAP; provided, that such balance sheet shall reflect an accrual for the amount of any Bank Transaction Expenses to the extent not already paid as of the date of such balance sheet; provided, further, that if the Closing is to occur during the first ten days of any month then the Closing Tangible Common Equity shall be calculated as of the end of the second month immediately preceding the Closing. An illustrative calculation of Closing Tangible Common Equity based on the December 31, 2017 Balance Sheet is attached as Exhibit E.

"**Code**" means the Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated thereunder.

"**Common Stock**" is defined in Section 3.2(a).

"**Company**" is defined in the introductory paragraph.

"**Company Tax Returns**" is defined in Section 5.18.

"**Consent**" means any approval, consent, ratification, waiver or other authorization of, notice to or registration, qualification, designation, declaration or filing with any Person, including any Governmental Authority.

"**Contemplated Transactions**" means all of the transactions between the Company, the Bank, and the Purchasers contemplated by this Agreement, including all transfers and assignments of Other Purchased Assets between the Company and the Bank contemplated by this Agreement, and also including the execution, delivery and performance of all documents, instruments and agreements contemplated hereby.

"**Contracts**" means all contracts, agreements, instruments, leases, indentures, mortgage, bond, arrangement, authorization, license, obligation, plan, practice, understanding, restriction, undertaking and commitments, whether written or oral, including non-competition, non-solicitation and confidentiality agreements, to which any Person is a party or that is binding on any Person or its capital stock, assets or business.

"**CRA**" is defined in Section 3.19.

"**Criticized Assets**" is defined in Section 3.23(a).

"**Cure Costs**" means, with respect to any contract or agreement to which the Company is party, the amount required to be paid with respect to such contract or agreement to cure all monetary defaults under such contract or agreement to the extent required by Section 365(b) of the Bankruptcy Code and otherwise satisfy all requirements imposed by Section 365 of the Bankruptcy Code.

"**D&O Indemnified Parties**" is defined in Section 5.6(a).

"**December 31 Balance Sheet**" means the balance sheet included in the Call Report of the Bank as of December 31, 2017.

"**Deposit Amount**" is defined in Section 2.3.

"**Derivative Transactions**" means any swap transaction, option, warrant, forward purchase or sale transaction, futures transaction, cap transaction, floor transaction or collar transaction relating to one or more currencies, commodities, bonds, equity securities, loans, interest rates, prices, values, or other financial or non-financial assets, credit-related events or conditions or any indexes, or any other similar transaction or combination of any of these transactions, including any collateralized debt or equity instruments evidencing or embedding any such types of transactions, and any related credit support, collateral or other similar arrangements related to such transactions.

"**Disclosing Party**" is defined in Section 5.2.

"**Disclosure Schedule**" means the disclosure schedule delivered by the Company to the Purchasers concurrently with the execution and delivery of the Original Agreement.

4829-0090-3265.v1

"**Encumber**" means to create or permit to exist an Encumbrance.

"**Encumbrance**" means, with respect to any asset, whether or not registered or registrable or recorded or recordable, and regardless of how created or arising: a lien, encumbrance, adverse claim, charge, execution, security interest or pledge against such asset, or a subordination to any right or claim of others in respect thereof; a claim or interest against such asset or the owner thereof; an option or other right to acquire any interest in such asset; an interest of a vendor or lessor under any conditional sale agreement, capital lease or other title retention agreement relating to such asset; or any other encumbrance of whatsoever nature or kind against such asset, other than, with respect to the Shares, transfer restrictions imposed by federal or state securities laws.

"**Environmental Claim**" means any claim, action, cause of action, suit, proceeding, investigation, order, demand or notice by any Person alleging actual or potential non-compliance or Liability (including for investigatory costs, cleanup costs, governmental response costs, natural resources damages, property damages, personal injuries, attorneys' fees or penalties) arising out of, based on, resulting from or relating to (i) the presence, or release into the environment; of, or exposure to, any Materials of Environmental Concern, or (ii) circumstances forming the basis of any violation, or alleged violation, of any Environmental Law.

"**Environmental Laws**" means all Legal Requirements and Governmental Authorizations and Permits relating to pollution or protection of human health or the environment (including air, surface water, ground water, land surface or subsurface strata, and natural resources) including Legal Requirements relating to (i) emissions, discharges, releases or threatened releases of, or exposure to, Materials of Environmental Concern, (ii) the manufacture, processing, distribution, use, treatment, generation, storage, containment (whether above ground or underground), disposal, transport or handling of Materials of Environmental Concern, (iii) recordkeeping, notification, disclosure and reporting requirements regarding Materials of Environmental Concern, (iv) endangered or threatened species of fish, wildlife and plant and the management or use of natural resources, (v) the preservation of the environment or mitigation of adverse effects on or to human health or the environment, or (vi) emissions or control of greenhouse gases.

"**Equity Contribution**" means the cash equity investment, to be made immediately following the Purchasers' acquisition of all of the capital stock of the Bank, by the Purchasers to the Bank in an amount not less than $2,000,000.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder.

"**ERISA Affiliate**" with respect to an entity means any other entity that, together with such first entity, would be treated as a single employer under Section 414 of the Code.

"**Escrow Account**" means the account or accounts maintained by the Escrow Agent into which the Deposit Amount is deposited in accordance with the Escrow Agreement.

4829-0090-3265.v1

"**Escrow Agent**" means the entity selected by mutual agreement of the Purchasers and the Company as promptly as practicable following the entry of the Bidding Procedures Order.

"**Escrow Agreement**" means that certain Escrow Agreement, in a form to be agreed as promptly as practicable following the entry of the Bidding Procedures Order, by and among the Purchasers, the Company and the Escrow Agent.

"**Escrow Funds**" means, as of the Closing, the funds in the Escrow Account, including interest actually earned thereon.

"**Estimated Closing Statement**" is defined in Section 2.7(a).

"**Excluded Liabilities**" is defined in Section 2.6.

"**Excluded Taxes**" means (a) any Taxes of the Bank or any Subsidiary of the Bank for any Pre-Closing Tax Period or resulting from any transaction in the Pre-Closing Tax Period, (b) any Taxes of the Company or any of its Affiliates (other than the Bank or any Subsidiary of the Bank) for any period, (c) any Taxes of any other Person for which the Company, the Bank or any of their respective Subsidiaries may be liable under Section 1.1502-6 of the Treasury Regulations (or any similar provision of state, local or foreign Tax law), as a transferee or successor, by contract or otherwise, (d) any Taxes resulting from any breach of or inaccuracy of any representation or warranty contained in Section 3.7 (disregarding any materiality or "Material Adverse Effect" qualification contained therein), and (e) any Transfer Taxes for which the Seller is liable pursuant to Section 5.21.

"**Execution Date**" is defined in the Preamble.

"**FDIC**" means the Federal Deposit Insurance Corporation, or any successor thereto.

"**Federal Reserve Board**" means the Board of Governors of the Federal Reserve System, or any successor thereto.

"**Filing Date**" is defined in Section 5.10.

"**final, non-appealable**" (including, with correlative meaning, the term "final and non-appealable") means, with respect to any Order or other action of a Governmental Authority, an Order or other action (a) as to which no appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been timely filed or, if any of the foregoing has been timely filed, it has been disposed of in a manner that upholds and affirms the subject Order in all material respects without the possibility for further appeal or rehearing thereon; and (b) as to which the time for instituting or filing an appeal, motion for rehearing or motion for new trial shall have expired, excluding any additional time periods that may begin as a result of Federal Rule 60(b).

"**GAAP**" means generally accepted accounting principles as in effect in the United States.

"**Governmental Authority**" means any federal, state, municipal, county or regional government or governmental or regulatory authority, domestic or foreign, and includes any department, court, commission, bureau, board, administrative agency or regulatory body of any of the foregoing or any nongovernmental regulatory body that provides standards for certification.

"**Governmental Authorization**" means any Consent, approval, license, registration, Permit or waiver issued, granted, given or otherwise, made available by or under the authority of any Governmental Authority or pursuant to any Legal Requirement.

"**Interim Financial Statements**" means the consolidated unaudited financial statements of the Bank and its Subsidiaries, consisting of consolidated statements of financial condition as of June 30, 2017 and June 30, 2016, and consolidated statements of operations, consolidated statements of comprehensive income, consolidated statements of stockholders' equity, and consolidated statements of cash flows, each for the three months ended June 30, 2017 and June 30, 2016, true and complete copies of which have previously been provided to the Purchasers prior to the Execution Date.

"**Knowledge**" of the Company, or words of similar import, including the Company being aware of a fact or circumstance, means the actual knowledge, after reasonable inquiry, of Scott Jackson, John Sprengle, and Nicholas Filla.

"**Leased Properties**" is defined in Section 3.11.

"**Legal Requirement**" means, with respect to any Person, any (i) federal, state, local, municipal, foreign, international, multinational or other constitution, law, ordinance, principle of common law, code, rule, regulation, statute, treaty, or administrative pronouncement having the force of law, (ii) Order, or (iii) other similar requirement enacted, adopted, promulgated or applied by a Governmental Authority, in each case, that is binding upon or applicable to such Person, as amended, unless expressly specified otherwise.

"**Liability**" means, with respect to any Person, any direct or indirect, primary or secondary, liability or obligation of such Person of any kind, character or description, whether known or unknown, absolute or contingent, whether or not accrued, disputed or undisputed, liquidated or =liquidated, secured or unsecured, joint or several, due or to become due, vested or =vested, executory, determined, determinable or otherwise.

"**Loans**" is defined in Section 3.23(a).

"**Material Adverse Effect**" means (a) any fact, effect, event, change, development, occurrence or circumstance that, by itself or together with other facts, effects, events, changes, occurrences or circumstances, has had or could reasonably be expected to have, individually or in the aggregate, a material and adverse effect on (1) the business, regulatory status, any Regulatory Agreement, assets, liabilities (including deposit liabilities), profits, prospects, condition (financial or otherwise) or results of operations of the Bank and its Subsidiaries, taken as a whole, or the Business, taken as a whole, (2) the ability of the Company or the Bank to timely consummate the transactions contemplated by this Agreement and fulfill its respective obligations hereunder, or (3) any other act or omission that could reasonably be expected to

8

materially impair the ability to operate the Business in the Ordinary Course, including after the Closing, or (b) prevents or materially impairs or impedes the ability of a party to this Agreement to timely consummate the transactions contemplated hereby; provided, however, that none of the following shall be taken into account in determining whether there has been a "Material Adverse Effect" under (a)(1)): (i) generally applicable changes after the Execution Date in GAAP or applicable regulatory accounting requirements, (ii) changes after the Execution Date in laws, rules or regulations of general applicability to companies or banks in the U.S. banking industry, (iii) changes after the Execution Date in global, national or regional political conditions or general economic or market conditions (including changes in prevailing interest rates, credit availability and liquidity, currency exchange rates, and price levels or trading volumes in the United States or foreign securities markets) affecting the U.S. banking industry generally and not specifically relating to the Bank or its Subsidiaries, (iv) any outbreak or escalation of hostilities, or declared or undeclared acts of war or terrorism, and (v) with respect to the Bank, any pre-Closing restrictions or conditions imposed on the Bank as of the Execution Date pursuant to the Regulatory Agreements to which the Bank is a party as of the Execution Date and that have been provided to the Purchasers in writing prior to the Execution Date; except, with respect to clauses (i), (ii), (iii) and (iv), to the extent that the effects of such change are disproportionately adverse to the business, regulatory status, any Regulatory Agreement, assets, liabilities (including deposit liabilities), profits, prospects, condition (financial or otherwise) or results of operations of the Bank and its Subsidiaries, taken as a whole, or the Business, taken as a whole, as compared to other banks organized in the United States or any of its States.

"**Material Governmental Authorization**" is defined in Section 3.3(b)(ii).

"**Material Permit**" is defined in Section 3.3(a).

"**Materials of Environmental Concern**" means chemicals, pollutants, contaminants, toxic or hazardous substances, materials or wastes, petroleum and petroleum products, greenhouse gases, asbestos or asbestos-containing materials or products, polychlorinated biphenyls, lead or lead-based paints or materials, radon, fungus, mold, mycotoxins or other substances having an adverse effect on human health or the environment, but specifically excluding any such substances to the extent used in de minimis quantities and to the extent strictly for household or general office purposes.

"**Multiemployer Plan**" means a "multiemployer plan" as defined in Section 3(37) of ERISA.

"**Notice of Sale**" means a notice of the sale of the Shares and the Other Purchased Assets and the Sale Hearing.

"**OCC**" means the Office of the Comptroller of the Currency, or any successor thereto.

"**OFAC**" is defined in Section 3.20.

"**Operating Property**" means any property owned, leased, or operated by the party in question or by any of its Subsidiaries or in which such party or Subsidiary holds a security interest

9

or other interest (including an interest in a fiduciary capacity), and, where required by the context, includes the owner or operator of such property, but only with respect to such property.

"**Order**" means any order, judgment, decree, decision, ruling, writ, assessment, charge, stipulation, injunction or other determination of any Governmental Authority, or any arbitration award entered into by an arbitrator, in each case having competent jurisdiction to render such.

"**Ordinary Course of Business**" or "**in the Ordinary Course**" means the conduct of the Business in the same manner in all material respects as the Business was operated on the Execution Date, including operations consistent with past practices and in conformance with the Bank's practices and procedures as of such date.

"**Original Agreement**" is defined in the Preamble.

"**Other Purchased Assets**" is defined in Section 2.1.

"**Outside Date**" is defined in Section 6.4(a).

"**Owned Properties**" is defined in Section 3.11.

"**Participation Facility**" means any facility or property in which the party in question or any of its Subsidiaries participates in the management and, where required by the context, said term means the owner or operator of such facility or property, but only with respect to such facility or property.

"**PBGC**" is defined in Section 3.10(a).

"**Permits**" means all permits, licenses, registrations, consents, authorizations, approvals, privileges, waivers, exemptions, orders, certificates, rulings, qualifications, quotas, notices, security clearances, agreements and other concessions from, of or with Governmental Authorities or other regulatory bodies.

"**Permitted Liens**" means (i) liens for current taxes and assessments not yet delinquent or as to which the Bank is diligently contesting in good faith and by appropriate proceeding either the amount thereof or the liability therefor or both and for the payment of which adequate reserves in accordance with GAAP and regulatory accounting principles have been established on the December 31 Balance Sheet; (ii) liens of landlords, carriers, mechanics, materialmen and repairmen incurred in the Ordinary Course of Business consistent with past practice for sums not yet past due, or that are being contested in good faith by appropriate proceedings and for the payment of which adequate reserves in accordance with GAAP and regulatory accounting principles have been established on the December 31 Balance Sheet, or that have been bonded over by a financially sound surety; (iii) zoning restrictions, easements, licenses and other restrictions on the use of real property or any interest therein, or minor irregularities in title thereto, that do not materially impair the use of such property or the merchantability or the value of such property or interest therein; and (iv) liens on assets given to secure advances by a Federal Home Loan Bank or the Federal Reserve discount window, in each case in the Ordinary Course of Business; provided that except in the case of Permitted Liens under clause (iv) above, an Encumbrance in respect of a monetary obligation will not be

10

considered a Permitted Lien if the monetary obligation could reasonably be expected to be greater than $250,000 or the aggregate monetary obligations in respect of all Encumbrances that would otherwise be Permitted Liens could reasonably be expected to exceed $100,000.

"**Person**" means an individual, legal personal representative, corporation, limited liability company, partnership, firm, trust, trustee, syndicate, joint venture, unincorporated organization or Governmental Authority.

"**Pre-Closing Tax Period**" is defined in Section 5.18.

"**Premium Cap**" is defined in Section 5.6(b).

"**Pro Rata Portion**" is defined in Section 2.1.

"**Proceedings**" means any action, claim, arbitration, audit, allegation, hearing, investigation, litigation, suit or other legal or quasi-legal proceeding (whether civil, criminal, administrative, investigative or informal) commenced, brought, conducted or heard by or before, or otherwise involving, any court or other Governmental Authority or referee, trustee, arbitrator or mediator.

"**Properties**" is defined in Section 3.11.

"**Proprietary Rights**" is defined in Section 3.17.

"**Purchase Price**" is defined in Section 2.2.

"**Purchasers**" is defined in the introductory paragraph.

"**Purchasers' Required Approvals**" is defined in Section 4.2.

"**Qualified Plan**" is defined in Section 3.10(b).

"**Real Estate**" is defined in Section 3.11.

"**Recipient Party**" is defined in Section 5.2.

"**Regulatory Agreement**" is defined in Section 3.3(b)(vii).

"**Sale**" is defined in the Preamble.

"**Sale Hearing**" is defined in Exhibit C.

"**Sale Motion**" is defined in Section 5.10.

"**Sale Order**" means an order of the Bankruptcy Court substantially in the form of Exhibit C.

"**Sanctions**" is defined in Section 3.21.

4829-0090-3265.v1

"**Sanctioned Countries**" is defined in Section 3.21.

"**SEC**" means the U.S. Securities and Exchange Commission, or any successor thereto.

"**Shares**" is defined in the Preamble.

"**Specified Person**" means (i) any Person that has indicated an interest in, or could reasonably be expected to have an interest in, participating in an Alternative Transaction, (ii) any Affiliate of any such Person and (iii) any director, officer, employee, agent, representative or advisor of any such Person or any of its Affiliates.

"**Subsidiary**" shall have the meaning given such term in Section 2(d) of the BHCA, 12 U.S.C. § 1841(d).

"**Successful Bidder**" is defined in Exhibit A.

"**Successor**" is defined in Section 2.3.

"**Tax**" or "**Taxes**" means (i) all federal, state, local and foreign taxes, charges, fees, imposts, levies or other like assessments, including all income, gross income, gross receipts, business, alternative or add-on minimum, capital, sales, use, ad valorem, escheat, commercial rent, value added, transfer, registration, franchise, profits, windfall profits, inventory, capital stock, license, premium, withholding, payroll, employment, social security, unemployment, disability, excise, severance, stamp, occupation, recapture, real and personal property, estimated taxes, customs duties, fees, assessments and charges of any kind whatsoever, together with any interest, penalties, additions to tax or additional amounts imposed by any taxing authority, whether disputed or not, and (ii) any liability for the payment of any amounts of the type described in clause (i) of another Person as a result of being a member of an affiliated, consolidated, combined or unitary group for any period (including any arrangement for group or consortium tax relief or similar arrangement).

"**Tax Matter**" is defined in Section 5.20.

"**Tax Refund**" means any Tax refunds from any Governmental Authority.

"**Tax Returns**" means all returns, statements, reports, documents, declarations, forms, designations, claims for refund, and other information and filings (including elections, disclosures, schedules and estimates), and any attachments, addenda or amendments thereto (whether or not a payment is required to be made with respect to any such return or other document) relating to Taxes.

"**Tax Sharing Agreement**" **is defined** in Section 3.7(e).

"**Third Party**" means Person that is not (a) a party to this Agreement or their successors and permitted assigns or (b) an Affiliate of a party to this Agreement.

"**Third-Party Claim**" means any Proceeding which is asserted or threatened in writing by a Third Party.

12

"**Transfer Tax Returns**" is defined in Section 5.21.

"**Transfer Taxes**" is defined in Section 5.21.

"**Treasury**" is defined in Section 3.20.

"**USA PATRIOT Act**" is defined in Section 3.20.

Section 1.2    *Interpretation*. For the purposes of this Agreement: (a) words in the singular shall be held to include the plural and vice versa, and words of one gender shall be held to include the other gender as the context requires; (b) references to the terms Article, Section, paragraph, Exhibit and Schedule are references to the Articles, Sections, paragraphs, Exhibits and Schedules to this Agreement unless otherwise specified; (c) the terms "hereof," "herein," "hereby," "hereto," and derivative or similar words refer to this entire Agreement, including the Disclosure Schedules, Schedules and Exhibits hereto; (d) references to "$" shall mean United States dollars and except where otherwise provided, all monetary amounts in this Agreement are stated and shall be paid in United States dollars; (e) the word "including" and words of similar import when used in this Agreement shall mean "including without limitation," unless otherwise specified; (f) the word "or" shall not be exclusive; (g) references to "written" or "in writing" include in electronic form; (h) provisions shall apply, when appropriate, to successive events and transactions; (i) the Company and the Purchasers have each participated in the negotiation and drafting of this Agreement and if an ambiguity or question of interpretation should arise, this Agreement shall be construed as if drafted jointly by the parties hereto and no presumption or burden of proof shall arise favoring or burdening any party by virtue of the authorship of any of the provisions in this Agreement; (j) a reference to any Person includes such Person's successors and permitted assigns; (k) any reference to "days" shall mean calendar days unless Business Days are expressly specified; and (1) when calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded and if the last day of such period is not a Business Day, the period shall end at the close of business on the next succeeding Business Day.

Section 1.3    *Governing Law*. This Agreement and the agreements contemplated hereby, and all claims, causes of action and Proceedings (whether in contract, tort or statute) that may be based upon, arise out of or relate to this Agreement, or the negotiation, execution or performance of this Agreement (including any claim, cause of action or Proceeding based upon, arising out of or related to any representation or warranty made in or in connection with this Agreement or as an inducement to enter into this Agreement) shall be construed and interpreted, and the rights of the parties shall be governed by, and enforced in accordance with, the Bankruptcy Code and the internal laws of the State of Colorado, including its statutes of limitations, without giving effect to any Legal Requirement that would cause application of any Legal Requirement of any jurisdiction other than the State of Colorado and, if and when applicable, the Bankruptcy Code.

Section 1.4    *Effectiveness*. This Agreement is effective as of the Execution Date.

4829-0090-3265.v1

## ARTICLE 2
## PURCHASE OF SHARES AND OTHER ASSETS

Section 2.1    *Purchase and Sale of the Shares and Other Purchased Assets*. Subject to the terms and conditions set forth in this Agreement, and subject to the entry of a Sale Order, the Company agrees to sell, assign and transfer to the Purchasers, free and clear of all Encumbrances, and the Purchasers agree to purchase from the Company, on the Closing Date, effective as of and from the Closing, (a) all of the Shares in accordance with the allocation percentages set forth on the Purchasers' signature pages hereto (such percentages the "**Pro Rata Portion**"), and (b) (i) all of the Contracts of the Company and its Subsidiaries (other than the Bank and its Subsidiaries) that relate to the Business (collectively, the "**Bank Related Contracts**") that the Purchasers have identified in accordance with Section 5.5 as Assumed Bank Related Contracts, (ii) all right, title and interest of the Company to any proceeds received or to be received after November 8, 2017 related to any Assumed Bank Related Contract, including any such proceeds from any insurance claims to the extent (but, in the case of insurance claims, only to the extent) related to the Bank or its Subsidiaries or the Business, and (iii) all right, title and interest of the Company to the assets set forth on Section 2.1 of the Disclosure Schedule (the assets identified in clauses (i), (ii), and (iii) collectively, the "**Other Purchased Assets**").

Section 2.2    *Consideration*. The amount payable to the Company for the Shares and the Other Purchased Assets will be the Closing Tangible Common Equity determined in accordance with Section 2.7, plus $4,200,000 (the "**Purchase Price**").  The Purchase Price shall, subject to the terms and conditions hereof, be payable, as set forth in Section 2.4, at the Closing. Concurrently with the Closing, the Bank or, if designated by the Purchasers, a Subsidiary of the Bank shall assume the Assumed Contract Liabilities.

Section 2.3    *Purchase Price Deposit*. As soon as practicable following the date of entry of the Bidding Procedures Order, but in no event later than the Bid Deadline (as such term is defined in the Bidding Procedures) the Parties shall enter into the Escrow Agreement and the Purchasers shall deposit with the Escrow Agent the sum of $600,000.00 (the "**Deposit Amount**"). The Deposit Amount will be either delivered to the Purchasers (in accordance with the Purchasers' Pro Rata Portion) or paid to the Company as follows (in addition to any other remaining Escrow Funds): (a) if the Closing occurs, the Deposit Amount and all other Escrow Funds shall be applied towards the Purchase Price payable by the Purchasers, (b) if this Agreement is terminated by the Company pursuant to Section 6.4(b)(iii), then the Company and the Purchasers shall promptly submit joint written instructions to the Escrow Agent to release the Deposit Amount and all other Escrow Funds to the Company (and such Escrow Funds will be deemed fully earned by the Company as compensation and consideration for entering into this Agreement), or (c) if this Agreement is terminated for any reason other than by the Company pursuant to Section 6.4(b)(iii), then the Purchasers, upon notice to the Company, shall submit written instructions to the Escrow Agent to release the Deposit Amount and all other Escrow Funds to the Purchasers in accordance with their Pro Rata Portion. The Deposit Amount shall only constitute property of the Company's bankruptcy estate in the event that the Deposit Amount is required to be released to the Company by the Escrow Agent in accordance with the terms of this Agreement.

The obligation to return the Deposit Amount in accordance with the provisions of this Section 2.3 will (i) be binding upon and enforceable against the Company immediately upon the Bankruptcy Court's entering the Bidding Procedures Order, (ii) not be terminable or dischargeable thereafter for any reason, (iii) survive any subsequent conversion, dismissal or consolidation of the Bankruptcy Case, any plan of reorganization or liquidation in the Bankruptcy Case, and (iv) survive the subsequent termination of this Agreement by any means. The obligations to return the Deposit Amount, as and when required under this Agreement, is intended to be, and upon entry of the Bidding Procedures Order is, binding upon (A) the Company, (B) any successors or assigns of the Company, (C) any trustee, examiner or other representative of the Company's bankruptcy estate, (D) the reorganized Company and (E) any other entity vested or revested with any right, title or interest in or to the Company, or any other Person claiming any rights in or control (direct or indirect) over the Company (each of (A) through (E), a "**Successor**") as if such Successor were the Company hereunder. The obligations of the Company to return the Deposit Amount, as and when required under this Agreement, may not be discharged under Sections 1141 or 727 of the Bankruptcy Code or otherwise and may not be abandoned under Section 554 of the Bankruptcy Code or otherwise.

Section 2.4    *Payments*. On the Closing Date, the Purchasers shall (a) pay or cause to be paid the Broker's Fees pursuant to Section 5.27 and (b) pay the Purchase Price set forth on the Closing Statement (less (i) the Broker's Fees and (ii) the Deposit Amount and all other Escrow Funds) to the Company by wire transfer to an account designated by the Company in writing at least three Business Days prior to the Closing Date. In connection with the foregoing, the Purchasers and the Company shall promptly submit joint written instructions to the Escrow Agent to release the Deposit Amount and all other Escrow Funds to the Company.

Section 2.5    *Equity Contribution*. Immediately following the Purchasers' acquisition of all of the capital stock of the Bank, the Purchasers shall make the Equity Contribution to the Bank.

Section 2.6    *Excluded Liabilities*. Notwithstanding anything in this Agreement to the contrary, except as expressly provided in Section 5.6 hereof, none of the Purchasers, the Bank, nor any Affiliate of the Bank shall assume, *and* shall not be deemed to have assumed or be bound by, any duties, responsibilities, obligations or liabilities of the Company or any of its Affiliates (other than, in the case of the Bank and its Subsidiaries, the duties, responsibilities, obligations or liabilities of the Bank and its Subsidiaries, respectively) of any kind or nature, known, unknown, contingent or otherwise, whether direct or indirect, matured or unmatured, other than, in the case of the Bank or, if designated by the Purchasers, a Subsidiary of the Bank, the Assumed Contract Liabilities (collectively, the "**Excluded Liabilities**").  For the avoidance of doubt, the Excluded Liabilities shall include any commitment by the Company or any of its Affiliates to any federal depository institutions regulatory agency (or predecessor to such agency) to maintain the capital of the Bank within the meaning of 11 U.S.C. §§ 365(o) and 507(a)(9).

Section 2.7    *Purchase Price Calculation and Adjustment.*

(a)    *Estimated Closing Tangible Common Equity*. At least 15 Business Days before the Closing, the Company shall prepare and deliver to the Purchasers a statement setting

forth its good faith estimate of Closing Tangible Common Equity (the "**Estimated Closing Tangible Common Equity**"), which statement shall contain the related estimated consolidated balance sheet of the Bank as of the applicable month end date and a calculation of Estimated Closing Tangible Common Equity as of the same applicable month end date (the "**Estimated Closing Statement**").

(b)     *Post-Closing Adjustment*. Within five Business Days of the date the Purchasers receive the Estimated Closing Statement, the Purchasers shall prepare and deliver to the Company a statement setting forth its calculation of Closing Tangible Common Equity, which statement shall contain the related consolidated balance sheet of the Bank as of the Closing and a calculation of Closing Tangible Common Equity (the "**Closing Statement**").

(c)     *Examination and Review*.

(i)     After receipt of the Closing Statement, the Company shall have five Business Days (the "**Review Period**") to review the Closing Statement. During the Review Period, the Company and the Company's accountants shall have access to the books and records of the Bank, the personnel of the Bank and/or the Bank's accountants to the extent that they relate to the Closing Statement and to such historical financial information (to the extent in the Purchasers' or the Bank's possession) relating to the Closing Statement as the Company may reasonably request for the purpose of reviewing the Closing Statement and to prepare a Statement of Objections; provided, that such access shall be during normal business hours and in a manner that does not interfere with the normal business operations of the Company.

(ii)     On or prior to the last day of the Review Period, the Company may object to the Closing Statement by delivering to the Purchasers a written statement setting forth the Company's objections in reasonable detail, indicating each disputed item or amount and the basis for the Company's disagreement therewith (the "**Statement of Objections**"). If the Company fails to deliver the Statement of Objections before the expiration of the Review Period, the Closing Statement delivered by the Purchasers shall be deemed to have been accepted by the Company. If the Company delivers the Statement of Objections before the expiration of the Review Period, the Purchasers and the Company shall negotiate in good faith to resolve such objections within three Business Days after the delivery of the Statement of Objections (the "**Resolution Period**"), and, if the same are so resolved within the Resolution Period and the Closing Statement with such changes as may have been previously agreed in writing by the Purchasers and the Company, shall be final and binding on the parties. During the Resolution Period, the Purchasers and their representatives shall be permitted to review the working papers of the Company and its accountants relating to the Statement of Objection and the basis therefore.

(iii)     If the Company and the Purchasers fail to reach an agreement with respect to all of the matters set forth in the Statement of Objections before expiration of the Resolution Period, then any amounts remaining in dispute ("**Disputed Amounts**") shall be deemed to equal to the amount set forth on the Bank's Call Report that is the

most current Call Report prior to the Closing and such Disputed Amount shall be so reflected on the Closing Statement.

ARTICLE 3
REPRESENTATIONS AND WARRANTIES OF THE COMPANY

Except (a) as set forth in the Disclosure Schedule or (b) for information and documents commonly known as "confidential supervisory information" that is prohibited from disclosure (and as to which nothing in this Agreement shall require disclosure), the Company hereby makes the following representations and warranties to the Purchasers as of the Execution Date, the date of this Agreement and as of the Closing Date; provided, that those representations and warranties which address matters only as of a particular earlier date shall have been true and correct only as of such date:

Section 3.1    *Organization; Non-contravention.*

(a)    *Status of the Company.* The Company is duly organized, validly existing and in good standing under the laws of the State of Delaware and otherwise has the corporate power and authority to own or lease all of its properties and assets and to conduct its business in the manner in which its business is now being conducted. The Company is duly registered with the Board of Governors of the Federal Reserve System as a bank holding company under the BHCA. The Company is duly qualified to do business and is in good standing in each jurisdiction in which its ownership of properties or conduct of business requires such qualification except where the failure to be so qualified has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(b)    *Status of Bank.* The Bank is a direct, wholly owned Subsidiary of the Company, is duly organized, validly existing and in good standing under the laws of the United States, is authorized under the laws of the United States to engage in the Business and otherwise has the corporate power and authority to own or lease all of its properties and assets and to conduct the Business in the manner in which the Business is now being conducted. The Bank is duly qualified to do business and is in good standing in each jurisdiction in which its ownership of properties or conduct of business requires such qualification except where the failure to be so qualified has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. The Bank is a national banking association which is duly licensed by the OCC to engage in commercial banking. The FDIC has not been appointed receiver of the Bank. Complete and correct copies of the applicable Charter Documents of the Bank, as currently in effect, have prior to the Execution Date been delivered to the Purchasers.

(c)    *Status of the Bank's Subsidiaries.* Each of the Bank's Subsidiaries is directly or indirectly wholly owned by the Bank, is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization, is authorized under the laws of such jurisdiction to engage in the Business that such Subsidiary conducts and otherwise has the corporate power and authority to own or lease all of its properties and assets and to conduct the

17

Business that the Subsidiary conducts in the manner in which the Business that the Subsidiary conducts is now being conducted. Each of the Bank's Subsidiaries is duly qualified to do business and is in good standing in each jurisdiction in which its ownership of properties or conduct of business requires such qualification except where the failure to be so qualified has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(d)     *Authority*. Except as set forth in Section 3.1(d) of the Disclosure Schedule, (i) the Company has full legal right, corporate power and authority to enter into this Agreement and, subject to the Sale Order, to carry out its obligations hereunder and thereunder, including the consummation of the Sale and the Contemplated Transactions; and (ii) the execution and delivery of this Agreement and, subject to the Sale Order, the completion and performance of the Contemplated Transactions have been duly authorized by all necessary corporate action on the part of the Company, and this Agreement and all documents, instruments and agreements required to be executed and delivered by the Company pursuant to this Agreement have been duly executed and delivered by the Company and, subject to the Sale Order (and assuming due authorization, execution and delivery by the Purchasers), constitute a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with their respective terms. No other corporate proceedings, including any stockholder approvals, are necessary for the execution and delivery by the Company of this Agreement, the performance by it of its obligations hereunder or the consummation by it of the Contemplated Transactions.

(e)     *No Conflicts*. Except as set forth in Section 3.1(e) of the Disclosure Schedule, none of the execution and delivery of this Agreement, the completion and performance of the Contemplated Transactions (subject to the Sale Order), or compliance by the Company with any of the provisions hereof, will (i) violate, conflict with, or result in a breach of any provision of, or constitute a default (or an event which, with notice or lapse of time or both, would constitute a default) under, or result in the termination of, or result in the loss of any benefit or creation of any right on the part of any third party under, or accelerate the performance required by, or result in a right of termination or acceleration of, or result in the creation of any Encumbrance upon any of the material properties or assets of the Company, the Bank or any other Subsidiary of the Company, under any of the terms, conditions or provisions of (A) the Charter Documents of the Company, the Bank or any other Subsidiary of the, Company or the Bank, or (B) any Contract to which the Company, the Bank or any other Subsidiary of the Company or the Bank is a party or by which it may be bound, or to which the Company, the Bank or any other Subsidiary of the Company or the Bank or any of the properties or assets of the Company, the Bank or any other Subsidiary of the Company or the Bank may be subject, or (ii) assuming the Purchasers Required Approvals are duly obtained, violate in any respect any Legal Requirement or any Order applicable to the Company, the Bank or any other Subsidiary of the Company or the Bank or any of their respective properties or assets.

(f)     *Title*. At the Closing, the Company will transfer and deliver good and marketable title to the Shares to the Purchasers and to the Other Purchased Assets to the Bank or, if designated by the Purchasers, a Subsidiary of the Bank, in each case, free and clear of any Encumbrances.

Section 3.2     *Capitalization of the Bank.*

18

(a)      *Capitalization*. The authorized capital stock of the Bank consists of 10,000 shares of common stock, $10.00 par value per share (the "**Common Stock**"), of which 10,000 shares of Common Stock are outstanding. No other shares of capital stock of the Bank are issued or outstanding. 10,000 of the outstanding shares of Common Stock are directly and beneficially owned and held by the Company and all of the outstanding shares of Common Stock have been duly authorized and validly issued, are fully paid and nonassessable (except as provided in 12 U.S.C. § 55) with no personal liability attaching to the ownership thereof, have been issued in full compliance with all federal and state securities laws and other Legal Requirements, were not issued in violation of or subject to any preemptive rights or other rights to subscribe for or purchase securities, and are free and clear of all Encumbrances. The Company has good and valid title to the Shares. The Company has no other equity interests in the Bank.

(b)      *Outstanding Stock Rights*. Except as set forth in Section 3.2(b) of the Disclosure Schedule, there are no (i) outstanding preemptive rights, subscriptions, options, calls, units, warrants or other rights of any kind or nature to acquire or which relate to any securities of the Bank or its Subsidiaries; (ii) outstanding securities, instruments or obligations that are or may become convertible into or exchangeable or exercisable for any securities of the Bank or its Subsidiaries; (iii) Contracts under which the Company or any of its Subsidiaries or the Bank or any of its Subsidiaries are or may become obligated to sell, issue or otherwise dispose of or redeem, purchase or otherwise acquire any securities of the Bank or its Subsidiaries; (iv) shareholder agreements, voting trusts or other agreements, arrangements or understandings to which the Company or any of its Subsidiaries or the Bank or any of its Subsidiaries is a party or of which the Company is aware, that may affect the exercise of voting or any other rights with respect to the capital stock of the Bank or its Subsidiaries; or (v) outstanding bonds, debentures, notes or other indebtedness having the right to vote on any matters on which the shareholders of the Bank or its Subsidiaries may vote.

(c)      *Bank's Subsidiaries*. Other than the entities listed on Section 3.2(c) of the Disclosure Schedule, the Bank does not have any Subsidiaries nor own any equity interests in any other Person. The number of authorized and outstanding shares of capital stock (or other equity interests, as applicable) of each of the Bank's Subsidiaries is set forth on Section 3.2(c) of the Disclosure Schedule. No other shares of capital stock of any of the Bank's Subsidiaries are issued or outstanding. All of the outstanding shares of the Bank's Subsidiaries are directly or indirectly beneficially owned and held by the Bank and have been duly authorized and validly issued, are fully paid and nonassessable with no personal liability attaching to the ownership thereof, have been issued in full compliance with all federal and state securities laws and other Legal Requirements, were not issued in violation of or subject to any preemptive rights or other rights to subscribe for or purchase securities, and are free and clear of all Encumbrances.

(d)      *Ownership of Assets*. Neither the Company nor any of its Subsidiaries (other than the Bank and its Subsidiaries) (i) owns or has any right to use any asset or property (whether real, personal, tangible, intangible or otherwise) used in or held for use in, or related to, the Business or (ii) other than the Bank Related Contracts, is a party to any Contract relating to the Business. No Subsidiary of the Company (other than the Bank or its Subsidiaries) has or owns any interest in any Tax Refund (or any proceeds of any Tax Refund received or to be received after June 30, 2017) or any proceeds received or to be received after June 30, 2017

related to any Assumed Bank Related Contract (including any proceeds from any insurance claim to the extent related to the Bank or its Subsidiaries or the Business).

Section 3.3    *Licenses, Permits and Orders.*

(a)    *Permits.* The Bank and its Subsidiaries hold, and have at all times since January 1, 2012, held, all Permits material to the Business (including all Permits required from the FDIC and the OCC in connection with the Business) (each, a "**Material Permit**"). Except as set forth in Section 3.3(a) of the Disclosure Schedule, all of the Material Permits are validly issued, are in full force and effect and are being and have been complied with by the Bank and its Subsidiaries in all material respects. Except as set forth in Section 3.3(a) of the Disclosure Schedule; no notice of breach or default in respect of any Material Permit has been received by the Bank or its Subsidiaries and there are no proceedings in progress, pending or threatened which would reasonably be expected to result in the cancellation, revocation, modification, withdrawal, limitation, suspension or adverse alteration of any of them, and the Company is not aware of any existing matters or state of facts which would reasonably be expected to give rise to any such notice or proceeding.

(b)    *Governmental Authorizations.*

(i)    Each Governmental Authorization that is held by the Bank or its Subsidiaries or that otherwise relates to the Business is valid and in full force and effect.

(ii)    Except as set forth in Section 3.3(b) of the Disclosure Schedule, the Bank and its Subsidiaries are, and have at all times since January 1, 2012, been, in compliance with all of the terms and requirements of each Governmental Authorization applicable to them that is material to the Business (a "**Material Governmental Authorization**").

(iii)    Except as set forth in Section 3.3(b) of the Disclosure Schedule, no event has occurred or circumstance exists that would or would reasonably be expected to (with or without notice or lapse of time or both) (A) constitute or result directly or indirectly in a material violation of or a failure to comply with any term or requirement of any Material Governmental Authorization, or (B) result directly or indirectly in the revocation, withdrawal, suspension, cancellation or termination of, or any modification to, or would otherwise impair in any way, any Material Governmental Authorization.

(iv)    Except as set forth in Section 3.3(b) of the Disclosure Schedule, neither the Company nor the Bank (nor any of its Subsidiaries) has received any notice or other communication from any Governmental Authority regarding (A) any actual, alleged, possible or potential violation of or failure to comply with any term or requirement of any Material Governmental Authorization or (B) any actual, proposed, possible or potential revocation, withdrawal, suspension, cancellation, termination of or modification to any Material Governmental Authorization.

(v)    All applications required to have been filed for the renewal of the Material Governmental Authorizations have been duly filed on a timely basis with the appropriate Governmental Authorities, and all other filings required to have been made

20

with respect to such Material Governmental Authorizations have been duly made on a timely basis with the appropriate Governmental Authority, except as has not been and would not reasonably be expected to be material.

(vi)     There is no Governmental Authorization, Consent, Permit, Order or any other action of, or any registration, declaration, filing or notice with or to any Governmental Authority that is required for the execution or delivery by the Company of this Agreement or the validity or enforceability of this Agreement against the Company or, subject to the Sale Order and the receipt of the Purchasers Required Approvals, the completion or performance by the Company of any of the Contemplated Transactions.

(vii)     Except as set forth in Section 3.3(b)(vii) of the Disclosure Schedule, neither the Bank nor any of its Subsidiaries is subject to any cease-and-desist or other similar Order or enforcement action (formal or informal) issued by, nor is any of them a party to any written agreement, consent agreement or memorandum of understanding with, or a party to any commitment letter, troubled condition letter, supervisory letter or similar undertaking to, or subject to any capital directive by, or adopted any board resolutions at the request of, any Governmental Authority (each item in this sentence, whether or not set forth in the Disclosure Schedule, and including any amendment, supplement or modification thereto, a "**Regulatory Agreement**"), nor has the Bank or any of its Subsidiaries been notified since January 1, 2012, by any Governmental Authority that it is considering issuing, initiating, ordering, or requesting any such Regulatory Agreement, or amending any such Regulatory Agreement. There is no pending or threatened regulatory investigation or other action by any Governmental Authority that could reasonably be expected to lead to the existence of any Regulatory Agreement.

(c)     *Compliance with Law*. Except as set forth in Section 3.3(c) of the Disclosure Schedule, neither the Company nor any of its Subsidiaries is in material violation of, or has materially violated, and to the Knowledge of the Company neither the Company nor any of its Subsidiaries is under investigation with respect to or has been threatened to be charged with or given notice of any material violation of, any Legal Requirement.

(d)     *Fiduciary Activities*. The Bank and each of its Subsidiaries has properly administered all accounts for which it acts as a fiduciary, including accounts for which it serves as a trustee, agent, custodian, personal representative, guardian, conservator or investment advisor, in accordance with the terms of the governing documents and applicable law in all material respects. Except as would not reasonably be expected to be material to the Bank and its Subsidiaries, taken as a whole, none of the Bank, any of its Subsidiaries, or any director, officer or employee of the Bank or of any of its Subsidiaries, has committed any breach of trust or fiduciary duty with respect to any such fiduciary account, and the accountings for each such fiduciary account are true and correct and accurately reflect the assets of such fiduciary account. The Bank has requisite authority from the OCC to exercise fiduciary powers under section 92a of the National Bank Act, 12 U.S.C. § 92a, and from any other applicable Governmental Authority.

Section 3.4     *Reports*. The Bank and its Subsidiaries have filed or furnished, as applicable, on a timely basis, all forms, filings, registrations, submissions, statements,

21

certifications, reports and documents required to be filed or furnished by them with any Governmental Authority, including any and all federal and state banking authorities, since January 1, 2012 (including any amendments thereto, the "**Bank's Reports**"). Each of the Bank's Reports, at the time of its filing or being furnished, complied as to form in all material respects with all Legal Requirements applicable to the Bank's Reports. As of their respective dates (or, if amended prior to the Execution Date, as of the date of such amendment), the Bank's Reports did not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements made therein, in light of the circumstances in which they were made, not misleading. Except for normal examinations conducted by a Governmental Authority in the Ordinary Course, there is no pending Proceeding before, or examination or investigation by, any Governmental Authority into the Business or operations of the Company, the Bank or any Subsidiary of the Bank. Except as set forth in Section 3.4(a) of the Disclosure Schedule, there are no unresolved violations, criticisms, or exceptions by any Governmental Authority with respect to any report relating to any examinations of the Company, the Bank or any Subsidiary of the Company or the Bank, except where any such violations, criticisms or exceptions that would not, individually or in the aggregate, be material to the Bank.

Section 3.5     *Deposits*. All of the deposits held by the Bank (including the records and documentation pertaining to such deposits) have been established and are held in compliance in all material respects with (i) all applicable policies, practices and procedures of the Bank, and (ii) all applicable Legal Requirements, including anti-money laundering, anti-terrorism, or embargoed persons requirements. All of the deposit accounts of the Bank are insured by the FDIC to the maximum limit set by the FDIC, any premiums and assessments required to be paid in connection therewith have been fully paid when due, and no Proceedings for the termination or revocation of such insurance are pending, or, to the Knowledge of the Company, threatened.

Section 3.6     *Financial Statements; Reporting; Internal Controls.*

(a)     *Bank's Financial Statements*. The Company has prior to the Execution Date provided to the Purchasers the Audited Financial Statements and the Interim Financial Statements. The Audited Financial Statements and the Interim Financial Statements (i) have been prepared from, and are in accordance with, the books and records of the Bank and its Subsidiaries and are true, accurate and complete in all material respects, (ii) have been prepared in accordance with GAAP and regulatory accounting principles consistently applied, except as may be otherwise indicated in the notes thereto and except for the omission of footnotes from the Interim Financial Statements, and (iii) fairly present the consolidated financial position of the Bank and its Subsidiaries as of the respective dates set forth therein and their consolidated results of operations, cash flows and changes in shareholders' equity, for the respective periods set forth therein, subject, in the case of the Interim Financial Statements, to normal year-end adjustments (none of which will be material). The consolidated financial statements of the Bank and its Subsidiaries to be prepared after the Execution Date and prior to the Closing (A) will be prepared from, and in accordance with, the books and records of the Bank and its Subsidiaries and will be true, accurate and complete in all material respects, (B) will have been prepared in accordance with GAAP and regulatory accounting principles consistently applied, except as may be otherwise indicated in the notes thereto and except for the omission of footnotes, and (C) will fairly present in all material respects the consolidated financial position of the Bank and its Subsidiaries as of the respective dates set forth therein and their consolidated results of operations, cash flows and changes in shareholders' equity for the respective periods set forth therein, subject, in the case of the interim period financial statements, to normal year-end adjustments (none of which will be material).

22

(b)      *Call Reports*. The Company has prior to the Execution Date provided to the Purchasers true and complete copies of the Call Reports of the Bank for the periods ending December 31, 2014, 2015 and 2016, and 2017. The financial statements contained in such Call Reports (i) have been prepared from, and are in accordance with, the books and records of the Bank and its Subsidiaries and are true, accurate and complete in all material respects, (ii) have been prepared in accordance with GAAP and regulatory accounting principles consistently applied, except as may be otherwise indicated in the notes thereto and except for the omission of footnotes, and (iii) fairly present in all material respects the consolidated financial position of the Bank and its Subsidiaries as of the respective dates set forth therein and their consolidated results of operations, cash flows and changes in shareholders' equity for the respective periods set forth therein, subject, in the case of the interim period financial statements, to normal year-end adjustments (none of which will be material). The financial statements contained in the Call Reports of the Bank to be prepared after the Execution Date and prior to the Closing (A) will be prepared from, and in accordance with, the books and records of the Bank and its Subsidiaries and will be true, accurate and complete in all material respects, (B) will have been prepared in accordance with GAAP and regulatory accounting principles consistently applied, except as may be otherwise indicated in the notes thereto and except for the omission of footnotes, and (C) will fairly present in all material respects the consolidated financial position of the Bank and its Subsidiaries as of the respective dates set forth therein and their consolidated results of operations, cash flows and changes in shareholders' equity for the respective periods set forth therein, subject, in the case of the interim period financial statements, to normal year-end adjustments (none of which are reasonably expected to be material).

(c)      *Systems and Processes*. Except as set forth in Section 3.6(c) of the Disclosure Schedule, the Bank and its Subsidiaries have in place sufficient systems and processes that are customary for a bank of the size and risk profile of the Bank and that (x) provide reasonable assurances regarding the reliability of the Bank's and its Subsidiaries' financial statements and (y) in a timely manner accumulate and communicate to the Bank's and its Subsidiaries' principal executive officer and principal financial officer the type of information that would be required to be disclosed in the Bank's and its Subsidiaries' financial statements. Neither the Bank or its Subsidiaries nor, to the Company's Knowledge, any employee, auditor, accountant or representative of the Bank or its Subsidiaries has received or otherwise had or obtained Knowledge of any complaint, allegation, assertion or claim, whether written or oral, regarding the adequacy of such systems and processes or the accuracy or integrity of the Bank's or its Subsidiaries' financial statements or accounting practices. There has been no instance of fraud by the Bank or its Subsidiaries, whether or not material, that occurred during any period since January 1, 2012.

(d)      *Auditor Independence*. Since January 1, 2012, the Company's and the Bank's external auditor was independent of the Company and the Bank and their management. The Company's and the Bank's external auditor has not resigned or been dismissed as a result of or in connection with any disagreements with the Company on a matter of accounting principles or practices, financial statement disclosure or auditing scope or procedure.

(e)      *Books and Records and Internal Controls*.

(i)     The Books and Records have been and are being maintained in the Ordinary Course of Business in accordance and compliance with all applicable accounting requirements and Legal Requirements and are complete in all material respects to reflect action and activities by the Bank and its Subsidiaries. Neither the Company nor the Bank nor any of their Subsidiaries has any off balance sheet arrangements as defined in Item 303(a)(4)(ii) of Regulation S-K of the Securities Act of 1933, as amended.

(ii)     The records, systems, controls, data and information of the Bank and its Subsidiaries are recorded, stored, maintained and operated under means (including any electronic, mechanical or photographic process, whether computerized or not) that are under the exclusive ownership and control of the Bank and its Subsidiaries or any of their accountants (including all means of access thereto and therefrom) in all material respects. The Bank and its Subsidiaries have established and maintain a system of internal accounting controls designed to provide reasonable assurances that (A) transactions are executed in accordance with management's general or specific authorizations and (B) transactions are recorded in conformity with GAAP consistently applied and all Legal Requirements. Since January 1, 2012, neither the Bank nor its Subsidiaries nor, to the Company's Knowledge, any director, senior executive officer, auditor, or independent accountant, has received notice or otherwise obtained knowledge of any material weakness regarding the accounting or auditing practices, procedures or methods of the Bank or its Subsidiaries or their respective internal accounting controls.

(f)     *Absence of Undisclosed Liabilities*. Neither the Bank nor its Subsidiaries has any Liability, and there is no existing fact, condition, situation or set of circumstances that could reasonably be expected to result in such a Liability, except: Liabilities to the extent reflected in or provided for on the December 31 Balance Sheet; or Liabilities incurred in the Ordinary Course of Business since December 31, 2017 that are not, individually or in the aggregate, material to the Bank.

(g)     *Absence of Changes*. Since December 31, 2014, (i) apart from the Bankruptcy Case, there have been no events, circumstances, facts or occurrences that have had, individually or in the aggregate, a Material Adverse Effect, (ii) the Company, the Bank and their respective Subsidiaries have owned, operated, maintained and conducted the Business in the Ordinary Course, and (iii) neither the Company nor the Bank has taken any action that would be prohibited by Section 5.1 if it were taken after the Execution Date and prior to the Closing or that would prevent the consummation of the transactions contemplated hereby.

Section 3.7     *Tax Matters*.

(a)     Each of the Bank and its Subsidiaries (or the Company on behalf of the Bank or its Subsidiaries) has timely filed (after giving effect to applicable extensions) all federal income Tax Returns and all other Tax Returns required to be filed by it. All such Tax Returns were true, correct and complete in all respects and accurately reflected in all respects the taxable income (or other measure of Tax) of the Bank and its Subsidiaries.

24

(b)     Each of the Company, the Bank and its Subsidiaries (or the Company on behalf of the Bank or its Subsidiaries) has paid all Taxes required to be paid by the Bank, its Subsidiaries or the consolidated, combined, affiliated, unitary or other Tax group including the Company, the Bank and its Subsidiaries whether or not shown on any Tax Return. The Bank and its Subsidiaries have established reserves in accordance with GAAP that are adequate for the payment of all Taxes not yet due and payable with respect to the assets and operations of the Bank and its Subsidiaries.

(c)     Each of the Bank and its Subsidiaries (or the Company on behalf of the Bank or its Subsidiaries) has withheld and paid to the appropriate taxing authority all Taxes required to be withheld and paid, including in connection with any amounts owing to any employee, independent contractor, creditor, stockholder or other third party and all Forms W-2 and 1099 and any other forms required with respect thereto have been properly completed and timely filed in all respects.

(d)     None of the Company, the Bank or its Subsidiaries has received from any taxing authority written notice of, and, to the Knowledge of the Company, there is not threatened, any audit, claim, action, suit, request for information, ruling, determination, investigation or administrative or judicial Proceeding that is pending or being conducted with respect to Taxes of the Bank or its Subsidiaries. None of the Company, the Bank or its Subsidiaries has received from any taxing authority (including in jurisdictions in which the Bank or its Subsidiaries has not filed Tax Returns) written notice of, and, to the Knowledge of the Company, there is not threatened, any proposed assessment, adjustment or deficiency for any amount of Taxes proposed, asserted, or assessed against the Bank or its Subsidiaries.

(e)     Neither the Bank nor its Subsidiaries is a party to or bound by any Tax sharing, allocation or indemnification agreement or similar agreement or arrangement other than the Tax Sharing Agreement, dated as of October 31, 2014, by and between the Company and the Bank (the "**Tax Sharing Agreement**"), which agreement shall terminate on or before Closing.

(f)     Neither the Bank nor its Subsidiaries has, in the past seven (7) years or, to the Knowledge of the Company, prior years, constituted either a "distributing corporation" or a "controlled corporation" in a distribution of stock intended to qualify for tax-free treatment under Section 355 of the Code.

(g)     Without regard to the Agreement, neither the Bank nor any of its Subsidiaries has undergone an "ownership change" within the meaning of Section 382 of the Code.

(h)     Neither the Bank nor its Subsidiaries will be required, for income Tax purposes for any taxable period ending after the Closing Date, to include in its taxable income any item of income or gain or to exclude from its taxable income any item of deduction or loss as a result of any (i) change in method of accounting under Section 481(c) of the Code (or any corresponding or similar provision of state, local or foreign law) for a taxable period ending on or prior to the Closing Date, (ii) closing agreement under Section 7121 of the Code (or any corresponding or similar provision of state, local or foreign law) executed on or prior to the Closing Date, (iii) installment sale or open transaction disposition occurring on or prior to the

25

Closing Date, (iv) deferred intercompany transaction, (v) election made under Section 108(i) of the Code, or a gain recognition agreement, or a transaction under which previously utilized Tax losses or credits may be recaptured (including a dual consolidated loss or an excess loss account) or (vi) prepaid amount received on or prior to the Closing Date.

(i)     There are no Encumbrances for Taxes on the Bank Shares or any of the assets of the Bank or its Subsidiaries except for Permitted Liens.

(j)     No written claim has been received in the last six (6) years by the Company, the Bank or its Subsidiaries from a taxing authority in a jurisdiction where the Bank or its Subsidiaries does not file Tax Returns that the Bank or its Subsidiaries is or may be subject to taxation by that jurisdiction or should have been included in a combined, consolidated, affiliated, unitary or other group Tax Return of that jurisdiction.

(k)     Neither the Bank nor its Subsidiaries has engaged in any "reportable transactions" within the meaning of Treasury Regulations Section 1.6011-4(b) (or any equivalent provision under state, local, or foreign Tax Law). Each of the Bank and its Subsidiaries (or the Company on behalf of the Bank or its Subsidiaries) has disclosed on its United States federal income Tax Returns all positions taken therein that could give rise to a substantial understatement of United States federal income Tax within the meaning of Section 6662 of the Code.

Section 3.8     *Litigation*. Except as set forth in Section 3.8 of the Disclosure Schedule, there are no current, pending or, to the Knowledge of the Company, threatened Proceedings against or relating to the Bank or its Subsidiaries or the Business or any of the Contemplated Transactions, or that could otherwise materially interfere with or delay any of the Contemplated Transactions. To the Knowledge of the Company, no basis for any Proceeding that would, individually or in the aggregate, be material to the Bank or its Subsidiaries, taken as a whole, exists. Except as set forth in Section 3.8 of the Disclosure Schedule, there is no material Order or regulatory restriction imposed upon or relating to the Bank or its Subsidiaries or the Business or any of the Contemplated Transactions, or that could otherwise materially interfere with or delay any of the Contemplated Transactions.

Section 3.9     *Key Employees*. Section 3.9 of the Disclosure Schedule sets forth, for (i) each officer and (ii) each other key employee whose annual base compensation equals or exceeds $100,000 of the Bank or its Subsidiaries, such employee's name, title, hire date, location, whether full-or part-time, whether active or on leave (and, if on leave, the nature of the leave and the expected return date), annual salary or wage rate, most recent annual bonus received and current annual bonus opportunity. To the Knowledge of the Company, no (i) officer or (ii) other key employee whose compensation equals or exceeds $100,000 of the Bank or its Subsidiaries has indicated to the Company, the Bank or any of their Subsidiaries that he or she intends to resign or retire as a result of the transactions contemplated by this Agreement or otherwise within one year after the Closing Date.

26

Section 3.10    *Employee Benefit Plans.*

(a)    Section 3.10(a) of the Disclosure Schedule sets forth a complete and correct list of each Benefit Arrangement. The Company has prior to the Execution Date provided to the Purchasers correct and complete copies of (i) each Benefit Arrangement, including all amendments thereto (or, in the case of any such Benefit Arrangement that is unwritten, descriptions thereof), (ii) the most recent annual reports on Form 5500 and accompanying schedules, if any, filed with the Internal Revenue Service with respect to each Benefit Arrangement, (iii) the most recent summary plan description for each Benefit Arrangement for which such summary plan description is required, (iv) each trust agreement and insurance or group annuity contract relating to any Benefit Arrangement, (v) for the past two years, (A) audited financial statements and (B) actuarial valuation reports for each applicable Benefit Arrangement and (vi) all correspondence with the Department of Labor, the Internal Revenue Service and the Pension Benefit Guaranty Corporation (the "**PBGC**").

(b)    Each Benefit Arrangement that is intended to be tax qualified under Section 401(a) of the Code (each, a "**Qualified Plan**") and each trust established in connection with any Qualified Plan which is intended to be tax exempt under Section 501(a) of the Code (i) is tax qualified or tax exempt, as applicable, and the Bank has received a determination letter or an opinion letter from the Internal Revenue Service upon which it may rely regarding each such Qualified Plan's qualified status under the Code, and (ii) to the Company's Knowledge, no event has occurred since the date of the most recent determination letter or application relating to any such Qualified Plan that would adversely affect the qualification of such Qualified Plan. The Company has prior to the Execution Date provided to the Purchasers a correct and complete copy of the most recent determination letter or opinion letter received with respect to each Qualified Plan, as well as a correct and complete copy of each pending application for a determination letter, if any.

(c)    Each Benefit Arrangement has been administered in all material respects in accordance with its terms and in compliance with the applicable provisions of ERISA, the Code, all other Legal Requirements and the terms of all applicable collective bargaining agreements (if any). No events have occurred with respect to any Benefit Arrangement that could result in payment or assessment by or against the Bank or its Subsidiaries of any excise taxes under Sections 4972, 4975, 4976, 4977, 4979, 4980B, 4980D, 4980E or 5000 of the Code. In addition, with respect to any Benefit Arrangement, no administrative investigation, audit or other Proceedings by the Department of Labor, the PBGC, the Internal Revenue Service or any other Governmental Authority is pending, threatened or in progress. None of the Company, the Bank or any of the Bank's Subsidiaries has taken any action to take corrective action or make a filing under any voluntary correction program of the Internal Revenue Service, Department of Labor or any other Governmental Authority with respect to any Benefit Arrangement, and none of the Company, the Bank or any of the Bank's Subsidiaries has any Knowledge of any plan defect that would qualify for correction under any such program.

(d)    Except as set forth in Section 3.10(d) of the Disclosure Schedule, with respect to each Benefit Arrangement that is subject to Title W or Section 302 of ERISA or Section 412 or 4971 of the Code: (i) the applicable minimum funding standards of Sections 412 and 430 of the Code and Sections 302 and 303 of ERISA, whether or not waived, are satisfied and the Benefit Arrangement is not currently, and is not reasonably expected to be, in "at risk

27

status" within the meaning of Section 430(i) of the Code or Section 303(i) of ERISA; (ii) the fair market value of the assets of such Benefit Arrangements equals or exceeds the actuarial present value of all accrued benefits under such Benefit Arrangements (whether or not vested) on a termination basis; (iii) no reportable event within the meaning of Section 4043(c) of ERISA for which the 30-day notice requirement has not been waived has occurred, and the consummation of the transactions contemplated by this Agreement will not result in the occurrence of any such reportable event; (iv) all premiums to the PBGC have been timely paid in full; (v) no liability (other than for premiums to the PBGC) under Title W of ERISA has been or is expected to be incurred by the Company, the Bank or any of the Bank's Subsidiaries; (vi) the PBGC has not instituted proceedings to terminate any such Benefit Arrangement and, to the Company's Knowledge, no condition exists that presents a risk that such proceedings will be instituted or which would constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any such Benefit Arrangement and (vii) no written or oral communication has been received from the PBGC concerning the funded status of any such plan or any transfer of assets and liabilities from any such Benefit Arrangement. In addition, no administrative investigation, audit or other administrative Proceeding by the Department of Labor, the PBGC, the Internal Revenue Service or other Governmental Authority is pending, threatened or in progress with respect to any Benefit Arrangement.

(e)    Except as set forth in Section 3.10(e) of the Disclosure Schedule, neither the Bank nor any of its ERISA Affiliates contributes to, or has within the preceding six (6) years, contributed to, any Multiemployer Plan or a plan that has two (2) or more contributing sponsors at least two (2) of whom are not under common control, within the meaning of Section 4063 of ERISA. Neither the Bank nor any of its ERISA Affiliates has, within the preceding six (6) years, withdrawn in a complete or partial withdrawal from any Multiemployer Plan or incurred any liability under Section 4204 of ERISA that has not been satisfied in full.

(f)    The Bank and its Subsidiaries have no obligation to provide medical, dental or life insurance benefits (whether or not insured) to any employees or former employees of the Bank or its Subsidiaries after retirement or other termination of service (other than (i) coverage mandated by Legal Requirements and (ii) benefits, the full direct cost of which is borne by the employee or former employee (or beneficiary thereof)).

(g)    There are no collective bargaining agreements binding on the Bank or its Subsidiaries; none of the employees of the Bank or its Subsidiaries is represented by a labor union, and to the Knowledge of the Company, there is no, and since January 1, 2012, has been no, (i) organizational effort made or threatened by or on behalf of any labor organization or trade union to organize any employees of the Bank or its Subsidiaries, or (ii) demand for recognition of any employees of the Bank or its Subsidiaries made by or on behalf of any labor organization or trade unions.

(h)    There is no, and since January 1, 2012, there has not been, any strike, work stoppage, work slowdown, or lockout pending, or, to the Knowledge of the Company, contemplated or threatened against or involving the Bank or its Subsidiaries.

(i)    The Company is in compliance, in all material respects, with all applicable Legal Requirements respecting employment and employment practices, including those relating

to labor management relations, wages, hours, overtime, employee classification, discrimination, sexual harassment, civil rights, affirmative action, work authorization, immigration, safety and health, information privacy and security, workers compensation, continuation coverage under group health plans, wage payment and the payment and withholding of Taxes.

(j)      There are no Proceedings pending or, to the Knowledge of the Company, threatened against or affecting the Bank or its Subsidiaries, relating to the alleged material violation of any applicable Legal Requirement pertaining to labor relations or employment matters.

(k)      Neither the execution and delivery of the Agreement nor the consummation of the transactions contemplated hereby, either alone or together with a termination of service, will (i) result in any payment (including severance, golden parachute, forgiveness of indebtedness or otherwise) becoming due under any Benefit Arrangement, whether or not such payment is contingent, (ii) increase any payments or benefits otherwise payable under any Benefit Arrangement, (iii) result in the acceleration of the time of payment, vesting or funding of any benefits, whether or not contingent; or (iv) result in any limitation on the right of the Company, the Bank or any of Bank's Subsidiaries to amend, merge, terminate or receive a reversion of assets from any Benefit Arrangement or related trust. There is no agreement, contract or arrangement to which the Company, the Bank or any of the Bank's Subsidiaries is a party that could, individually or collectively, result in the payment of any amount that would not be deductible by reason of Section 280G of the Code, as determined without regard to Section 280G(b)(4) of the Code. No Benefit Arrangement provides for the gross-up or reimbursement of Taxes under Section 4999 or 409A of the Code, or otherwise. Section 3.10(k) of the Disclosure Schedule sets forth (i) the amount of each payment or benefit that could become payable to each employee under a Benefit Arrangement as a result of the transactions contemplated by the Agreement or a termination of employment or service, including as a result of accelerated vesting and (ii) the amount of the "excess parachute payments" within the meaning of Section 280G of the Code that could become payable to each such employee.

(l)      There has been no amendment to, written interpretation of or announcement (whether or not written) by the Company, the Bank or the Bank's Subsidiaries relating to, or change in employee participation or coverage under, any Benefit Arrangement that would increase materially the expense of maintaining such plan above the level of expense incurred in respect thereof for the most recent fiscal year ended prior to the Execution Date.

Section 3.11    *Real Property*. The Bank or one of its Subsidiaries (a) has good, valid and marketable title to all the properties and assets reflected in the December 31 Balance Sheet or acquired after the Execution Date (except properties sold or otherwise disposed of since the date thereof in the Ordinary Course) (the "**Owned Properties**"), free and clear from any Encumbrances other than Encumbrances that, (A) (i) would not, and would not reasonably be expected to, individually or in the aggregate, affect the value thereof or interfere with the use made or to be made thereof by the Bank or its Subsidiaries, (ii) do not secure indebtedness for borrowed money and (iii) arose only in the Ordinary Course and (B) in the case of Owned Properties consisting of Real Estate, Permitted Liens, (b) is the lessee of all leasehold estates reflected in the December 31 Balance Sheet or acquired after the Execution Date (except for

leases that have expired by their terms since the Execution Date) (the "**Leased Properties**" and, collectively with the Owned Properties, the "**Properties**"; and any Property consisting of real estate or buildings or improvements thereon ("**Real Estate**")), free and clear from Encumbrances other than Encumbrances that, (A)(i) would not, and would not reasonably be expected to, individually or in the aggregate, affect the value thereof or interfere with the use made or to be made thereof by the Bank or its Subsidiaries, (ii) do not secure indebtedness for borrowed money and (iii) arose only in the Ordinary Course and (B) in the case of Leased Properties consisting of Real Estate, Permitted Liens, and is in possession of the properties purported to be leased thereunder, and each such lease is valid without default thereunder by the lessee or, to the Knowledge of the Company, the lessor, and (c) owns or leases all properties and assets as are used by the Bank or its Subsidiaries in the Business or otherwise necessary to their respective operations as now conducted. The Real Estate is in compliance with all applicable zoning laws and building codes, and the buildings and improvements located on the Real Estate are in good operating condition and in a state of good working order, ordinary wear and tear excepted. There are no pending or, to the Knowledge of the Company, threatened condemnation proceedings against any of the Real Estate. The Bank and its Subsidiaries are in compliance with all applicable health and safety related requirements for the Real Estate, including those under the Americans with Disabilities Act of 1990 and the Occupational Safety and Health Act of 1970.

Section 3.12    *Absence of Certain Changes*. Since December 31, 2016, (a) apart from the Bankruptcy Case, there have been no events, circumstances, facts, changes, developments or occurrences that have had, individually or in the aggregate, a Material Adverse Effect, (b) the Company, the Bank and their respective Subsidiaries have owned, operated, maintained and conducted the Business in the Ordinary Course, and (c) neither the Company nor the Bank has taken any action that would be prohibited by Section 5.1 if it were taken after the Execution Date and prior to the Closing or that would prevent the consummation of the transactions contemplated hereby.

Section 3.13    *Material Contracts.*

(a)    Except as set forth in Section 3.13 of the Disclosure Schedule in sections corresponding to the following subsections, there are no Contracts to which the Bank or its Subsidiaries is a party or subject or which otherwise relate to the Business (whether written or oral, express or implied, whether or not the Bank or the Company is party thereto) of the type described below (each Contract disclosed or required to be disclosed, including the Bank Related Contracts, a "**Bank Significant Agreement**"):

(i)    any Contract which is or would constitute a "material contract" within the meaning of Item 601(b)(10) of Regulation S-K to be performed in whole or in part after the Execution Date;

(ii)    any Contract with respect to the employment or service of any current directors, officers, employees or consultants of the Bank or its Subsidiaries or of any former director or officer of the Bank or its Subsidiaries whose service as such terminated after December 31, 2014, other than the Bank's standard form at-will offer letter;

(iii)     any Contract between the Bank or its Subsidiaries and the Company or any of its Affiliates (other than the Bank or its Subsidiaries);

(iv)     any Contract by the Bank or its Subsidiaries with any director or officer of the Company or its Affiliates;

(v)     any Contract which limits or purports to limit the freedom of the Bank or its Subsidiaries (or after Closing would so limit or purport to so limit the Purchasers) to compete in any line of business or with any Person or in any area, or to solicit the business of any Person or category of Persons;

(vi)     any Contract with a Governmental Authority;

(vii)     any Contract which (A) grants any person a right of first refusal, right of first offer or similar right with respect to any properties, assets or businesses of the Bank or its Subsidiaries; (B) limits or purports to limit the ability of the Bank or its Subsidiaries to own, operate, sell, transfer, pledge or otherwise dispose of any assets or business the Bank or its Subsidiaries owns, or (C) contains a "most favored nation" clause or similar term providing preferential pricing to a party (other than the Bank or its Subsidiaries) or grants to any Person (other than the Bank or its Subsidiaries) any exclusivity rights;

(viii)     any partnership, joint venture, limited liability company, operating, shareholder, investors rights or other similar agreement or arrangement;

(ix)     any lease or sublease (A) of personal property providing for aggregate rentals of $10,000 or more or (B) of Real Estate;

(x)     any indenture, deed of trust, loan agreement or other flanking agreement or instrument to which the Bank or any of its Subsidiaries is an obligor or guarantor;

(xi)     any Contract relating to the acquisition or disposition of any material business or material assets or liabilities (whether by merger, sale of stock or assets or otherwise), which acquisition or disposition is not yet complete or where such contract contains continuing material obligations, including continuing material indemnity obligations, of the Bank or its Subsidiaries;

(xii)     any agreement or series of related agreements for the purchase, sale, receipt, lease, license or use of materials, supplies, goods, services, Proprietary Rights, equipment or other assets providing for aggregate payments by or to the Bank and its Subsidiaries of $10,000 or more annually or $100,000 or more in aggregate;

(xiii)     any participation, loan purchase or similar agreement pursuant to which the Bank or its Subsidiaries has (A) acquired an interest in the indebtedness of any third party or (B) sold an interest the indebtedness of any third party;

31

(xiv)    any agreement (including any keepwell agreement, other than the Company's source of strength obligations pursuant to the Federal Reserve Board's Regulation Y) under which (A) any Person has directly or indirectly guaranteed any liabilities or obligations of the Bank or its Subsidiaries or (B) the Bank or its Subsidiaries has, directly or indirectly, guaranteed any liabilities or obligations of any other Person (other than letters of credit entered into in the Ordinary Course, including for the avoidance of doubt with customary terms); and

(xv)    any Bank Related Contract.

(b)    Prior to the Execution Date, the Company has provided (by hard copy or electronic data room access) to the Purchasers true, correct and complete copies, including all amendments, purchase orders and statements of work (as applicable), of each of the Bank Significant Agreements. (i) Each of the Bank Significant Agreements has been duly and validly authorized, executed and delivered by the Bank or its Subsidiaries and is legal and binding on the Bank or its Subsidiaries, as applicable, and, to the Company's Knowledge, each other party thereto, and in full force and effect; (ii) the Bank and its Subsidiaries are in compliance with and have performed all obligations required to be performed by any of them under each Bank Significant Agreement; (iii) the Bank and its Subsidiaries have not received any notice to terminate, in whole or part, or notice of any violation or default (or any condition which with the passage of time or the giving of notice or both would cause such a violation or default) or of a repudiation or waiver of a provision by any party under any Bank Significant Agreement; and (iv) no other party to any Bank Significant Agreement is, to the Knowledge of the Company, in default or violation in any respect under a Bank Significant Agreement.

Section 3.14    *Risk Management Instruments*. All derivative instruments of the Bank and its Subsidiaries, including all Derivative Transactions, whether entered into for the Bank's or its Subsidiaries' own account or for the account of a customer of the Bank, were entered into (a) only in the Ordinary Course of Business and consistent with past practice, (b) in accordance with all applicable Legal Requirements and regulatory policies and in accordance with prudent practices, and (c) with counterparties believed to be financially responsible at the time; and each derivative instrument and each Derivative Transaction constitutes the valid and legally binding obligation of the Bank or one of its Subsidiaries and is enforceable against the Bank or one of its Subsidiaries, as applicable, and, to the Knowledge of the Company, the other parties thereto (except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer and similar laws of general applicability relating to or affecting creditors' rights or by general equity principles) in accordance with its terms. Neither the Bank nor its Subsidiaries, nor any other party thereto, is in breach of any of its obligations under any such derivative instrument and Derivative Transaction.

Section 3.15    *Environmental Matters.*

(a)    Each of the Company, the Bank and its Subsidiaries, the Real Estate, the Bank's Participation Facilities and the Bank's Operating Properties are and have since January 1, 2012, been in compliance with all Environmental Laws, including possessing all environmental, health and safety permits, licenses, registrations or authorizations, consents issued, granted, given, or otherwise made available by or under the authority of any Governmental Authority or

32

pursuant to any Environmental Law. None of the Bank, the Bank's Subsidiaries nor the Company has received any communication from any Person that alleges that the Bank or any of its Subsidiaries or their respective Participation Facilities or Operating Properties is not in compliance with or is subject to any Liability under any Environmental Laws and, to the Knowledge of the Company, there are no circumstances that would reasonably be expected to prevent or interfere with such compliance or give rise to such Liability in the future.

(b)     There is no Environmental Claim pending or, to the Knowledge of the Company, threatened, nor are there any circumstances that would reasonably be expected to form the basis for any Environmental Claim, against the Bank or its Subsidiaries or their respective Participation Facilities or Operating Properties or against any Person whose liability for any Environmental Claim the Bank or any of its Subsidiaries has indemnified, retained or assumed by contract or by operation of law.

(c)     The Company has provided to Purchasers all assessments, reports, data, results of investigations or audits, and other information that is in the possession or control of or reasonably available to the Company or the Bank or its Subsidiaries regarding any Materials of Environmental Concern, Environmental Law, Environmental Claim or other environmental matters pertaining to, or the environmental condition of, any properties currently or previously owned, leased or operated by the Bank or its Subsidiaries, including but not limited to corporate offices or branch locations or properties acquired through foreclosure, granting of a deed in lieu of foreclosure or similar transfer of title or possession, and including the Bank's Participation Facilities and the Bank's Operating Properties or the compliance (or noncompliance) by or Liability of the Bank or its Subsidiaries under any Environmental Laws.

(d)     Except as would not reasonably be expected to give rise to any Liability of the Bank or its Subsidiaries, no Materials of Environmental Concern have been discharged, disposed of, spilled, leaked otherwise released at, on, to, from or under any property now or previously owned, leased or operated by the Bank or its Subsidiaries or any of their respective predecessors (including, to the Knowledge of the Company, any such properties acquired through foreclosure, granting of a deed in lieu of foreclosure or similar transfer of title or possession and including the Bank's Participation Facilities and the Bank's Operating Properties).

(e)     Neither the Bank nor any of its Subsidiaries is required by any Environmental Law or by virtue of the transactions set forth herein and contemplated hereby, or as a condition to the effectiveness of any transactions contemplated hereby, (i) to perform a site assessment for Materials of Environmental Concern, (ii) to remove or remediate Materials of Environmental concern, (iii) to give notice to, make any filings with or receive approval from any Governmental Authority regarding environmental matters, other than a supervising bankruptcy court with jurisdiction over the pending transaction, or (iv) to record or deliver to any Person any disclosure document or statement pertaining to environmental matters.

Section 3.16   *Insurance*. Section 3.16 of the Disclosure Schedule contains an accurate and complete list (including description, premium, term and coverage) as of the Execution Date of all insurance policies with respect to the Assets or employees of the Company and the Company Subsidiaries or the Business (the "**Insurance Policies**"). The Bank and its Subsidiaries

33

maintain insurance underwritten by insurers of recognized financial responsibility, of the types and in the amounts that the Bank and its Subsidiaries reasonably believe are adequate for its business, prudent and consistent with industry practice, including, but not limited to, insurance covering all real and personal property owned by or leased by the Bank or its Subsidiaries against theft, damage, destruction, acts of vandalism and all other risks customarily insured against, with such deductibles as are customary for companies in the same or similar business. The Company has furnished to the Purchasers prior to the Execution Date true and complete copies of all Insurance Policies and fidelity bonds relating to the assets, Business, operations, employees, officers or directors of the Bank and its Subsidiaries, whether or not the Bank or its Subsidiaries are party to such Insurance Policies or fidelity bonds. There is no claim by the Bank or its Subsidiaries pending under any of such Insurance Policies or fidelity bonds as to which coverage has been questioned, denied or disputed by the underwriters of such Insurance Policies or fidelity bonds or in respect of which such underwriters have reserved their rights. All premiums payable under all such Insurance Policies and fidelity bonds have been timely paid and the Company, the Bank and its Subsidiaries have otherwise in all material respects complied fully with the terms and conditions of all such Insurance Policies and fidelity bonds. Such Insurance Policies and fidelity bonds (or other policies and bonds providing substantially similar insurance coverage) have been in effect since at least January 1, 2012, and remain in full force and effect. The Company has no Knowledge of any threatened termination of, premium increase with respect to, or material alteration of coverage under, any of such Insurance Policies or fidelity bonds. The Bank and its Subsidiaries shall after the Closing continue to have coverage under such Insurance Policies and fidelity bonds with respect to events occurring prior to the Closing, and such coverage will not be affected by any claims by the Company or any of its Subsidiaries other than the Bank and its Subsidiaries.

Section 3.17   *Intellectual Property*. The Bank and its Subsidiaries own, are licensed to use or otherwise possess legally enforceable rights to use all patents, patent rights, licenses, inventions, copyrights, know-how (including trade secrets, applications and other =patented or un-patentable proprietary or confidential information, systems or procedures), trademarks, service marks, trade names, domain names, the goodwill associated with the foregoing and registrations of, and applications to register, the foregoing, and extensions, modifications or renewals of such registrations or applications, and all other intellectual property rights (collectively, "**Proprietary Rights**") that are material to the Business and used in or necessary for the conduct of the Business as currently conducted. The Bank and its Subsidiaries have the right to use all material Proprietary Rights owned or licensed by the Bank or used in the conduct of the Business as currently conducted without infringing, misappropriating or otherwise violating the Proprietary Rights of any third party, and neither the Bank, its Subsidiaries nor the conduct of the Business has infringed, misappropriated or otherwise violated any such Proprietary Rights. To the Company's Knowledge, no Person is infringing, misappropriating or otherwise violating any of the Proprietary Rights of the Bank or its Subsidiaries, except where such infringement, misappropriation or other violation, or the lack of a right to use such Proprietary Rights, would not have any Material Adverse Effect on the Bank or its Subsidiaries. No charges, claims, allegations, or litigation have been asserted or, to the Company's Knowledge, threatened against the Bank or its Subsidiaries (i) contesting the right of the Bank or its Subsidiaries to use, or the validity of, any of the Proprietary Rights used in the conduct of the Business as currently conducted, (ii) challenging or questioning the validity or effectiveness of any license or agreement pertaining thereto or asserting the misuse thereof, or (iii) claiming that

the Bank, its Subsidiaries or the conduct of the Business infringes, misappropriates or otherwise violates any Proprietary Rights of any Person, and, to the Company's Knowledge, no valid basis exists for the assertion of any such charge, claim, allegation or litigation. All licenses and other agreements to which the Bank or its Subsidiaries is a party relating to Proprietary Rights are in full force and effect and constitute valid, binding and enforceable obligations of the Bank and, to the Company's Knowledge, each other party thereto, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles, as the case may be, and there have not been and there currently are not any defaults (or any event which, with notice or lapse of time or both, would constitute a default) by the Bank or, to the Company's Knowledge, any other party thereto under any license or other agreement affecting Proprietary Rights used in the conduct of the Business as currently conducted, except for defaults, if any, which would not have any material impact on the Bank or its Subsidiaries. The validity, continuation and effectiveness of all licenses and other agreements relating to the Proprietary Rights used in the conduct of Business as currently conducted and the current terms thereof will not be affected by the transactions contemplated by this Agreement.

Section 3.18   *Related Party Transactions.*

(a)    Except as set forth in Section 3.18(a) of the Disclosure Schedule or as part of the normal and customary terms of an individual's employment or service as a director, neither the Bank nor its Subsidiaries is now or has since January 1, 2012, been involved, directly or indirectly, in any business arrangement or other relationship (as debtor, creditor, guarantor or otherwise), Contract for goods or services, lease or other transaction or agreement with (x) the Company or any of its Affiliates (other than the Bank or its Subsidiaries), any director or officer of the Company or any of its Affiliates (including the Bank and its Subsidiaries), any stockholder owning 5% or more of the outstanding Common Stock of the Company or, to the Knowledge of the Company, any Affiliate or "associate" or member of the "immediate family" (as such terms are respectively defined in Rule 12b-2 and Rule 16a-1 of the Securities Exchange Act of 1934) of any such director, officer or stockholder, or (y) to the Knowledge of the Company, and other than credit and consumer banking transactions in the Ordinary Course of Business, any employee of the Company or any of its Affiliates (including the Bank and its Subsidiaries) who is not an officer, or any Affiliate, or "associate" or member of the "immediate family" of any such employee.

(b)    The Bank is in compliance with Sections 23A and 23B of the Federal Reserve Act and its implementing regulations, and all extensions of credit by the Bank to any "executive officer," "director," "principal shareholder" or "related interest" of any of the foregoing (as such terms are defined in the Federal Reserve Board's Regulation 0) of the Bank or the Company have been made in compliance with the Federal Reserve Board's Regulation 0 and the Company has not been advised that, and has no reason to believe that, any facts or circumstances exist that would cause the Bank, or any extensions of credit by the Bank, not to be so compliant.

Section 3.19   *Community Reinvestment Act and Consumer Compliance.* The Company has no Knowledge of, has not been advised of, and has no reason to believe that any facts or circumstances exist that would cause the Bank or its Subsidiaries: (1) to be deemed not to be in

35

satisfactory compliance in any material respect with the Community Reinvestment Act ("**CRA**") or to be assigned a rating for CRA purposes by federal or state bank regulators of lower than "satisfactory" or (2) to be deemed not to be in satisfactory compliance with the fair lending laws and regulations or other applicable federal or state consumer protection laws and regulations applicable to any of the activities of the Bank and its Subsidiaries.

Section 3.20    *Money Laundering; Unlawful Payments.*

(a)    Neither the Bank nor any of its Subsidiaries has, since January 1, 2012, violated, and the Company has no Knowledge of, has not been advised of, and has no reason to believe that: (1) any facts or circumstances exist that would cause the Bank or its Subsidiaries to be operating in violation of (a) the Bank Secrecy Act or the USA PATRIOT Act of 2001 (the "**USA PATRIOT Act**"), or the regulations implementing those statutes, or regulatory guidance with respect thereto, that the U.S. Department of the Treasury ("**Treasury**") or the OCC has issued, (b) any regulation or order or regulatory guidance with respect to economic and trade sanctions issued by Treasury's Office of Foreign Assets Control ("**OFAC**")**,** or (c) any other applicable anti-money laundering or economic or trade sanction statute, rule, regulation, order or regulatory guidance; or (2) the Bank or its Subsidiaries is under investigation with respect to or has been threatened to be charged with or given notice of, or is or may be subject to a Regulatory Agreement relating to, any violation of or noncompliance with any of the foregoing. The Company has no Knowledge of, has not been advised of, and has no reason to believe that any facts or circumstances exist that would cause there to be any deficiencies in its compliance risk management program with respect to the Bank Secrecy Act or the USA PATRIOT Act or any rules, regulations or regulatory guidance issued thereunder or any regulations or orders with respect to the trade or economic sanctions issued by OFAC. The Bank's Board of Directors has adopted and implemented a compliance program that complies with all the requirements of the Bank Secrecy Act, the USA PATRIOT Act, and any other applicable anti-money laundering or economic or trade sanction statutes, rules, regulations, orders or regulatory guidance issued by Treasury, OFAC or the OCC.

(b)    None of the Company, the Bank, any Subsidiary of the Company or the Bank, any director or officer of the Company, the Bank or any Subsidiary of the Company or the Bank, or, to the Knowledge of the Company any agent, employee or other Person acting on behalf of the Company, the Bank or any of their respective Subsidiaries, in the course of its actions for, or on behalf of, the Company, the Bank or any of their respective Subsidiaries for any unlawful contribution, gift, entertainment or other unlawful expenses relating to political activity, (ii) made any direct or indirect unlawful payment to any foreign or domestic government official or employee from corporate funds of the Company, the Bank or any of their respective Subsidiaries, (iii) violated or is in violation of any provision of the U.S. Foreign Corrupt Practices Act of 1977, (iv) made any bribe, unlawful rebate, payoff, influence payment, kickback or other unlawful payment to any Person, private or public, regardless of form, whether in money, property or services, to obtain favorable treatment in securing business to obtain special concessions for the Company, the Bank or any of their respective Subsidiaries, to pay for favorable treatment for business secured, or to pay for special concessions already obtained for the Company, the Bank or any of their respective Subsidiaries, (v) established or maintained any unlawful fund of monies or other Assets of the Company, the Bank or any of their respective

Subsidiaries, or (vi) made any fraudulent entry on the books and records of the Company, the Bank or any of their respective Subsidiaries.

Section 3.21   *OFAC*. None of the Company, the Bank or any of their respective Subsidiaries, directors or officers or, to the Knowledge of the Company, any agent, employee, Affiliate or other Person acting on behalf of the Company, the Bank or any of their respective Subsidiaries is (a) engaged in any services (including financial services), transfers of goods, software, or technology, or any other business activity related to (i) Cuba, Iran, North Korea, Sudan, Syria or the Crimea region of Ukraine claimed by Russia ("**Sanctioned Countries**"), (ii) the government of any Sanctioned Country, (iii) any person, entity or organization located in, resident in, formed under the Laws of, or owned or controlled by the government of, any Sanctioned Country, or (iv) any Person made subject of any sanctions administered or enforced by the United States Government, including, without limitation, the list of Specially Designated Nationals of OFAC, or by the United Nations Security Council, the European Union, Her Majesty's Treasury, or other relevant sanctions authority (collectively, "**Sanctions**"), (b) engaged in any transfers of goods, technologies or services (including financial services) that may assist the governments of Sanctioned Countries or facilitate money laundering or other activities proscribed by United States Law, (c) is a Person currently the subject of any Sanctions or (d) located, organized or resident in any Sanctioned Country.

Section 3.22   *Customer Information Security*. Since January 1, 2012, to the Company's Knowledge, there has been no unauthorized disclosure of, or access to any non-public personal information of a customer of the Bank or its Subsidiaries that could result in substantial harm or inconvenience to such customer. The Bank and its Subsidiaries are and have been since January 1, 2012, in compliance with, and the Company has no Knowledge of, has not been advised of, and has no reason to believe that any facts or circumstances exist that would cause the Bank or its Subsidiaries to be deemed not to be in satisfactory compliance with, the applicable privacy of customer information requirements contained in any federal and state privacy laws and regulations, including in Title V of the Gramm-Leach-Bliley Act of 1999 and regulations promulgated thereunder, as well as the provisions of any information security program adopted by the Bank pursuant to 12 C.F.R. Part 30.

Section 3.23   *Loans.*

      (a)      Neither the Bank nor its Subsidiaries is a party to any written or oral loan agreement in which the Bank nor its Subsidiaries is a creditor which as of September 30, 2017, had an outstanding balance of $50,000 or more and under the terms of which the obligor was, as of September 30, 2017, over 90 days delinquent in payment of principal or interest. Section 3.23(a)(1) of the Disclosure Schedule sets forth (i) the aggregate outstanding principal amount, as of September 30, 2017 of all loan agreements, notes or borrowing arrangements (including leases, credit enhancements and participations) payable to the Bank or its Subsidiaries (collectively, the "**Loans**")**,** other than "non-accrual" Loans, and (ii) separately, the aggregate outstanding principal amount, as of the Execution Date, of all "non-accrual" Loans. Except as listed on Section 3.23(a)(2) of the Disclosure Schedule, as of the Execution Date, neither the Bank nor its Subsidiaries had any outstanding Loan or asset classified as "Other Real Estate Owned" or that was designated internally by the Bank or its Subsidiaries (or, to the Company's Knowledge, by a Governmental Authority in an examination report or directive) as "special mention," "substandard," "doubtful," "loss" or words of similar import

37

(any of the foregoing Loans or assets, "**Criticized Assets**"). Section 3.23(a)(2) of the Disclosure Schedule sets forth (x) a summary of Criticized Assets as of the Execution Date, by category of Loan (*e.g.,* commercial and consumer), together with the aggregate principal amount of such Loans by category and (y) each asset of the Bank or its Subsidiaries that, as of the Execution Date, is so classified. The Bank or its Subsidiaries, as applicable, has good, valid and marketable title to all properties and assets reflected in Section 3.23(a)(2) of the Disclosure Schedule that are classified as "Other Real Estate Owned," free and clear from Encumbrances and any obligations that would affect the value or transferability thereof. The information (including electronic information and information contained on tapes and computer disks and the information set forth on Section 3.23(a) of the Disclosure Schedule referenced in this Section 3.23) with respect to the Loans and Criticized Assets made available to the Purchasers by the Company is, as of the respective dates indicated therein, true and complete.

(b) Each Loan (i) is evidenced by notes, agreements or other evidences of indebtedness which are true, genuine and what they purport to be, (ii) to the extent purported to be secured, has been secured by valid liens and security interests which have been perfected and (iii) is the legal, valid and binding obligation of the obligor named therein, enforceable in accordance with its terms (except as may be limited by bankruptcy, insolvency, moratorium, reorganization or similar laws affecting the rights of creditors generally and subject to general principles of equity). The notes or other credit or security documents with respect to each such outstanding Loan were in compliance in all material respects with all applicable Legal Requirements at the time of origination or purchase by the Bank and are complete and correct in all material respects. Neither the Bank nor its Subsidiaries administers or services, or has in the past administered or serviced, any loan, note or borrowing not originated and owned by the Bank. No Loans have been originated by the Bank's Subsidiaries. All Loans originated by the Bank were made and are administered or serviced, as applicable, in accordance with customary lending standards of the Bank, are being maintained, in all material respects in accordance with the relevant notes or other credit or security documents, the Bank's written underwriting standards (and, in the case of Loans held for resale to investors, the underwriting standards, if any, of the applicable investors) and with all applicable Legal Requirements. All such Loans (and any related guarantees) and payments due thereunder are, and on the Closing Date will be, free and clear of any Encumbrance, and each of the Bank and its Subsidiaries has complied, and on the Closing Date will have complied, with all applicable loan policies and procedures of the Bank and applicable laws and regulations relating to such Loans, including any applicable laws and regulations with respect to documentation in connection with the origination, processing, underwriting (including credit approval), purchase and servicing of mortgage Loans, real estate settlement procedures, consumer protection, truth in lending, fair housing, transfers of servicing, collection practices, equal credit opportunity and adjustable rate mortgages, and the terms and provisions of any mortgage or other collateral documents and other loan documents with respect to such Loans.

(c) Except as set forth in Section 3.23(c)(i) of the Disclosure Schedule, neither the Bank nor its Subsidiaries has, at any time since January 1, 2014, sold any assets of the Bank or its Subsidiaries with recourse of any kind to the Bank or its Subsidiaries, as applicable, or entered into any agreement providing for the sale or servicing of any Loan or other asset which constitutes a "recourse arrangement" under applicable regulation or policy promulgated by a Governmental Authority except, in each case, where neither the Bank nor its Subsidiaries has any ongoing liability or exposure. Except as set forth in Section 3.23(c)(ii) of

the Disclosure Schedule at any time since January 1, 2014, neither the Bank nor its Subsidiaries has received a request to repurchase any Loan or advance or participation therein, or any other asset, sold to a third party, nor has the Bank or its Subsidiaries been advised by any third-party purchaser of any Loan or advance or participation therein, or any other asset, that such purchaser intends to request that the Bank or its Subsidiaries repurchase such Loan or advance or participation therein, or other asset, and there is no basis for any of the foregoing.

(d)     The Bank is not now, nor has it since January 1, 2012 been, subject to any fine, suspension, settlement or other agreement or other administrative agreement or sanction by, or any reduction in any loan purchase commitment from, the Department of Housing and Urban Development, the Government National Mortgage Association, the Department of Veterans Affairs, the Federal National Mortgage Association or the Federal Home Loan Mortgage Corporation or any federal or state agency relating to the origination, sale or servicing of mortgage or consumer Loans.

(e)     There is no pending or, to the Knowledge of the Company, threatened Proceeding with respect to, any Loan which could adversely affect the rights of the Bank to enforce such Loan or the Bank's rights with respect to any related property.

(f)     Notwithstanding anything to the contrary in this Agreement, the Company makes no representation or warranty as to the sufficiency of collateral securing or the collectability of the Loans.

Section 3.24    *Brokers*. Except for the Broker's Fees set forth in Section 3.24 of the Disclosure Schedule, neither the Company, the Bank nor any of their respective Subsidiaries, nor any of their representatives, has incurred or will incur any Liability for brokerage or finders' fees or agents' commissions or other similar payments (or any expenses in connection therewith) in connection with the Contemplated Transactions, and any such fees, commissions or other payments due in connection with the Contemplated Transactions are solely Liabilities of the Company (not including the Bank or its Subsidiaries).

Section 3.25    *Investment Securities.*

(a)     The Bank and its Subsidiaries have good title to all securities and commodities owned by them (except those sold under repurchase agreements), free and clear of any Encumbrances, except to the extent that such securities or commodities are pledged in the Ordinary Course to secure obligations of the Bank or its Subsidiaries. Such securities and commodities are valued on the books of the Bank in accordance with GAAP in all material respects.

(b)     The Bank and its Subsidiaries employ investment, securities risk management and other policies, practices and procedures which the Company believes are prudent and reasonable in the context of such businesses.

Section 3.26    *Takeover Statute*. The Company, the Bank and each of their boards of directors and stockholders have taken all necessary action, if any, in order to render inapplicable any control share acquisition, business combination, poison pill (including any distribution under a rights agreement) or other similar anti-takeover provision under any certificates of designations

39

or the applicable Legal Requirements of the jurisdiction of its formation or incorporation which is or could become applicable to the Purchasers as a result of the transactions contemplated by this Agreement.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF THE PURCHASERS

The Purchasers hereby makes the following representations and warranties to the Company as of the Execution Date, the date of this Agreement and as of the Closing Date; provided, that those representations and warranties which address matters only as of a particular earlier date shall have been true and correct only as of such date.

Section 4.1 *Organization; Non-contravention.*

(a) *Status of the Purchasers.* Each of the Purchasers is an individual and has the capacity to enter into this Agreement, carry out the Contemplated Transactions to which he is a party, and duly observe and perform all of his obligations contained in this Agreement.

(b) *Authority.* The execution and delivery of this Agreement and the completion and performance of the transactions and obligations contemplated by or contained in this Agreement have been duly authorized by all necessary organizational or corporate action on the part of the Purchasers, as applicable, and this Agreement has been duly executed and delivered by the Purchasers and (assuming due authorization, execution and delivery by the Company) constitutes a legal, valid and binding obligation of the Purchasers and, subject to the approval of the Bankruptcy Court, is enforceable in accordance with its terms.

(c) *Conflicts.* Neither the execution and delivery of this Agreement nor the completion and performance of the Contemplated Transactions will result in a material breach of or material default under, or contravene, any material Contract to which the Purchasers are a party or by which the Purchasers are bound.

Section 4.2 *Governmental Consents.* Except for the entry of the Sale Order, and for the filing of applications, filings and notices, as applicable, with the OCC under the CBCA and approval of such applications, filings and notices listed in Section 4.2 of the Disclosure Schedule (collectively, with the applications filings and notices set forth in Section 3.1(e) of the Disclosure Schedule, the "**Purchasers' Required Approvals**"), no Consent, Order, or Governmental Authorization filing or registration with, any Governmental Authority is required for or in connection with the Sale or the consummation by the Company or the Bank of the transactions contemplated under this Agreement.

Section 4.3 *Investment Intent.* The Purchasers are acquiring the Shares for the Purchasers' own accounts and not with the view toward distribution within the meaning of Section 2(a)(11) of the Securities Act of 1933, as amended, other than in compliance with all applicable Legal Requirements, including United States federal securities laws.

Section 4.4 *Financing.* As of the Closing Date, the Purchasers shall have sufficient funds to pay the Purchase Price on the terms and conditions contained herein.

ARTICLE 5
PRE-CLOSING MATTERS AND OTHER COVENANTS

Section 5.1    *Conduct of Business Prior to Closing*. Except as expressly otherwise provided in this Agreement or as may be otherwise expressly required by the Bankruptcy Court, from the Execution Date to the Closing:

(a)    *Conduct of Business*. The Company shall cause the Bank and its Subsidiaries to: (i) carry on and conduct the Business in all material respects in the Ordinary Course consistent with past practice; (ii) use commercially reasonable efforts to maintain and preserve intact its business organization and advantageous business relationships, including with customers, vendors, strategic partners, suppliers, distributors, Governmental Authorities, and employees, and retain the services of its key officers and employees (as the Purchasers intend to retain substantially all of the employees of the Bank); (iii) maintain, renew, keep in full force and effect and preserve its rights, franchises and licenses and all Governmental Authorizations and Permits; (iv) take no action that is intended to or would reasonably be expected to adversely affect or materially delay the ability of the Company, the Bank or the Purchasers to obtain any necessary approvals of any Governmental Authority required for the Contemplated Transactions or to perform its covenants and agreements under this Agreement or to consummate the Contemplated Transactions; and (v) maintain its Books and Records in the usual, regular and ordinary manner.

(b)    *Bank Forbearances*. The Company shall not, to the extent relating to or impacting the Bank or its Subsidiaries, and shall cause the Bank and its Subsidiaries not to, and, in the case of clause (iv) below, shall cause the directors of the Bank not to, in each case except with the prior written consent of the Purchasers:

(i)    enter into any new line of business or materially change its lending, investment, underwriting, risk and asset liability management, and other banking and operating policies, except as required by any applicable Legal Requirement or policies imposed by any Governmental Authority, or fail to operate in accordance with such policies;

(ii)    make any capital expenditures in excess of $25,000 individually or $50,000 in the aggregate, other than as required pursuant to Contracts already entered into and disclosed in Section 5.1(b)(ii) of the Disclosure Schedule;

(iii)    terminate, enter into, amend, modify, waive any material provision of or renew any Bank Significant Agreement, Governmental Authorization or Permit (other than renewals in the Ordinary Course) other than the Tax Sharing Agreement, which shall be terminated prior to the Closing in accordance with Section 5.16 and other than the Bank Significant Agreements as described in Section 3.13(a)(xiii) of this Agreement;

(iv)    adjust, split, combine or reclassify the Bank's or its Subsidiaries' stock, sell, transfer, mortgage, Encumber or otherwise dispose of any shares of the Bank's capital stock beneficially owned by the Company, or permit any third party to

41

sell, transfer, mortgage, Encumber or otherwise dispose of any shares of the Bank's capital stock beneficially owned by such third party, or issue, sell or otherwise permit to become outstanding, or dispose of or Encumber or pledge or authorize or propose the creation of, any additional shares of the Bank's or its Subsidiaries' capital stock or any securities convertible into or exchangeable for such stock or any options or other rights, grants or awards with respect to the Bank's or its Subsidiaries' capital stock;

(v)      make, declare, pay or set aside for payment any dividend or other distribution (whether in cash, stock or property or any combination thereof) in respect of any shares of the Bank's capital stock or redeem, repurchase or otherwise acquire or offer to redeem, repurchase, or otherwise acquire any shares of the Bank's capital stock;

(vi)      sell, transfer, mortgage, Encumber or otherwise dispose of or discontinue any of its assets, deposits, businesses or properties, except for sales, transfers, mortgages, Encumbrances or other dispositions or discontinuances in the Ordinary Course of Business consistent with past practice and in a transaction that individually or taken together with all other such transactions is not material to the Company, the Bank or any of their respective Subsidiaries;

(vii)      incur any indebtedness for borrowed money or issue any debt securities or assume, guarantee or endorse, or otherwise become responsible for the obligations of, any other Person; provided, that the Bank may continue to borrow money from the Federal Home Loan Bank System, the Federal Reserve or any other Governmental Authority in the Ordinary Course of Business;

(viii)      except as set forth in Section 5.1(b)(viii) of the Disclosure Schedule, make, renew, amend or modify any Loan, extension of credit or participation therein, individually or in the aggregate with other Loans or other extensions of credit or participations therein to the same relationship, in excess of $500,000 (however, in the case of criticized assets, such amount shall not exceed $500,000); provided, that the Bank may make an extension of credit in the Ordinary Course of Business in connection with the sale of an asset classified as "Other Real Estate Owned" if said extension of credit is not in excess of $100,000; provided, further, that the Bank's gross loan portfolio shall not increase by more than $1,000,000 in the aggregate from the total of the Bank's Loans as of June 30, 2017 disregarding any reduction as a result of any write-offs or losses on Loans since June 30, 2017. With respect to this Section 5.1(b)(viii), the Purchasers agree that he will either give or deny any requested consent no later than three (3) Business Days after the Purchasers has received a written request therefor (which request shall be provided in accordance with Section 8.2 or other written instructions provided by the Purchasers), together with all material information relating thereto, provided, that if the Purchasers do not object to the terms within three (3) Business Days after Purchasers have so received information and a written request therefor, the Purchasers' consent shall be deemed to have been given;

(ix)      except as set forth in Section 5.1(b)(ix) of the Disclosure Schedule, (1) sell any asset classified as "Other Real Estate Owned" with a value greater than $100,000 as of December 31, 2017, if such action would result in a loss (relative to the value of the relevant asset as of December 31, 2017 as set forth in the December 31

42

Balance Sheet) equal to or greater than 15% of such value of such asset as of December 31, 2017 or $500,000, or (2) sell any asset classified as "Other Real Estate Owned" with a value equal to or less than $100,000 as of December 31, 2017, if such action would result in a loss (relative to the value of the relevant asset as of December 31, 2017 as set forth in the December 31 Balance Sheet) equal to or greater than 25% of such value of such asset as of December 31, 2017. However, the Company shall not be required to request or receive consent from the Purchasers to consummate any such sale of any asset classified as "Other Real Estate Owned" with a value equal to or less than $100,000 as of December 31, 2017 wherein the sale would result in a loss (relative to the value of the relevant asset as of December 31, 2017 as set forth in the December 31 Balance Sheet) not greater than 25% of such value of such asset as of December 31, 2017. With respect to this clause (viii), the Purchasers agree that he will either give or deny any requested consent no later than five (5) Business Days after the Purchasers have received a written request therefor (which request shall be provided in accordance with Section 8.2 or other written instructions provided by the Purchasers), together with all material information relating thereto, provided, that if the Purchasers do not object to the terms of the sale within five Business Days after the Purchasers have so received information and a written request therefor, the Purchasers' consent shall be deemed to have been given;

(x)     pay an effective yield on any existing or new deposit that exceeds the effective yield that is 50 basis points more than (x) for an existing deposit, the effective yield paid by the Bank on such existing deposit as of the Execution Date or (y) for a new deposit, the effective yield paid by the Bank on deposits of comparable size and maturity as of the Execution Date;

(xi)     enter into, renew or amend any Derivative Transactions, whether entered into for the account of it or for the account of a customer of it, except in the Ordinary Course of Business and consistent with past practice;

(xii)     acquire (other than by way of foreclosure, deed in lieu of foreclosure, acquisitions of control in a fiduciary or similar capacity, or in satisfaction of debts previously contracted in good faith, in each case in the Ordinary Course of Business) all or any portion of the assets, business, deposits or properties (including any Loans or advances or any participations therein) of any other Person;

(xiii)     merge or consolidate with or into any legal entity, dissolve, liquidate, or otherwise terminate its existence;

(xiv)     file any application to establish, or to relocate or terminate the operations of, any branch or banking office;

(xv)     amend its applicable Charter Documents or similar organizational documents or otherwise add to, amend or modify in any respect the duties or obligations of indemnification by the Bank or its Subsidiaries with respect to any of their respective directors, officers, employees, agents or other Persons;

43

(xvi)   implement or adopt any change in its accounting principles, practices or methods, other than as required by GAAP or applicable accounting requirements of a Governmental Authority;

(xvii)   make, change or revoke any Tax election that would have an adverse effect on the Purchasers, the Bank or its Subsidiaries, file any amended Tax Return, initiate discussions or examinations with any Governmental Authority regarding Taxes, make any voluntary disclosure with respect to Taxes, enter into any closing agreement, settle any material Tax audit, claim or assessment, surrender or reduce any right to claim a refund of Taxes, agree to extend any statute of limitations relating to Taxes, fail to duly and timely file with appropriate taxing authorities all Tax Returns required to be filed by or with respect to the Bank or its Subsidiaries (provided, however, that no Tax Returns shall be filed in a jurisdiction where the Bank or its Subsidiaries have not historically filed Tax Returns), fail to remit any Taxes due, whether or not shown on any Tax Return, or implement or adopt any change in (or fail to follow) its Tax accounting principles, practices or methods;

(xviii)  settle any Proceeding against or affecting the Bank or its Subsidiaries except for any settlement of (A) any Proceeding arising out of or in connection with this Agreement or the Contemplated Transactions but only if such settlement would not (1) require any payments by or adversely affect the Bank or its Subsidiaries or the Business or the Purchasers, or (2) interfere with or delay any of the Contemplated Transactions; or (B) any other Proceeding that is settled in a manner consistent with past practice in an amount or for consideration not in excess of $25,000 individually or $100,000 in the aggregate and that would not (1) impose any restriction on or adversely affect the Bank, its Subsidiaries, the Business or, after the Closing, the Purchasers or (2) create precedent for claims that are reasonably likely to be adverse to the Bank, its Subsidiaries, the Business or, after the Closing, the Purchasers;

(xix)   initiate any Proceeding except Proceedings brought in the Ordinary Course that do not claim or involve in excess of $100,000; provided, however, that the Bank may bring Proceedings against borrowers in the Ordinary Course;

(xx)   (A) terminate, enter into, amend, modify (including by way of interpretation) or renew any employment, consulting, severance, change in control or similar contract, agreement or arrangement with any director, officer, employee or consultant, or grant any salary or wage increase or increase any employee benefit, including incentive or bonus payments (or, with respect to any of the preceding, communicate any intention to take such action), except for increases in annual base salary or wages in the Ordinary Course of Business and consistent with past practice for employees who are not executive officers and whose annual total compensation does not exceed $75,000 (which increase shall not exceed 3% for any individual employee on an annualized basis); (B) make new grants or awards or pay any bonus incentive or similar payment under any Benefit Arrangement; (C) accelerate the vesting of or lapsing of restrictions with respect to any stock-based compensation or other long-term incentive compensation under any Benefit Arrangement or (D) cause the funding of any rabbi trust

44

or similar arrangement or take any action to fund or in any other way secure the payment of compensation or benefits under any Benefit Arrangement;

(xxi)    make any payment, reimbursement, refund or other fund transfer to any Affiliate of the Company, other than the payment of salaries to officers and employees in the Ordinary Course;

(xxii)   establish, adopt, enter into or amend any collective bargaining agreement;

(xxiii)  (A) hire any employees other than to fill vacancies arising due to terminations of employment of employees with an annual total compensation of less than $100,000; or (B) terminate the employment of any employees with an annual total compensation of $100,000 or more other than for cause (as such term is used by the Company or the Bank in the Ordinary Course of Business consistent with past practice);

(xxiv)   (A) grant, extend, amend (except as required in the diligent prosecution of the Proprietary Rights owned (beneficially, and of record where applicable) by or developed for the Bank or its Subsidiaries), waive, or modify any material rights in or to, sell, assign, lease, transfer, license, let lapse, abandon, cancel, or otherwise dispose of, or extend or exercise any option to sell, assign, lease, transfer, license, or otherwise dispose of, any Proprietary Rights, or (B) fail to exercise a right of renewal or extension under any material agreement under which the Bank or its Subsidiaries is licensed or otherwise permitted by a third party to use any Proprietary Rights (other than "shrink wrap" or "click through" licenses), unless the Bank and/or its Subsidiaries, as applicable, obtains a substantially similar license or right to use such Proprietary Rights on terms as favorable as the terms under the existing agreement;

(xxv)    participate in any program sponsored or administered by any Governmental Authority, which program is not part of the usual and customary banking business of the Bank;

(xxvi)   engage in (or modify in a manner adverse to the Bank or its Subsidiaries) any transactions with any Person known to be a shareholder of the Company or any director or officer of the Company or the Bank (or any Affiliate, associate, or immediate family member of any such Person), other than deposit relationships in the Ordinary Course of Business and extensions of credit which are on substantially the same terms, including interest rates and collateral, as those prevailing at the time for comparable transactions with persons unaffiliated with the Company or the Bank and do not involve more than the normal risk of collectability or present other unfavorable features and in compliance with the Federal Reserve Board's Regulation O, as applicable;

(xxvii)  notwithstanding any other provision hereof, knowingly take, or knowingly omit to take, any action that would reasonably be expected to result in any of the conditions set forth in Section 6.1 or Section 6.3 not being satisfied, or any action in contravention of any Regulatory Agreement or that would otherwise reasonably be

45

expected to result in any of the representations and warranties of the Company in this Agreement becoming untrue at any time or a violation of this Agreement or prevent the Company from performing its obligations under this Agreement or consummating the Closing; or

(xxviii) enter into any Contract with respect to, or otherwise agree or commit to do, or adopt resolutions of its board of directors or similar governing body in support of, any of the foregoing.

(c)    *Access*. From time to time as the Purchasers may reasonably request, the Company shall, and shall cause the Bank and its Subsidiaries to, afford to the Purchasers and their employees and agents and authorized representatives (including counsel and independent public accountants) reasonable access to (i) the properties and personnel of the Company and its Subsidiaries (including the Bank); (ii) the facilities, properties, Books and Records and other documents relating to the assets, stock ownership, properties, operations, obligations and liabilities of the Company and its Subsidiaries (including the Bank), including all books of account (including the general ledger), tax records, minute books of meetings of boards of directors (and any committees thereof) and stockholders, organizational documents, bylaws, material contracts and agreements, filings with any regulatory authority (except for any portions thereof that contain confidential supervisory information), accountants' work papers, litigation files, loan files, plans affecting employees and any other business activities or prospects; and (iii) all other information concerning the Business, its properties or personnel as the Purchasers may reasonably request, provided, that such access shall not unduly interfere with normal operations of the Business as currently conducted, or violate any Legal Requirement; and provided, further, that the Company reserves the right to exclude any records or other documentation which, upon the advice of legal counsel, would jeopardize the attorney-client privilege of the Company (after giving due consideration to the existence of any common interest, joint defense or similar agreement between the parties). The Company shall instruct the employees, counsel, accountants, agents, consultants, representatives and financial advisors of the Company and the Bank to cooperate with the Purchasers in connection with the foregoing. Without in any way limiting anything else contained in this Agreement, the Company and the Bank shall make their respective directors, officers, employees, agents and representatives (including counsel, accountants and financial advisors) available to confer with the Purchasers and its representatives; provided, that such access shall not unduly interfere with normal operations of the Business as currently conducted or violate any Legal Requirement. No access or investigation by the Purchasers or other information received by the Purchasers shall operate as a waiver or otherwise modify or affect any representation, warranty, covenant or agreement given or made by the Company in this Agreement, nor shall any such information be deemed to change, supplement or amend the Disclosure Schedule or any condition set forth in Section 6.1 or Section 6.3 or otherwise affect the remedies available to the Purchasers hereunder.

Section 5.2    *Confidentiality*. Each party hereto (such party when disclosing information being the "**Disclosing Party**", and such party when receiving information being the "**Recipient Party**") acknowledges that any information, materials and documentation of the other party it receives or observes pursuant to or as contemplated by the Contemplated Transactions, either before or after execution of this Agreement, is confidential; provided, that the foregoing shall not include information which (a) is or becomes available to the public other than as a result of a

disclosure by the Recipient Party, (b) was known to the Recipient Party or in its possession prior to its disclosure to the Recipient Party, (c) becomes available to the Recipient Party from a source other than the Disclosing Party; provided that such information is not known by the Recipient Party to have been provided in breach of a confidentiality agreement with the Disclosing Party or in breach of a contractual, legal or fiduciary obligation to the Disclosing Party, or (d) is or was developed independently by the Recipient Party without reference to confidential information provided by the Disclosing Party. Each party shall use, and shall cause its employees, representatives and agents to use, reasonable efforts to protect and maintain the confidentiality of such information, materials and documentation of the other party; provided, that the foregoing will not prevent the Recipient Party from disclosing or making available such information (i) to its and its Affiliates' respective directors, officers, employees, members, partners, shareholders, agents, representatives or advisors (including attorneys, accountants, insurers, rating agencies, consultants, bankers and financial advisors), any such information, materials and documentation on a confidential basis for the purpose of carrying out the Contemplated Transactions, (ii) to the extent required by a Legal Requirement or (iii) in connection with obtaining the Purchasers Required Approvals or discussions with supervising Governmental Authorities; and provided, further, that (x) the obligations of the Purchasers under this Section 5.2 shall terminate at Closing with respect to matters relating to the Bank, its Subsidiaries or the Business and (y) from and after Closing, the Company will treat all information, materials and documentation of or relating to the Bank, its Subsidiaries or the Business as confidential in accordance herewith and notwithstanding clause (b), (c) or (d) of the proviso to the first sentence of this Section 5.2.

Section 5.3    *Return of Information*. If the Closing is not completed and this Agreement is terminated, each party shall, upon the written request of the other party, at its election return to the other party or destroy (such destruction to be confirmed in writing to the other party upon further written request) all materials, documentation, data, records and other papers and copies thereof (whether on paper or in electronic, magnetic, photographic, mechanical or optical storage) relating to the Purchasers or the Company, the Bank, the Shares or the Business which is confidential and which is in the possession of such party and maintain the confidentiality of all information obtained from the other party, and not use any such information for any purpose whatsoever; provided, that a party may maintain such information to the extent that such information would be commercially impracticable to return or destroy or as required by applicable Legal Requirements or such party's bona fide document retention policies (including any practice or requirement to retain e-mail on an automated e-mail archival system) or relating to the safeguarding or backup storage of electronic data or in connection with a dispute with the other party.

Section 5.4    *Consents and Approvals.*

(a)    <u>*Efforts to Consummate*</u>. Each of the parties shall use their respective reasonable best efforts to prepare all documentation, to effect all applications, notices and filings and to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper, or advisable to consummate the transactions contemplated hereby as soon as practicable, including obtaining all other authorizations and Consents from any Governmental Authority necessary to be obtained by it, or its Subsidiaries or Affiliates, in order for it to consummate such transactions contemplated by this Agreement (including the Purchasers Required Approvals).

47

The parties shall coordinate and cooperate with one another in exchanging and providing such information as necessary to carry out the foregoing. After the Execution Date and prior to the Closing, each party shall (a) have the right to review in advance, and to the extent practicable consult with the other prior to sending any material notices to, making any material filings with, or having any material communications with any Person with respect to the transactions contemplated by this Agreement (other than any portions of material to be filed in connection therewith that contain competitively sensitive business or other proprietary information filed under a claim of confidentiality), (b) promptly consult with the other party with respect to all material notices sent, all material confidential filings made or any other material confidential information supplied by such party to a Person in connection with this Agreement and the transactions described herein, and (c) promptly inform the other party of any material communication from any Person regarding any of the transactions contemplated herein, including advising the other party upon receiving any material communication from the OCC, or any other applicable Governmental Authority, the Consent of which is required for the consummation of the transactions contemplated by this Agreement, that causes such party to believe that there is a reasonable likelihood that any Purchasers Required Approvals will not be obtained or may be materially delayed (a "**Regulatory Communication**"). Upon the receipt of a Regulatory Communication, without limiting the scope of the foregoing paragraphs, the receiving party shall, to the extent permitted under any applicable Legal Requirement (i) promptly advise the other party of the receipt of such Regulatory Communication and, subject to any prohibition under any Legal Requirement provide a copy of such Regulatory Communication to the other party, and (ii) provide the other party with a reasonable opportunity to participate in the preparation of any response thereto and the preparation of any other substantive submission or communication to any Governmental Authority with respect to the transactions contemplated hereby and to review any such response, submission or communication prior to the filing or submission thereof (other than portions of materials to be filed or submitted in connection therewith that contain competitively sensitive business or proprietary information filed or submitted under a claim of confidentiality). Notwithstanding anything to the contrary in this Agreement, nothing contained in this Agreement shall require the Purchasers to take, or agree to take, any actions that the Purchasers determine in good faith would be expected to, individually or in the aggregate, result in the imposition of a Burdensome Condition and, for the avoidance of doubt, any requirements to disclose any competitively sensitive business, other proprietary information of the Purchasers shall be deemed a "Burdensome Condition" unless otherwise determined by the Purchasers in their sole discretion.

(b)     Without the prior written consent of the Purchasers, the Company shall not take, or permit any of its Subsidiaries or Affiliates or any of its or their employees to take, any action that could reasonably be expected to result in a Burdensome Condition.

(c)     The parties agree to cooperate in good faith in connection with providing any notice to, and obtaining any consent or approval from, any third Person (other than a Governmental Authority, it being understood that the parties' agreements with respect to such matters as they relate to Governmental Authorities are set forth elsewhere in this Agreement) that is necessary or desirable in connection with the Contemplated Transactions. Without the Purchasers' consent, the Company shall not and shall not permit any of its Affiliates or any of its or their employees to make any payment to any such third Person (other than customary filing and application fees paid for by the Company), make or amend any commitment to any such third Person, or agree to do any of the foregoing, in each case, in order to obtain any consent or approval from any such third Person.

Section 5.5     *Certain Company Contracts.* The Company shall, at the Closing, pursuant to Section 365 of the Bankruptcy Code, assume (and take all necessary actions, including the payment of Cure Costs, to effect assumption) and assign to the Bank or, if designated by the Purchasers, a Subsidiary of the Bank, those Bank Related Contracts set forth on Section 3.13 of the Disclosure Schedule or identified by the Purchasers by written notice given to the Company no later than three Business Days prior to the Closing (such Contracts, the "**Assumed Bank Related Contracts**"). In connection with the Bankruptcy Case, the Company shall (a) include in the Sale Motion, in form and substance acceptable to the Purchasers in their sole discretion, a request for authorization to assume and assign to the Bank or, if designated by the Purchasers, a Subsidiary of the Bank, such Assumed Bank Related Contracts and a schedule of the Company's (in consultation with the Purchasers) good-faith estimate of Cure Costs with respect to each Bank Related Contract, and (b) promptly serve the Sale Motion on all counterparties to the Bank Related Contracts as directed by the Purchasers. To the extent that any Assumed Bank Related Contract may not be assigned to the Bank or, if designated by the Purchasers, a Subsidiary of the Bank, by the Company absent the waiver or consent of, or notice to, one or more Persons, the Company and the Purchasers shall use their commercially reasonable efforts to obtain all such waivers or consents and to make all such notices prior to the Closing and shall cooperate in all respects with respect thereto. Notwithstanding anything in this Agreement to the contrary, the only liabilities or obligations that will be assigned to or assumed by the Bank or, if designated by the Purchasers, a Subsidiary of the Bank, with respect to the Assumed Bank Related Contracts will be those liabilities and obligations that first arise after the Closing (the "**Assumed Contract Liabilities**") and not any liabilities or obligations for breaches or defaults occurring on or before the Closing (including Cure Costs).

Section 5.6     *Indemnification; D&O Insurance; D&O Tail Coverage.*

(a)     From and after the Closing, the Purchasers shall indemnify and hold harmless each present and former officer and director of the Company, Bank or their respective Affiliates (the "**D&O Indemnified Parties**") with respect to all costs, expenses, claims, judgments, fines, losses, damages or liabilities to the extent arising out of (i) the fact that such D&O Indemnified Party was an officer or director of the Company, Bank or their respective Affiliates or (ii) acts or omissions prior to the Closing in such Person's capacity as an officer or director of the Company, Bank or their respective Affiliates to the same extent as such D&O Indemnified Parties are entitled to be indemnified pursuant to the applicable Charter Documents of the Company, Bank or their respective Affiliates in effect as of the Execution Date or arising by operation of any Legal Requirement in effect as of the Execution Date. Such indemnification obligations shall continue in full force and effect for so long as they would have (but for the Contemplated Transactions) otherwise survived and continued in full force and effect. For a period of six (6) years from the Closing Date, the Purchasers shall not amend, repeal or otherwise modify any exculpation and indemnification provisions of the applicable Charter Documents of the Bank in effect as of the Execution Date for the benefit of the D&O Indemnified Parties in any manner that would adversely affect the rights thereunder of any of the D&O Indemnified Parties relating to acts or omissions prior to the Closing.

(b)     For a period of six (6) years after the Closing, the Purchasers shall cause the D&O Indemnified Parties covered by the directors' and officers' liability insurance policy maintained by the Bank or its Affiliates and in effect immediately prior to the Closing (the

"**Bank D&O Policy**") to continue to be covered by the Bank D&O Policy (provided, that the Purchasers may substitute therefor policies of at least the same coverage and amounts containing terms and conditions which are no less advantageous to the insured) with respect to claims arising from facts or events which occurred at or prior to the Closing; provided, that the Purchasers shall not be required to expend on an annual basis more than 250% of the current annual premium paid as of the Execution Date by the Bank for such insurance (the "**Premium Cap**"), and if such premiums for such insurance would at any time exceed the Premium Cap, the Purchasers shall cause to be maintained policies of insurance which, in the Purchasers' good faith determination, provide the maximum coverage available at an annual premium equal to the Premium Cap. In lieu of the foregoing, in consultation with, and only upon the written consent of, the Purchasers, the Bank may obtain at or prior to the Closing a six-year "tail" policy under the Bank D&O Policy providing equivalent coverage to that described in the preceding sentence if and to the extent that the same may be obtained for an aggregate one-time premium payment that does not exceed 250% of the current annual premium paid as of the Execution Date for the Bank D&O Policy.

Section 5.7 *Notifications*. The Company shall promptly notify the Purchasers in writing of:

(a) any notice or other material communication from any Person in connection with the Contemplated Transactions;

(b) any Proceedings commenced or, to its Knowledge, threatened against, relating to or involving or otherwise affecting the Contemplated Transactions, the Company or the Bank or its Subsidiaries that, if pending on the Execution Date, would have been required to have been disclosed pursuant to Section 3.8 if determined adversely or that could reasonably be expected to adversely affect or delay the Company's ability to consummate any of the Contemplated Transactions;

(c) any circumstance, event or action the existence, occurrence or taking of which could reasonably be expected to result in any representation or warranty made by the Company in this Agreement not being true and correct at any time from the Execution Date through the Closing Date or that could reasonably be expected to cause any condition set forth in Section 6.1 or Section 6.3 not to be satisfied; and

(d) any failure of the Company to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by it under this Agreement.

No information received by the Purchasers pursuant to this Section 5.7 or otherwise shall operate as a waiver or otherwise modify or affect any representation, warranty, covenant or agreement given or made by the Company in this Agreement, nor shall any such information be deemed to change, supplement or amend the Disclosure Schedule or any condition set forth in Section 6.1 or Section 6.3, or otherwise affect the remedies available to the Purchasers hereunder.

Section 5.8     *Reserved.*

Section 5.9     *Debtor-in-Possession*. During the pendency of the Bankruptcy Case, the Company shall continue to operate its business as debtor-in-possession pursuant to the Bankruptcy Code.

Section 5.10     *The Sale Motion*. On, or before November 8, 2017, the Company shall file for chapter 11 bankruptcy protection (the "**Filing Date**"). On or within one business day after the Filing Date, the Company shall file a sale motion with the Bankruptcy Court (the "**Sale Motion**") in form and substance acceptable to the Purchasers in their sole discretion (and shall thereafter use commercially reasonable efforts to cause the Bankruptcy Court to enter a corresponding order or orders), and in any event seeking the following relief from the Bankruptcy Court:

(a)     approval of the Bidding Procedures and entry of the Bidding Procedures Order no later than 35 days following the Filing Date;

(b)     scheduling the Sale Hearing to take place not more than 35 days following the entry of the Bidding Procedures Order;

(c)     subject to the Bidding Procedures, approval of the proposed purchase agreement between the Company and the Successful Bidder, including the Sale of the Shares to such Successful Bidder and the sale of the Other Purchased Assets (as applicable) (including the assumption and assignment of the Assumed Bank Related Contracts, if any) and the Equity Contribution to the Bank by such Successful Bidder contemplated by such agreement;

(d)     authorization of the sale of the Shares to the Successful Bidder and the sale of the Other Purchased Assets (including the assumption and assignment of the Assumed Bank Related Contracts, if any), as applicable, free and clear of all Encumbrances and other interests to the full extent permitted by the Bankruptcy Code;

(e)     authorization of the assumption and assignment of the Assumed Bank Related Contracts, subject to the terms hereof (or of the agreement of any other Successful Bidder, as applicable); and

(f)     authorization of the Company to cause the Closing to occur as soon as practicable after the entry of the Sale Order.

Section 5.11     *The Bidding Procedures*. The Company will use commercially reasonable efforts to promptly obtain the entry by the Bankruptcy Court of the Bidding Procedures Order, including approval of the Bidding Procedures, which Bidding Procedures and Bidding Procedures Order shall be substantially as set forth in Exhibit A and Exhibit B, respectively, and otherwise in form and substance acceptable to the Purchasers.

Section 5.12     *Resignations*. On the Closing Date, the Company or the Bank, as applicable, shall cause to be delivered to the Purchasers duly signed resignations, effective as of the Closing, of all directors of the Bank and its Subsidiaries to the extent requested by the Purchasers prior to Closing.

4829-0090-3265.v1

Section 5.13   *Sale Order*. The Sale Order shall be substantially as set forth in Exhibit C, respectively, and otherwise in form and substance acceptable to the Purchasers in their sole discretion.

Section 5.14   *Non-Solicitation*. Upon entry of the Bidding Procedures Order by the Bankruptcy Court, the Company shall not, and shall cause the Bank and its respective Subsidiaries, Affiliates, directors, officers, employees, agents, counsel, accountants, financial advisors, consultants and representatives not to, directly or indirectly, take any action, except in accordance with the provisions of the Bidding Procedures, to (a) solicit, encourage (including by providing information or assistance), initiate, facilitate or engage in discussions or negotiations with, or enter into any agreement with any Specified Person (other than the Purchasers and their Affiliates and representatives) concerning any offer, inquiry, proposal or indication of interest (whether communicated to the Company, the Bank or any of their respective Subsidiaries or publicly announced and whether binding or non-binding) by such Specified Person involving, any direct or indirect (i) acquisition or recapitalization of the Company, the Bank or any of their respective Subsidiaries, (ii) merger, consolidation or other business combination involving the Company, the Bank or any Company Subsidiary, (iii) acquisition (by purchase, lease, license, or otherwise) of any of the assets or properties or equity securities of the Company, the Bank or any of their respective Subsidiaries or (iv) similar transactions involving the Company, the Bank or any of their respective Subsidiaries (the foregoing clauses (i) through (iv), an "**Alternative Transaction**") or (b) provide any Specified Person (other than the Purchasers) with access to the books, records, operating data, contracts, documents or other information relating to the Company, the Bank or any of their respective Subsidiaries or Affiliates.

Section 5.15   *Public Announcements*. Other than mutually agreed upon press releases and other materials to be issued upon the announcement of this Agreement or thereafter, with respect to which the parties shall cooperate in good faith to jointly prepare or communicate consistent with the joint communication policy of the parties, from and after the Execution Date, neither party shall make any public announcement or public comment regarding this Agreement or the Contemplated Transactions without the prior written consent of the other party (which consent shall not be unreasonably withheld, delayed or conditioned), unless and only to the extent that (a) the furnishing or use of information is required in making any filing or obtaining any Governmental Authorization required for the consummation of the Contemplated Transactions or (b) the furnishing or use of such information is required by Legal Requirements. Notwithstanding anything to the contrary in this Agreement (including this Section 5.14), nothing herein shall prohibit the Company or its Affiliates from complying with the requirements of the Bidding Procedures Order approved by the Bankruptcy Court.

Section 5.16   *Tax Refunds and Other Proceeds*. Notwithstanding anything to the contrary in the Tax Sharing Agreement or any Assumed Bank Related Contract, any Bank Tax Refund received by the Company, before or after the Closing, shall be allocated entirely to the Bank. The Company shall hold in trust for the benefit of the Bank the amount of any Bank Tax Refund allocated to the Bank pursuant to this Section 5.16 before or after the Closing, and the Company shall remit such amounts to the Bank within seven Business Days of receipt thereof. The Company agrees that all Bank Tax Refunds are Other Purchased Assets sold to the Bank free and clear of all Encumbrances, pursuant to the terms and conditions of this Agreement. Anything in any other agreement to the contrary notwithstanding, all liabilities and obligations

between the Company or any of its Subsidiaries (other than the Bank) on the one hand and the Bank or any of its Subsidiaries on the other hand, under any Tax allocation or Tax sharing agreement (including the Tax Sharing Agreement) in effect prior to the Closing Date (other than this Agreement) shall cease and terminate as of the Closing Date as to all past, present and future taxable periods. Prior to the Closing, the Company and the Bank shall terminate the Tax Sharing Agreement; provided, that such termination shall be without any liability whatsoever to the Bank or any of its Subsidiaries or the Purchasers.

Section 5.17   *Tax Election*. On its consolidated federal income Tax Return for the taxable year in which the Closing Date occurs, the Company shall elect under Treasury Regulations Section 1.1502-36(d) to reduce its Tax basis in the Shares to the extent necessary to prevent any reduction of the Bank's attributes. All Tax Returns filed by the Company, the Bank and its Subsidiaries shall be consistent with this provision. In addition, the Company shall take any other action reasonably requested by the Purchasers to preserve the Bank's attributes.

Section 5.18   *Preparation and Filing of Tax Returns; Taxes*. The Company shall include the income of the Bank and its Subsidiaries on the Company's consolidated, unitary, affiliated or other combined federal and state income Tax Returns for all periods through the end of the Closing Date (such period, the "**Pre-Closing Tax Period**" and such Tax Returns, the "**Company Tax Returns**") and pay any federal and state income Taxes attributable to such income. The Bank shall furnish Tax information to the Company for inclusion in such Tax Returns in accordance with the Bank's past custom and practice. The income Taxes of the Bank and its Subsidiaries (i) shall be apportioned to (x) the period up to and including the Closing Date and (y) the period after the Closing Date and (ii) shall be determined on a closing of the books method of the Bank and its Subsidiaries at the end of the day on the Closing Date. The Company shall timely prepare and file (or cause to be prepared and filed) the Company Tax Returns, and shall prepare all Company Tax Returns in a manner consistent with prior practice in respect of the Bank and its Subsidiaries unless otherwise required by applicable law or unless the Purchasers consents to such different treatment. The Company shall provide (or cause to be provided) to the Purchasers a copy of any Company Tax Return at least 20 Business Days prior to the due date for filing such return, and the Purchasers shall have 10 Business Days in which to review and comment on such return prior to the filing thereof, provided, however, the Company shall in its reasonable discretion determine whether to accept such comments. The Purchasers and the Company agree to report all transactions not in the Ordinary Course of Business occurring on the Closing Date after the Closing, unless otherwise directed by the Purchasers, on the first day of the Company's separate federal and state income Tax Returns to the extent permitted by Treasury Regulations Section 1.1502-76(b)(1)(ii)(B).

Section 5.19   *Tax Cooperation*. In connection with the preparation of Tax Returns, audit examinations, and any administrative or judicial proceedings relating to the Tax liabilities imposed on or attributable to the Bank or its Subsidiaries, the Purchasers, on the one hand, and the Company, on the other hand, shall reasonably cooperate fully with each other, including the furnishing or making available during normal business hours of records, personnel (as reasonably required), books of account, powers of attorney or other materials necessary or helpful for the preparation of such Tax Returns, the conduct of audit examinations or the defense of claims by taxing authorities as to the imposition of Taxes. The Company shall provide to the

53

Purchasers copies of all information, returns, books, records and documents relating to any Tax matters of or attributable to the Bank or its Subsidiaries.

Section 5.20   *Tax Proceedings*. The Company shall promptly notify the Purchasers upon receipt by the Company of any notice of any inquiries, assessments, audits, proceedings or similar events received from any taxing authority with respect to any Taxes, Tax attributes (including net operating losses) or Bank Tax Refunds, including such items included in any consolidated, affiliated, unitary or other combined Tax Return, whether attributable to the Pre-Closing Tax Period or any period or portion of a period after the Closing Date (any such inquiry, assessment, audit, proceeding or similar event, including any such matter relating to any Bank Tax Refund, a "**Tax Matter**"). Prior to the Closing, the Company shall have the right to control the process, disposition and decision of whether to settle any Tax Matter; provided, that the Company shall consult with the Purchasers relating to all of the foregoing. In addition, the Company shall not enter into any settlement of or otherwise compromise any inquiry, assessment, audit, proceeding or similar event to the extent that such settlement or compromise could adversely affect the Tax liability (including a reduction of a Tax Refund, net operating loss or other tax attribute) of the Bank, its Subsidiaries or the Purchasers with respect to a Tax period or portion thereof occurring after the Closing Date, without the consent of the Purchasers, such consent not to be unreasonably withheld or delayed. Following the Closing, the Purchasers shall have the right to control the process, disposition and decision of whether to settle any Tax Matter in its sole discretion, provided, that, the Purchasers shall obtain the consent from the Company, which shall not be unreasonably withheld or delayed to settle any Tax Matter that would result in current or future Taxes for which the Company would be liable for under this Agreement. The Company will promptly disclose to the Purchasers all information it receives after the Execution Date or that was in its possession prior to the Execution Date but not previously disclosed to the Purchasers, in each case that is or may be material and relates to any Bank Tax Refund.

Section 5.21   *Transfer Taxes*. Notwithstanding any other provision of this Agreement, the Purchasers, on the one hand, and the Company, on the other hand, shall each be responsible for 50% of any transfer, sales, use, stamp, conveyance, value added, recording, registration, documentary, filing and other similar non-income Taxes and administrative fees (including notary fees) ("**Transfer Taxes**") arising in connection with the consummation of the Contemplated Transactions, whether levied on the Company or the Purchasers. The Purchasers shall timely prepare (or cause to be prepared) any Tax Returns with respect to Transfer Taxes arising in connection with the consummation of the Contemplated Transactions (the "**Transfer Tax Returns**"). The Purchasers shall provide (or cause to be provided) to the Company a copy of any Transfer Tax Return at least 20 days prior to the due date for filing such return, and the Company shall have 10 days in which to review and comment on such return prior to the filing thereof. The Purchasers shall take any such Company comments into consideration in good faith; provided, however, that the Purchasers shall have final determination as to the contents of any Transfer Tax Return unless the Company believes and informs the Purchasers that, upon advice of its advisors, a position taken by the Purchasers is not permitted under applicable law; and provided, further, that if the Company so believes any position reflected on a Transfer Tax Return is not permitted under applicable law, the parties shall engage an independent third party accounting firm to determine whether such position is permitted under applicable law and the determination of such accounting firm shall control the treatment of the disputed position(s) on such Transfer Tax Return. The expense of such accounting firm shall be borne 50% by the

Company and 50% by the Purchasers. The Company shall timely file all Transfer Tax Returns and shall timely pay all Transfer Taxes when due, subject to the Purchasers' obligation to reimburse the Company for 50% of such Transfer Taxes as set forth in this Section 5.21. Upon the request of the other party, each of the Company and the Purchasers agree to pay the other 50% of any additional Transfer Taxes, along with related penalties and interest, if any, if and to the extent any such party is then liable for such Transfer Taxes pursuant to an audit or other proceeding by a taxing authority in respect of any Transfer Taxes that the other party has not previously paid over to the applicable party or taxing authority. The Company and the Purchasers shall cooperate to minimize Transfer Taxes. If a certificate or document of exemption is required to reduce or eliminate the Transfer Taxes, the Purchasers will promptly furnish such certificate or document to the Company or the Purchasers will cooperate with the Company to allow the Company to obtain such reduction or exemption from Transfer Taxes.

Section 5.22    *Bankruptcy Filings.*

(a)    From and after the Execution Date, the Company shall provide the Purchasers with a copy of any papers or pleadings to be filed in the Bankruptcy Case that relate in any way to this Agreement, the Sale, the Bidding Procedures, the Contemplated Transaction or the Purchasers at least three Business Days prior to such filings.

(b)    The Company shall provide the Purchasers with prompt notice of any papers or pleadings filed by a party other than the Purchasers in the Bankruptcy Case that relate in any way to this Agreement, the Sale, the Bidding Procedures or the Purchasers.

Section 5.23    *Transfer of Business-Related Assets and Contracts.* If at any time, whether before or after the Closing, the Company or any of its officers or employees discovers or is otherwise aware of the fact that the Company or one of its Subsidiaries (other than the Bank or its Subsidiaries) (i) owns any asset (whether real, personal, tangible, intangible or otherwise) that is used or held for use in connection with, or that relates to, the Business or (ii) is a party to any Contract relating to the Business, the Company will promptly give notice of that fact to the Purchasers and, if the Purchasers so requests, the Company will promptly cause such asset to be transferred to the Bank free and clear of all Encumbrances, or the rights and obligations (but not any obligations relating to a pre-transfer breach or default) under such Contract to be assigned to the Bank free and clear of all Encumbrances, as the case may be, for no additional consideration beyond that currently provided for herein.

Section 5.24    *Plan.* The Company covenants and agrees that if the Sale Order is entered, the terms of any plan of reorganization or liquidation submitted, supported or sponsored by the Company for confirmation shall not conflict with, supersede, abrogate, nullify, modify or restrict the terms of this Agreement and the rights of the Purchasers hereunder, or in any way prevent or interfere with the consummation or performance of the transactions contemplated by this Agreement, including any transaction that is approved pursuant to the Sale Order.

Section 5.25    *Appeal.* If the Sale Order or the Bidding Procedures Order is appealed by any Person, or petition for certiorari or motion for rehearing or reconsideration is filed with respect thereto, the Company agrees to take all action as may be necessary to defend against such

55

appeal, petition or motion and to obtain an expedited resolution of such appeal, petition or motion.

Section 5.26    *Charter Documents*. The Company and the Bank shall cause the applicable Charter Documents of the Bank to be amended or brought into existence, as the case may be, effective as of the Closing, in any manner requested by the Purchasers, including to make changes to the Charter Documents to facilitate the Equity Contribution and its appropriate economic effect.

Section 5.27    *Payment of the Broker's Fees*. At the Closing, the Purchasers shall pay or shall cause the Bank to pay (as determined by the Purchasers in their sole discretion and as partial payment of the Purchase Price) to the Broker the Broker's Fees in full satisfaction of all obligations of the Bank and the Purchasers in connection with any engagement letters or other agreements of the Company, the Bank or any other Subsidiary with the Broker, and the Company will cause the Broker to deliver to the Bank and the Purchasers a pay-off letter in respect thereof in form and substance reasonably satisfactory to the Purchasers.

ARTICLE 6
CONDITIONS OF CLOSING

Section 6.1    *Conditions to Purchasers' Obligations*. The obligation of the Purchasers to complete the Contemplated Transactions is subject to the fulfillment or (to the extent permitted by law) waiver on or prior to the Closing Date of the following conditions:

(a)    *Representations and Warranties*. (i) The representations and warranties of the Company contained in Section 3.1, Section 3.2, Section 3.6(g), Section 3.12(a) and Section 3.24 (the "**Fundamental Representations**") shall be true and correct in all respects as of the Execution Date and as of the Closing Date with the same effect as though such representations and warranties had been made as of the Closing Date (except to the extent expressly made as of a particular earlier date, in which case as of such earlier date), Section 3.7 shall survive for the full period of all applicable statutes of limitations (giving effect to any waiver, mitigation or extension thereof) plus 60 days, and (ii) each of the representations and warranties of the Company contained in this Agreement (other than those representations and warranties specified in subclause (i) above) shall be true and correct in all respects (without regard to materiality or Material Adverse Effect qualifications contained therein) both as of the Execution Date, the date of this Agreement and as of the Closing Date with the same effect as though such representations and warranties had been made as of the Closing Date (except to the extent expressly made as of a particular earlier date, in which case as of such earlier date), except where the failure of such representations and warranties in this subclause (ii) to be so true and correct (without regard to materiality or Material Adverse Effect qualifications contained therein) has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect;

(b)    *Covenants*. The covenants and obligations of the Company to be performed or observed on or before the Closing Date pursuant to this Agreement shall have been duly performed or observed in all material respects;

56

(c)      *Petition Date; Sale Motion*. The Company shall have filed the Bankruptcy Case and the Sale Motion within one (1) Business Day following the Filing Date;

(d)      *Bidding Procedures Order*. The Bankruptcy Court shall have entered the Bidding Procedures Order in form and substance acceptable to the Purchasers and such order shall not have been stayed, stayed pending appeal, reversed or vacated, and (ii) shall not have been amended, supplemented or otherwise modified in any manner adverse to the Purchasers;

(e)      *Sale Order*. The Bankruptcy Court shall have entered the Sale Order, in form and substance acceptable to the Purchasers and such order (i) shall have become final and non-appealable, (ii) shall not have been stayed as of the Closing Date, stayed pending appeal, reversed or vacated, and (iii) shall not have been amended, supplemented or otherwise modified in any manner adverse to the Purchasers;

(f)      *Officer's Certificate*. The Company shall have delivered to the Purchasers a certificate signed by its chief executive officer and secretary certifying to the effect that the conditions set forth in Section 6.1(a) and (b) have been satisfied;

(g)      *Purchasers Required Approvals*. The Purchasers shall have obtained all of the Purchasers Required Approvals in form and substance reasonably acceptable to the Purchasers and without the imposition of any Burdensome Condition, each such Purchasers Required Approval shall remain in full force and effect and no such Purchasers Required Approval shall have been amended, modified, reversed or vacated and all applicable waiting periods with respect to any of the Purchasers Required Approvals shall have expired;

(h)      *Consent*. The consents set forth in Section 6.1(h) of the Disclosure Schedule shall have been obtained in form and substance acceptable to the Purchasers and shall be in effect;

(i)      *Insurance*. The Purchasers shall have received endorsements on terms satisfactory to the Purchasers with respect to any insurance policies included in the Other Purchased Assets that, among other things, confirm the assignment of such policies, and provide that the Bank and its Subsidiaries will have the right to give notice with respect to, control and receive the proceeds of, any claims under such policies relating to the Bank or its Subsidiaries;

(j)      *Release*. The Purchasers shall have received from the Company an instrument dated as of the Closing Date releasing the Purchasers and the Bank from any and all claims of the Company in form and substance satisfactory to the Bank and the Purchasers;

(k)      *[RESERVED]*.

(l)      The Purchasers shall have received each of the documents, certificates, instruments and agreements required to be delivered pursuant to Section 7.2.

The foregoing conditions are for the benefit of the Purchasers only and accordingly the Purchasers will be entitled to waive compliance with any such conditions if the Purchasers see fit to do so, without prejudice to the Purchasers' rights and remedies at law and in equity and also

without prejudice to any of the Purchasers' rights of termination or otherwise in the event of the failure to fulfill any other conditions in whole or in part.

Section 6.2 *Conditions to the Company's Obligations*. The obligation of the Company to complete the Contemplated Transactions is subject to the fulfillment or (to the extent permitted by law) waiver on or prior to the Closing Date of each of the following conditions:

(a) *Representations and Warranties*. The representations and warranties of the Purchasers contained in this Agreement shall be true and correct in all material respects on and as of the Closing Date with the same effect as though such representations and warranties had been made as of the Closing Date (except to the extent expressly made as of a particular earlier date, in which case as of such earlier date);

(b) *Performance*. The covenants and obligations of the Purchasers to be performed or observed on or before the Closing pursuant to this Agreement shall have been duly performed or observed in all material respects;

(c) *Sale Order*. The Bankruptcy Court shall have entered the Sale Order and such order shall not have been stayed as of the Closing Date, stayed pending appeal, reversed or vacated; and

(d) *Purchasers' Certificate*. The Purchasers shall have delivered to the Company a certificate signed by each of them certifying to the effect that the conditions set forth in Section 6.2(a) and (b) have been satisfied.

(e) *Release*. The Company shall have received from the Bank an instrument dated as of the Closing Date releasing the Company from any and all claims of the Bank in form and substance mutually agreeable to the Company, the Bank and the Purchasers.

The foregoing conditions are for the benefit of the Company only and accordingly the Company will be entitled to waive compliance with any such conditions if it sees fit to do so, without prejudice to its rights and remedies at law and in equity and also without prejudice to any of its rights of termination or otherwise in the event of the failure to fulfill any other conditions in whole or in part.

Section 6.3 *Mutual Condition*. The obligations of the Company and the Purchasers to complete the Contemplated Transactions is subject to the fulfillment or (to the extent permitted by law) waiver by the parties of the condition that no injunction or restraining Order or other decision, ruling or Order of a Governmental Authority or administrative tribunal of competent jurisdiction, and no applicable Legal Requirement, shall be in effect which prohibits, restrains, limits or imposes any condition on the transactions contemplated by this Agreement and no action or proceeding shall have been instituted or remain pending or have been threatened (without such threat having been withdrawn) before any such court, board, Governmental Authority or administrative tribunal seeking to restrain, prohibit, limit or impose any condition on the transactions contemplated by this Agreement.

Section 6.4 *Termination.*

58

(a)    This Agreement may be terminated by either both of the Purchasers or the Company in the event that the Closing has not occurred on or before the later of (i) the date that is 60 days after the Bankruptcy Court enters the Sale Order, or (ii) July 31, 2018 (the "**Outside Date**").

(b)    This Agreement may also be terminated prior to the Closing:

(i)    at any time by the mutual written agreement of the Company and the Purchasers;

(ii)    by both of the Purchasers if there shall have been a breach of any of the covenants or agreements or any of the representations or warranties set forth in this Agreement on the part of the Company which breach, either individually or in the aggregate with other breaches by the Company, would result in, if occurring or continuing on the Closing Date, the failure of the conditions set forth in Section 6.1(a) or (b), as the case may be, and which is not cured within 30 days following written notice to the Company thereof (and in any event prior to the Outside Date) or which by its nature or timing cannot be cured within such time period (provided, that the Purchasers is not then in material breach of any of the covenants, agreements, representations or warranties set forth in this Agreement on the part of the Purchasers);

(iii)    by the Company if there shall have been a breach of any of the covenants or agreements or any of the representations or warranties set forth in this Agreement on the part of the Purchasers which breach, either individually or in the aggregate with other breaches by the Purchasers, would result in, if occurring or continuing on the Closing Date, the failure of the conditions set forth in Section 6.2(a) or (b), as the case may be, and which is not cured within 30 days following written notice to the Purchasers thereof (and in any event prior to the Outside Date) or which by its nature or timing cannot be cured within such time period (provided, that the Company is not then in material breach of any of the covenants, agreements, representations or warranties set forth in this Agreement on the part of the Company);

(iv)    by both of the Purchasers, if the Company shall fail to file the Sale Motion within one Business Day following the Filing Date;

(v)    by either the Company or both of the Purchasers, if the Auction has occurred and the Purchasers are not the Successful Bidder;

(vi)    by both of the Purchasers to the extent that Purchasers have elected to act as a Backup Bidder (as defined in the Bidding Procedures), if the Company has failed to consummate the sale of the Shares and the Other Purchased Assets with the winning bidder by the Outside Date;

(vii)    by either the Company or both of the Purchasers, with ten days prior written notice or such shorter period as is required by a court or Governmental Authority, or any applicable Legal Requirement, if any court or Governmental Authority shall finally determine that the subject of this Agreement violates any applicable Legal

Requirement and the terms of this Agreement cannot be amended to meet all Legal Requirements to the satisfaction of such court or Governmental Authority;

(viii)   by either the Company or both of the Purchasers, if the Purchasers receive written notice from or is otherwise advised by a Governmental Authority that it will not grant (or intends to rescind or revoke if previously approved) any of the Purchasers Required Approvals or receives written notice from or is otherwise advised by such Governmental Authority that it will not grant any such Purchasers Required Approval on the terms contemplated by this Agreement without imposing a Burdensome Condition;

(ix)   by both of the Purchasers, if the Bankruptcy Case is converted to a liquidation proceeding under Chapter 7 of the Bankruptcy Code;

(x)   by both of the Purchasers, if the Company shall fail to file the Bankruptcy Case by or before the Filing Date;

(xi)   by both of the Purchasers, if the Bankruptcy Court has not entered the Bidding Procedures Order within 115 days of the Filing Date, or if the Bidding Procedures Order has been entered but is stayed, stayed pending appeal, reversed or vacated as of such date, or has been amended, supplemented or otherwise modified in any manner adverse to the Purchasers as of such date;

(xii)   by both of the Purchasers, if the Bankruptcy Court has not entered the Sale Order approving the Sale to the Purchasers within 75 days of the Bid Procedures Order, if such Sale Order has been entered but is stayed or stayed pending appeal or has been reversed or vacated as of such date, or if such Sale Order has been entered but has been amended, supplemented or otherwise modified without the prior written consent of the Purchasers on or before such date;

(xiii)   by both of the Purchasers, if the Bankruptcy Court enters any Order materially inconsistent with the Bidding Procedures Order, the Sale Order or the Sale; or

(xiv)   automatically, upon the completion of an Alternative Transaction.

(c)   In the event that this Agreement is terminated pursuant to this Section 6.4, this Agreement shall terminate and there shall be no Liability on the part of any party to this Agreement (or any stockholder, member, partner, director, manager, officer, employee, agent, consultant or representative of such party) to the other parties to this Agreement, except that (a) Section 5.2, this Article 6, Article 8 and Article 9 shall survive such termination and remain in full force and effect, (b) if this Agreement is terminated by a party because of the material breach of this Agreement by the other party or because one or more of the conditions to the terminating party's obligations under this Agreement is not satisfied as a result of the other party's material breach of its obligations under this Agreement, the terminating party's right to pursue all legal remedies shall survive such termination, (c) no such termination shall relieve any party to this Agreement of any Liability or damages resulting from any fraud, bad faith or any intentional

60

breach of this Agreement, and (d) nothing in this Section 6.4 will be deemed to interfere with the Company's rights to retain the Deposit Amount to the extent provided in Section 2.3.

ARTICLE 7
CLOSING TRANSACTIONS

Section 7.1     *Time and Place*. The Closing shall take place in the offices of Baker & Hostetler LLP, 1801 California Street, Suite 4400, Denver, CO 80202-2662 at 10 a.m. Mountain Time on the Closing Date, or at such other time and date, or both, as the Company and the Purchasers or their respective counsel may agree upon in writing.

Section 7.2     *Company's Closing Deliverables*. At the Closing, the Company shall deliver the following to the Purchasers:

(a)     stock certificates evidencing the Shares duly endorsed in blank, or accompanied by stock powers duly executed in blank and with all required stock transfer Tax stamps affixed;

(b)     all conveyances, transfers, assignments, instruments and other documents which are necessary to assign, sell and transfer the Shares to the Purchasers and the Other Purchased Assets (including the assignment of the Assumed Bank Related Contracts, if any) to the Bank or, if designated by the Purchasers, a Subsidiary of the Bank, in either case as contemplated by this Agreement in such form and content as the Purchasers may require, acting reasonably;

(c)     the Company and the Bank shall each have delivered to the Purchasers a certificate of the secretary of the Company having attached thereto (i) its certificate of incorporation or articles of association certified by the applicable Governmental Authority, dated as of a recent date before the Closing and certifying that such certificate or articles has not been amended since the date of the last amendment thereto, (ii) its bylaws, if any, as in effect at the time of the Closing and as of the date the resolutions attached to the certificate, (iii) a true and complete copy of the resolutions approved by its board of directors and stockholders authorizing the transactions contemplated hereby and certifying that such resolutions have not been modified, rescinded or amended and are in full force and effect, and (iv) an incumbency certificate certifying the names of its officer or officers of authorized to sign this Agreement and the other documents provided for in this Agreement;

(d)     a certified copy of the Sale Order;

(e)     an affidavit from the Company that it is not a "foreign person" or subject to withholding requirements under the Foreign Investment in Real Property Tax Act of 1980, as amended;

(f)     pay-off letters in form and substance reasonably satisfactory to the Purchasers from each Person that has provided goods or services that might result in an obligation to pay any Bank Transaction Expenses;

(g)     the Company shall have delivered to the Purchasers a good standing certificate for the Company dated within two Business Days before the Closing Date from its jurisdiction of organization and any other jurisdiction in which the Company is qualified to do business;

(h)     the Company shall have delivered to the Purchasers a Certificate of Corporate Existence for the Company dated within ten Business Days before the Closing Date from the OCC;

(i)     each of the current directors of the Bank shall have delivered to the board of directors of the Bank a director resignation and release in a form satisfactory to the Purchasers and the persons listed on Section 7.2(i) of the Disclosure Schedule shall have been elected or appointed to the board of directors of the Bank effective as of the Closing;

(j)     the Company and the Bank shall have terminated the Tax Sharing Agreement between Colorado National Bancorp and Colorado National Bank, dated as of October 31, 2014.

(k)     a pay-off letter in form and substance reasonably satisfactory to the Purchasers from the Broker in respect of payment of the Broker's Fees.

Section 7.3     *Purchasers' Closing Deliverables*. At the Closing, the Purchasers shall deliver the following to the Company (or, in the case of the Purchase Price, as set forth in Section 2.4):

(a)     the Purchase Price as set forth in Section 2.4; and

(b)     a letter agreement, in form and substance reasonably satisfactory to the Company, pursuant to which the Bank, on its own behalf and on behalf of its Affiliates, irrevocably and unconditionally waives, releases and discharges any and all claims, counterclaims, demands, debts, costs, expenses (including reasonable legal fees and expenses), Liabilities, damages, obligations and causes of action of any kind or nature whatsoever, in each case whether absolute or contingent, liquidated or =liquidated, known or unknown, and whether arising under any agreement or understanding or otherwise in law or in equity, against the Company and its Affiliates other than the Bank and its Subsidiaries (and their successors and its and their respective officers, directors, employees, managers, partners, shareholders, members, and principals), other than Liabilities under this Agreement.

Section 7.4     *Concurrent Delivery*. It shall be a condition of the Closing that all matters of payment and the execution and delivery of documents, in each case, at Closing by any party to the other pursuant to the terms of this Agreement shall be concurrent requirements and that nothing will be complete at the Closing until everything required as a condition precedent to the Closing has been paid, executed and delivered, as the case may be.

Section 7.5     *Transfer of Shares and Other Purchased Assets*. Subject to the terms and conditions set forth in this Agreement, and subject to the entry of a Sale Order, the Sale of the Shares to the Purchasers and the sale of the Other Purchased Assets (including the assignment of

the Assumed Bank Related Contracts, if any) to the Bank or other designee of the Purchasers shall be deemed to take effect on the Closing Date.

ARTICLE 8
MISCELLANEOUS

Section 8.1     *Expenses*. Unless otherwise specifically provided herein, the Purchasers and the Company will pay their respective legal, accounting and other professional fees and expenses incurred by each of them in connection with the negotiation and settlement of this Agreement, the completion of the Contemplated Transactions and other matters pertaining hereto (the "**Bank Transaction Expenses**"), and the Company shall be deemed to have incurred (and therefore be responsible for payment of) all like costs and expenses of the Bank or its Subsidiaries.

Section 8.2     *Notices*. Any notice, request, demand or other communication required or permitted to be given under this Agreement shall be in writing and delivered by hand, facsimile transmission, electronic mail, or prepaid registered mail (return receipt requested) to the party to which it is to be given as follows:

To the Purchasers:

Richard A. Desich and
Jeffrey A. Desich
1 Equity Way
Westlake, OH 44145

Email:

with a copy (which shall not constitute notice) to:

Baker & Hostetler LLP
Key Tower
127 Public Square Suite 2000
Cleveland, OH 44114
Attention:     Michael A. VanNiel

Facsimile No.: (216) 696-0740
Email: mvanniel@bakerlaw.com

To the Company:

Colorado National Bancorp
700 17th Street, Suite 100
Denver, Colorado 80202Attention: Scott Jackson, Chief Executive Officer
Fax: (303) 962-7399

63

Email: sjackson@coloradonational.com

with a copy (which shall not constitute notice) to:

700 17th Street, Suite 100
Denver, Colorado 80202
Attention: Nick Filla, General Counsel
Fax: (303) 962-7399
Email: nfilla@coloradonational.com

or to such other address or fax number as a party may specify by notice given in accordance with this Section 8.2. Any such notice, request, demand or other communication given as aforesaid will be deemed to have been given, in the case of delivery by hand, electronic mail, or registered mail, when delivered, or, in the case of delivery by facsimile transmission, when a legible facsimile is received by the recipient, in each case, if delivered or received before 5:00 p.m. local time on a Business Day, or on the next Business Day if delivered or received on a day which is not a Business Day or after 5:00 p.m. local time on a Business Day.

Section 8.3    *Further Assurances*. Each of the parties shall execute and deliver such further documents, instruments and agreements and do such further acts and things as may be reasonably required from time to time, either before, on or after the Closing Date, to carry out the full intent and meaning of this Agreement, give effect to the transactions contemplated by this Agreement and assure to the Purchasers good and valid title to the Shares, free and clear of all Encumbrances, and assure to the Bank or, if designated by the Purchasers, a Subsidiary of the Bank good and valid title to the Other Purchased Assets (including the assignment of the Assumed Bank Related Contracts, if any), free and clear of all Encumbrances. The Company shall seek to enforce its rights under any third party nondisclosure or confidentiality agreements, including, prior to the entry of the Bidding Procedures Order, any standstill provisions thereof.

Section 8.4    *Time of the Essence*. Time shall be of the essence of this Agreement.

Section 8.5    *Entire Agreement*. This Agreement (and all related documents referred to herein, including the schedules and exhibits hereto) constitutes the entire agreement between the Company and the Purchasers pertaining to the Contemplated Transactions and supersedes all prior agreements, undertakings, negotiations and discussions, whether oral or written, including the Original Agreement, of the Company and the Purchasers and there are no warranties, representations, covenants, obligations or agreements between the Company (or any Affiliate thereof) and the Purchasers except as set forth in this Agreement (or any such related document). In the event of any inconsistency between the statements in the body of this Agreement, the Exhibits and Disclosure Schedules (other than an exception expressly set forth as such in the Disclosure Schedules), the statements in the body of this Agreement will control.

Section 8.6    *Assignability*. Neither party to this Agreement may assign any of its respective benefits, obligations or liabilities under or in respect of this Agreement without the prior written consent of the other party, which may be withheld in its absolute discretion. Any attempted assignment without the necessary consent shall be void.

64

Section 8.7    *Severability*. Each of the provisions contained in this Agreement is distinct and severable and a determination of illegality, invalidity or enforceability of any such provision or part hereof by a court of competent jurisdiction shall not affect the validity or enforceability of any other provision hereof, unless as a result of such determination this Agreement would fail in its essential purposes.

Section 8.8    *Waiver and Amendment*. Except as expressly provided in this Agreement, no amendment or waiver of it will be binding unless made in writing by the party to be bound by such amendment or waiver. No waiver of any provision, or any portion of any provision, of this Agreement will constitute a waiver of any other part of the provision or any other provision of this Agreement, nor a continuing waiver unless otherwise expressly provided.

Section 8.9    *Benefit*. This Agreement is for the sole benefit of the parties hereto and their permitted assigns and nothing herein express or implied shall give or be construed to give to any Person, other than the parties hereto and such permitted assigns, any legal or equitable rights hereunder; provided, that the current directors and officers of the Company and the Bank included in the term "Indemnified Parties" shall be deemed to be third-party beneficiaries of the provisions of Section 5.6.

Section 8.10    *Captions*. The captions in this Agreement are inserted for convenience of reference only and shall not be considered a part of or affect the construction or interpretation of any provision of this Agreement.

Section 8.11    *Disclosure Schedule*. Any matter disclosed in any portion of the Disclosure Schedule is deemed to have been disclosed for the purposes of all relevant provisions of this Agreement to the extent that its applicability to such provision(s) is reasonably apparent on its face. The inclusion of any item in the Disclosure Schedule is not evidence of the materiality of such item for the purposes of this Agreement. Nothing in this Agreement shall require disclosure of any information and documents commonly known as "confidential supervisory information" that is prohibited from disclosure.

Section 8.12    *Counterparts*. This Agreement may be signed in counterparts and each such counterpart will constitute an original document and such counterparts, taken together, will constitute one and the same instrument. Electronically transmitted or facsimile copies shall be deemed to be originals.

Section 8.13    *Specific Performance*. The parties hereto agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the parties shall be entitled (without the requirement to post bond) to an injunction or injunctions to prevent breaches of this Agreement or to enforce specifically the performance of the terms and provisions hereof, in addition to any other remedy to which they are entitled at law or in equity.

Section 8.14    *Consent to Jurisdiction*. The parties hereto agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby shall be brought in the United States Bankruptcy Court for the District of Colorado, provided, that if the Bankruptcy

Case has been closed pursuant to Section 350 of the Bankruptcy Code, the parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the Colorado Courts and any state appellate court therefrom within the State of Colorado, and, to the extent that applicable federal subject matter jurisdiction requirement are satisfied, in the United States District Court for the District of Colorado, and any appellate court thereof, for the resolution of any such suit, action or proceeding, so long as such court shall have subject matter jurisdiction over such suit, action or proceeding, and that any cause of action arising out of this Agreement shall be deemed to have arisen from a transaction of business in the State of Colorado, and each of the parties hereby irrevocably consents to the jurisdiction of such court (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in such court or that any such suit, action or proceeding brought in such court has been brought in an inconvenient forum. Process in any such suit, action or proceeding may be served on any party anywhere in the world, whether within or without the jurisdiction of such court. To the fullest extent permitted by applicable law, each of the parties hereby consents to process being served by any party in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of Section 8.2 of this Agreement.

Section 8.15  *Waiver of Jury Trial*. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF the parties have executed this Agreement as of the day and year first above written.

COLORADO NATIONAL BANCORP

By: _____

Name: _Scott Jackson_

Title: _CEO_

By: _____

Name: _John Sprengle_

Title: _EVP_

By: _____

Name:

Title:

[Signature Page to Stock Purchase Agreement]

4829-0090-3265.v1

JEFFREY A. DESICH

By: _____

Jeffrey A. Desich

To purchase 50% of the Shares (5,000 of the 10,000 issued and outstanding Shares)

RICHARD A. DESICH

By: _____

Richard A. Desich

To purchase 50% of the Shares (5,000 of the 10,000 issued and outstanding Shares)

[Signature Page to Stock Purchase Agreement]

**<u>Schedules</u>**

Contain confidential and proprietary information and will be made available to any Potential Bidder (as that term is defined in the Bidding Procedures).